# EXHIBIT 7

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF MICHIGAN

 3                    SOUTHERN DIVISION

 4    _____

 5    JOSEPH BRUNEAU,

 6          Plaintiff,        Case No. 1:19-cv-01037-PLM-RSK

 7    v                       Hon. Paul L. Maloney

 8    AQUINAS COLLEGE,

 9          Defendant.

10    _____

11

12

13        VIDEOTAPED DEPOSITION OF:   JOSEPH BRUNEAU (VIA ZOOM)

14

15

16

17

18    DATE:      August 26, 2020

19    TIME:      9:58 a.m.

20    LOCATION:  Kane & Trap Court Reporting, Inc.

21               333 Bridge Street, Suite 215

22               Grand Rapids, Michigan

23    REPORTER:  Kelly M. Kane, RPR, CSR-1470

24

25
```

Page 16

1  checklist.
2  A.  Okay.
3  Q.  Is this page here, this application checklist, is that
4     something that looks like your handwriting or maybe somebody
5     else's?
6  A.  It's -- it's not my handwriting.
7  Q.  Okay.  All right.  It may be that the application ends here
8     with the instructions.  But you recognize this document I've
9     just shown you as your application for enrollment at
10    Aquinas?
11 A.  Yes.
12 Q.  All right.  Did you ever fill out any other application for
13    enrollment with Aquinas aside from this one?
14 A.  No, not that I recall.
15 Q.  At any time between 1987 and the present?
16 A.  You know, I might have -- I might have done the process
17    online, just so I could see, you know, what the application
18    entailed.
19 Q.  Okay.  But did you ever submit any other application for
20    enrollment aside from this one here?
21 A.  No.
22 Q.  All right.  Now, do I understand you began your time at
23    Aquinas as a freshman in September of 1987?
24 A.  That sounds right, though it may have -- may have been late
25    August.

Page 17

1  Q.  Okay.
2  A.  But that sounds about right, yeah.
3  Q.  All right.  And did you last attend Aquinas in the fall of
4     1990?
5  A.  I think so.
6  Q.  Okay.  And it's my understanding that you were expelled from
7     Aquinas College in -- in the fall of 1990; is that correct?
8  A.  Yes, I believe so.
9  Q.  All right.
10 A.  That is, I believe it was in 19 -- fall of 1990, yes.
11 Q.  Okay.  All right.  Now, Aquinas College is a private
12    college, correct?
13 A.  Yes.
14 Q.  And it is a religious college?
15 A.  It's affiliated with the Catholic Church, to the best of my
16    understanding, although it doesn't -- it allows students of
17    any faith to attend.
18 Q.  Certainly.  Okay.  Students of any faith can attend but you
19    understand that it's affiliated with the Catholic Church in
20    terms of its philosophy of teaching and all of that?
21 A.  That's my understanding, yes.
22 Q.  Okay.  I'd like to talk with you, before we get into
23    details, just a little bit about some of the basics of your
24    claims in the case.  I'm going to stop sharing this
25    application with you now so we don't have to keep looking at

Page 18

1  that.
2  A.  Okay.
3  Q.  Now, you've -- you've claimed that Aquinas has violated
4     various statutes.  One of your claims is that Aquinas
5     violated the Americans with Disabilities Act.  I would just
6     like to understand from you, as we get started here today,
7     what treatment you've experienced by Aquinas that you
8     maintain violated the Americans with Disabilities Act?
9  A.  Being expelled and not being allowed to return.
10 Q.  You said being expelled?
11 A.  Yes.  And not being allowed to return.
12 Q.  Not being allowed to return.  And when you say not being
13    allowed to return do you mean not being allowed to return as
14    a student?
15 A.  Yes.
16 Q.  Okay.  With respect to not being allowed to return, I have
17    an understanding that there was a period of time following
18    your expulsion where you sought to come back and enroll as a
19    student.  Am I right about that?
20 A.  Correct.
21 Q.  And so is part of your claim that you weren't -- that those
22    efforts were not permitted and you were not allowed to
23    return at that time immediately following your expulsion?
24 A.  Okay.  So after I was expelled Aquinas put in place a series
25    of steps that I could take in order to be reinstated as a

Page 19

1  student.  And I -- I don't remember the wording of my
2  Complaint specifically, but part of my Complaint, or at
3  least part of what I'll try to argue if this goes to trial,
4  is that Aquinas did not follow their own guidelines that
5  they had set up in order to allow me to return.
6  Q.  Okay.  And that series of steps that you say was given to
7     you, and whether it was satisfied or not, is that -- are
8     those events that happened in the 1990s shortly after you
9     were expelled?
10 A.  Yes.  Within a few years anyway, right.  But correct, in the
11    '90s.
12 Q.  Okay.  Is there any more recent event or activity than what
13    occurred in the mid-1990s that you claim constituted a
14    violation of the Americans with Disabilities Act?
15 A.  Yes.  My attempts to become a student more recently and lift
16    the -- the restriction placed on me by Aquinas that I could
17    not visit the campus.  Of course, I mean, in order to
18    hopefully become a student there again I would have -- of
19    course need to come -- come back and, you know, go through
20    that process.  And they're not allowing me to do that.  So
21    that's -- that's part of my claim too.
22 Q.  Okay.  So are we referring to events related to 2016 and
23    forward then --
24 A.  Yes.
25 Q.  -- with respect to that, that piece of it?

**Page 20**

1 A.   Right.  There was a long process after February of 2016
2      where I was trying to get Aquinas to justify their -- you
3      know, their -- their order that I not return and -- and all
4      that and sort of justify their actions in excluding me.
5      So -- so there's that whole process.
6 Q.   Okay.  Let's talk about -- you mentioned that this second
7      aspect of how you feel Aquinas violated the Americans with
8      Disabilities Act was related to your attempts to become a
9      student again more recently.  So what attempts have you made
10     to become a student at Aquinas in the time period between
11     2016 and the present?
12 A.  I made attempts to get them to rescind the order that --
13     that I couldn't visit the campus.  And then when they
14     refused to do that I -- I asked that they justify, you know,
15     the reasons behind the order.  I think in emails they
16     justified it by saying my actions in February on campus
17     were -- let's see.  They used -- they used three terms,
18     intrusive -- well, they're in the paperwork anyway.
19 Q.  Sure.
20 A.  But, you know, there's three terms they used: harassing,
21     intrusive, and there was one other.  So, you know,
22     they're -- they're pointing to these -- to these -- you
23     know, these terms, and in my opinion the -- you know, the --
24     the write-up of my behavior in that day, it didn't back up
25     those accusations.  So I was trying to get them to say,

**Page 21**

1      okay, why am I being excluded.  And they just said, you
2      know, we're done talking about it, and they wouldn't really,
3      you know, explain why they were making those judgments, just
4      that we've made the judgment and that's it.
5 Q.   Okay.
6 A.   And then I had a big problem getting the Aquinas report, you
7      know, so that -- so that I could have an idea of what might
8      be in it, of why they might be saying that my behavior was
9      such and such.  And I finally got ahold of that report
10     because I was involved in another case where I needed that
11     as evidence, so they provided me finally with a copy of that
12     report.  And in the report, since I couldn't find any
13     evidence of harassing or intimidating behavior, you know, I
14     might have asked them again to -- to rescind the order, and
15     they would not.
16 Q.   Okay.  So am I correct in understanding that -- you've made
17     reference to an order not allowing you to return to campus.
18     Are you referring there to an order that was issued in
19     February of 2016?
20 A.   Yes.
21 Q.   Okay.  And was that issued following an instance in which
22     you came to Aquinas's campus in February of 2016?
23 A.   Yes.
24 Q.   And as far as your attempts to become a student within that
25     time frame I think you've indicated to me that you made

**Page 22**

1      attempts to get Aquinas to rescind that order that was
2      issued to you, correct?
3 A.   Correct.
4 Q.   And then you made attempts to get them to justify the
5      rationale they had provided you for not rescinding the
6      order?
7 A.   Correct.
8 Q.   And that they didn't change their mind?
9 A.   Right.
10 Q.  Okay.  Were there any other efforts you've made to become a
11     student at Aquinas besides what we've discussed?
12 A.  No.
13 Q.  Okay.  You also claim that Aquinas violated the
14     Rehabilitation Act.  Are the events that you claim to
15     constitute violations of the Rehabilitation Act the same
16     acts or different acts than what we've discussed concerning
17     the ADA?
18 A.  They're the same acts.
19 Q.  Okay.  And then lastly you make a claim under Michigan's
20     Persons with Disabilities Civil Rights Act.  Are there any
21     different events that you rely upon in support of that claim
22     than the ones that we've discussed with regard to the ADA?
23 A.  No, they're the same.
24 Q.  Okay.  So, Mr. Bruneau, do you -- do you claim to have a
25     disability?

**Page 23**

1 A.   Yes.
2 Q.   And what is that disability?
3 A.   Bipolar disorder.
4 Q.   Okay.  Does bipolar disorder have any impact on your major
5      life activities?
6 A.   Yes, it does.
7 Q.   Okay.  Can you just describe that for me a little bit?
8 A.   So people normally experience a mood in terms of highs and
9      lows, whereas, you know, there will be a normal fluctuation
10     in mood; for someone with bipolar disorder those
11     fluctuations are more extreme.  So for example, some things,
12     that doesn't bother someone too much, might -- might have a
13     greater effect on someone with bipolar disorder.
14        Do you want me to go on?
15 Q.   No, only if you feel that there's more that you want to
16     explain in terms of how this condition affects your major
17     life activities.
18 A.   Okay.  Also there are time periods where, you know, I have
19     more of a problem with the disorder and it leads to, you
20     know -- you know, disordered thinking.  And, you know, it
21     can -- it can -- it can lead to a state of psychosis in me,
22     where I require hospitalization at that point.  And then I'm
23     usually treated in a mental hospital setting.  This has
24     happened quite a lot in my life.
25 Q.   Okay.

Deposition of Joseph Bruneau

Joseph Bruneau v. Aquinas College

Page 24

1  A.   At those times I am -- I have to, you know, usually cease a
2       lot of activities.  Like, you know, if I'm enrolled in
3       school I would have to drop that semester or something, or
4       of course I wouldn't be able to come to work either.
5  Q.   Okay.  All right.  Do you currently receive any treatment
6       for bipolar disorder?
7  A.   I see a psychiatrist.
8  Q.   All right.  Is that for purposes of, like, talk therapy or
9       counseling or -- or what?
10 A.   That's correct.
11 Q.   Okay.  Has your psychiatrist prescribed you any medications
12      for your condition?
13 A.   He has in the past, yes.
14 Q.   Okay.  Do I understand correctly that you've made a personal
15      choice that you don't want to take medication for your
16      condition?
17 A.   It's a personal choice.  Of course I've discussed it with my
18      doctor, and he has -- he has said in the past that under
19      similar circumstances he might make the same choice.
20 Q.   Okay.  Has he recommended medication treatments to you?
21 A.   He has, yes.
22 Q.   All right.  But you've made a personal choice that you don't
23      want to pursue those types of medication treatments?
24 A.   That's correct.
25 Q.   Correct?

Page 25

1  A.   Right.
2  Q.   Correct?  Okay.
3  A.   Yes.
4  Q.   And is your -- when you mentioned your psychiatrist, is that
5       Dr. Filipczuk?
6  A.   Yes.
7  Q.   All right.  And his name is spelled F, as in frank,
8       i-l-i-p-c-z-u-k?  Am I correct about that?
9  A.   Yes.
10 Q.   It helps the court reporter so she doesn't have to ask us
11      later.
12 A.   Okay.
13 Q.   So what medication or medications has Dr. Filipczuk
14      recommended to you to consider for treating your condition?
15 A.   The most current one is Depakote.
16 Q.   All right.  Is Depakote a medication that people take on a
17      daily basis to manage bipolar?
18 A.   Yes.
19 Q.   All right.  And what are the advantages one gets by taking a
20      medication like Depakote, if you can answer that?
21 A.   I guess it's supposed to act as a mood stabilizer.
22 Q.   Okay.
23 A.   The drug wasn't originally designed for that but I guess
24      they decided, hey, it might work for that, too, so let's try
25      it out.  And of course there's trials and whatnot.

Page 26

1  Q.   All right.  And so the idea is if you take a medication like
2       Depakote it will help keep your moods more stable so you
3       don't have those extreme highs and lows that you mentioned?
4  A.   I guess that's the thinking, yes.
5  Q.   Is there -- now, you mentioned that five or six months ago
6       you did take Depakote for a period of time.
7  A.   Yes.
8  Q.   Is that right?  How long of a time did you say you took that
9       medication?
10 A.   I think it might have been around two months.
11 Q.   All right.  Was that prescribed for you as an ongoing
12      medication but that you just simply decided that you -- you
13      didn't feel comfortable taking it, or was it only prescribed
14      for a short-term period?
15 A.   Well, I really can't answer that.  That -- you'd have to ask
16      my doctor about that.
17 Q.   Okay.  All right.
18 A.   But as I've -- as I've already said, my doctor is aware of
19      my choice not to be on a medication.
20 Q.   Okay.  Your doctor didn't tell you to stop taking Depakote?
21 A.   No, he didn't.  But he's aware that I did.
22 Q.   Sure.  I understand.
23 A.   Okay.
24 Q.   When did you first begin experiencing bipolar disorder?
25 A.   That would have been in February 1988.

Page 27

1  Q.   And when were you first diagnosed with bipolar disorder, if
2       you know?
3  A.   I think that was at least a year afterward, perhaps --
4       perhaps longer.  It was a year or two after my first
5       episode.
6  Q.   Were you diagnosed with anything else prior to being
7       diagnosed with bipolar?
8  A.   As far as a mental health diagnosis?
9  Q.   Yes.
10 A.   No, there's no diagnosis -- well, okay.  So when I first had
11      the -- the first episode, they just diagnosed it unspecified
12      psychosis.
13 Q.   All right.
14 A.   So, you know, I guess they could have speculated at the
15      time, but for the first one they didn't really -- they
16      didn't really suggest that it might have been bipolar
17      disorder.  I don't know if they were aware that it might
18      have been or not, but --
19 Q.   Okay.
20 A.   -- they just said unspecified psychosis.
21 Q.   Okay.  When you first began experiencing bipolar disorder
22      how was the condition affecting you at that time?
23 A.   Okay.  So, you know, I had elevated mood and I cycled
24      between mania and depression, and eventually it got to the
25      point where I became psychotic and was requiring

Deposition of Joseph Bruneau

Joseph Bruneau v. Aquinas College

Page 28

1   hospitalization.
2   Q.   When you say you became psychotic, can you help me
3        understand what you mean when you use the word psychotic?
4   A.   Out of touch with reality.
5   Q.   Okay.  And you said that you became psychotic and came to a
6        point where you required hospitalization?
7   A.   Yes.
8   Q.   Do you -- do you have recall of the events that precipitated
9        your hospitalization or is it -- is it the sort of thing
10       that you don't have good recall of once -- once it occurs?
11  A.   I'd say my recall, it can be affected.
12  Q.   Okay.
13  A.   But I do have a recollection of certain events and -- and
14       whatnot, yes.  So --
15  Q.   What do you remember about the first instance which you just
16       described to me, that you were cycling between mania and
17       depression and went into a psychosis that required
18       hospitalization?  What all can you remember about when and
19       where that happened and the specifics of that event?
20  A.   So I was -- I was attending college at Aquinas and living in
21       a dorm, and I just had an escalation of symptoms like not
22       being able to sleep, thoughts becoming more and more racing
23       and disorganized; and eventually you get -- you get to the
24       stage where you're -- you're experiencing delusional
25       thinking.

Page 29

1   Q.   What kind of delusional thinking were you experiencing?
2   A.   Some of them were a bit paranoid, like I'd think that people
3        were, you know, keeping track of me or watching me; some of
4        them were sort of grandiose delusions where I believed I
5        had, you know, like a special purpose or special powers or
6        something.
7   Q.   Do you remember what special purpose you thought you had?
8   A.   It's sort of -- it's -- it's not something that I really
9        carry with me, like, the entire time, so, you know, at times
10       you just -- you're just -- the delusions come and go, right?
11  Q.   Okay.
12  A.   It's not something where you're always going to hold on to
13       this particular delusion, necessarily.  But, you know,
14       when -- when I was psychotic they got -- they got pretty
15       severe.  Like at one point I believed I was, you know,
16       Christ.  It just -- there's a lot of variance to it.  But
17       again, it's not a constant thing.
18  Q.   Okay.
19  A.   It's not something where through this whole time I was
20       walking around, like, trying to heal people or something.
21  Q.   Right.
22  A.   That's not what happened.  But, you know --
23  Q.   Okay.  How did -- did you put yourself into the hospital or
24       was there some intercession by other people to have that
25       happen the first time?

Page 30

1   A.   There was intercession by --
2   Q.   Okay.
3   A.   -- campus safety, I believe.
4   Q.   Okay.
5   A.   And --
6   Q.   So --
7   A.   And I think a counselor was involved as well.
8   Q.   Okay.  Were there concerns that you might be feeling like
9        you wanted to harm yourself or anybody else at that point?
10  A.   During that first one I -- I did have those thoughts.
11  Q.   Okay.
12  A.   Self-harm, not -- not others.
13       I don't think I would have acted on them.
14  Q.   Okay.  So when you were hospitalized that first time do you
15       remember what kind of treatment, if any, you were given for
16       your condition?
17  A.   Okay.  So at first they tried to administer the drug Haldol
18       to me orally and I -- I refused, I -- I didn't want to take,
19       you know, medication at that time.  They tried to force me
20       to orally take it, but I sort of fought them on that, and so
21       they ended up giving me an injection of it.  And that was
22       the drug of treatment for that first hospitalization.  It's
23       known as haloperidol and the short name is Haldol.  It's an
24       antipsychotic medication.
25  Q.   Okay.  Had you known anything about that medication before

Page 31

1        you were hospitalized?
2   A.   No, I did not.
3   Q.   Okay.  Do you know why you objected to taking the
4        medication?
5   A.   I was philosophically against, you know -- what would you
6        call it -- drug-administered mental health treatment.
7   Q.   Is that still the case today?
8   A.   I believe the medications have their place but I -- I don't
9        believe it would be a good idea for me, or most people for
10       that matter, to constantly, you know, be taking these drugs
11       if -- if they're not necessary, that --
12  Q.   What is the place -- I'm sorry, I stopped -- I interrupted
13       you.  Go ahead.
14  A.   No, I'm -- no, it's okay.  I was -- I was pretty much
15       finished.
16  Q.   Okay.
17  A.   Yeah.
18  Q.   You mentioned that now you believe those medications have
19       their place.  How would you describe your belief of what the
20       place for those medications is?
21  A.   They can be helpful in, you know, like getting someone down
22       to a -- or back to a more normal state of mind, you know.
23       But when -- when it comes down to it they're not -- you
24       know, they're not required for someone to do that, either.
25       But they can expedite the process, I think.

Deposition of Joseph Bruneau                                    Joseph Bruneau v. Aquinas College

Page 36

1  A.  I was not.
2  Q.  No, okay.
3  A.  I mean, it -- I guess it depends on how you define
4      treatment.  I wasn't taking any -- any drugs at that time.
5  Q.  Okay.
6  A.  I'm sure that everyone who's there is under a doctor's care,
7      right?
8  Q.  Okay.  But no medications?
9  A.  Correct.
10 Q.  Okay.  Any other times besides that instance where you've
11     experienced a psychosis that didn't result in you being
12     hospitalized for treatment?
13 A.  I don't think so.
14 Q.  Okay.  I understand from your interrogatory responses that
15     you've had, at least at the time of your interrogatory
16     responses, 28 instances since 1990 in which you were
17     hospitalized for psychosis?
18 A.  I'm sorry, are you asking if they were all since 1990?
19 Q.  Yes.  I think that was the way I asked the question in the
20     interrogatories --
21 A.  Okay.
22 Q.  -- and the way you responded.
23 A.  I assume I answered you correctly.
24 Q.  What's that?
25 A.  I -- I'm assuming I answered the interrogatory correctly.

Page 37

1  Q.  Okay.  So since you answered the interrogatories have you
2      had any experiences with psychosis since then?
3  A.  Let's see.  Since answering the interrogatory?  You mean in
4      the last few months?
5  Q.  Yes.
6  A.  No.
7  Q.  Okay.  And based on what we just talked about in terms of
8      you experiencing psychosis without being hospitalized, you
9      think that only happened one time, which was in 2016?
10 A.  Yeah, that's -- that's what I'm -- what I'm thinking, yes.
11 Q.  Okay.  So that would suggest that you've experienced
12     29 episodes of psychosis since 1990?
13 A.  So are you asking me, like, if I didn't include the
14     episode in 2016 because I wasn't hospitalized?
15 Q.  Right, yes.  Because I think I had asked you how many times
16     have you been hospitalized and you said 28 times and here
17     they are.
18 A.  Okay.  And then did I -- did I -- like did I give a list of,
19     like, where I was hospitalized or --
20 Q.  You did, yes.
21 A.  Okay.
22 Q.  And the years.  And so this incidence in 2016 --
23 A.  Right.
24 Q.  -- you weren't hospitalized so of course you didn't include
25     that in your answer, right?

Page 38

1  A.  Okay, okay.
2  Q.  Yes.  So I'm just trying to get at an overall number.  It
3      sounds like you identify 29 times in your life where you've
4      experienced psychosis --
5  A.  Okay.
6  Q.  -- since 1990 as a result of your condition.
7  A.  That sounds right then, yes.
8  Q.  Okay.  So in looking at your interrogatory responses on that
9      issue, it looks like there were certain years in which you
10     didn't experience any psychotic episodes, and I'd like to
11     just talk with you a little bit about those.
12 A.  Okay.
13 Q.  At least that you didn't report.  You, based on your list --
14     and if you have the interrogatory responses you're welcome
15     to look at those with me or I can show them to you.  I'm not
16     sure if we'll need them or not.  But based on your list it
17     looked to me like you did not report experiencing a
18     psychosis in 1995.  Where were you living in 1995, do you
19     remember?
20 A.  I think I was living in Grand Rapids then.
21 Q.  Okay.  And I -- you may find that you're not able to answer
22     these questions, and if you can't then we can go through it
23     a different way if we need to.  But do you remember, were
24     you taking any medications for your condition at that time?
25 A.  I'm sorry, I don't have a recollection of that.

Page 39

1  Q.  You don't remember either way?
2  A.  No.
3  Q.  Do you remember if you were working in 1995?
4  A.  I was probably working part time and going to school or
5      going to school part time and not working.  It was probably
6      one of the two.
7  Q.  Okay.
8  A.  Or -- or maybe I was working part time or full time and not
9      attending school.  It's hard for me to say exactly.  But I
10     think I included employment information that should cover
11     that too.
12 Q.  Yes.  And maybe I'll just match it up that way rather than
13     trying to ask you that on the spot.
14 A.  Yeah, I'd have to refer to that stuff anyway, and
15     unfortunately a lot of that's on my computer.
16 Q.  Okay.
17 A.  It's difficult to look that up while I'm -- until I'm
18     finished with you here.
19 Q.  Okay.  Let's -- let's just talk a little bit -- let's move
20     back into your time at Aquinas and talk about that in a
21     little more detail, the time that you were enrolled as a
22     student.  Okay?
23 A.  Okay.
24 Q.  So you were first enrolled in Aquinas in the
25     August-September time frame of 1987?

Page 40

1  A.  Yeah.
2  Q.  Where did you live that first semester?
3  A.  At St. Joseph Hall, the dorm.
4  Q.  Okay.  Did you have a roommate?
5  A.  I did.
6  Q.  What was your roommate's name?
7  A.  Matt Stork.
8  Q.  And were you enrolled at Aquinas on a full-time or a
9      part-time basis that first semester?
10 A.  Full time.
11 Q.  All right.
12 A.  However, that first semester I was also taking courses at
13     Kendall College of Art and Design.  Aquinas and Kendall had
14     an affiliated program.
15 Q.  Okay.  When you say then that you were full time do you mean
16     the combination of those two was full time or you were full
17     time at Aquinas plus more at Kendall?
18 A.  Well, definitely the combination was full time.  I think I
19     was taking three three-credit courses at Aquinas, which
20     would technically mean I was under the minimum full-time
21     course load at Aquinas by itself.
22 Q.  Okay.  All right.  We talked a little bit about this, but
23     you mentioned that you --
24 A.  It was not --
25 Q.  I'm sorry?

Page 41

1  A.  I'm sorry, it was -- I was only taking nine credit hours at
2      Aquinas, so that would be technically below full time at
3      Aquinas, but in combination with the coursework at Kendall I
4      was a full-time student.
5  Q.  Okay.  So you were taking nine credit hours at Aquinas plus
6      three credit hours at Kendall for a total of twelve credits
7      that first term?
8  A.  No, it was six credits with Kendall so a total of 15.
9  Q.  Six, okay.  Fifteen credits first term.  All right.  And
10     that was pursuant to a joint program that was operating
11     between those two schools at that time?
12 A.  Yes.
13 Q.  All right.  So as -- you said Matt's last name was Stort?
14 A.  Stork, like the bird.
15 Q.  Stork, okay.  Was Matt your roommate the entire year?
16 A.  Well, he was going to be and then I ended up taking the rest
17     of the year off after February.
18 Q.  Okay.  So February of --
19 A.  19 --
20 Q.  -- 1988 is the first time you experienced a psychotic
21     episode or experienced -- starting having trouble with
22     bipolar?
23 A.  Correct.
24 Q.  Okay.  And at that time it wasn't diagnosed as bipolar but
25     it's the condition you've continued to experience and have

Page 42

1  since been diagnosed as bipolar?
2  A.  Yes.
3  Q.  All right.  Did Matt Stork have any involvement in helping
4      get someone to respond to your situation?  Was he aware of
5      the problems you were experiencing, do you know?
6  A.  He was.  I'm not sure if he was the one who instigated a
7      response from, you know, a counselor at Aquinas; I know that
8      a counselor ended up talking to Matt and some of my other
9      friends there.
10 Q.  Did you interface with any Aquinas personnel in relation to
11     that episode you were experiencing?
12 A.  Yes, I did.
13 Q.  Tell me what you remember about that.
14 A.  I was taking a psychology course and I sort of had -- I
15     don't know if you'd call them unofficial counseling sessions
16     with -- with that gentleman, and then as my symptoms got
17     worse eventually they put me in touch with a -- with a
18     counselor.
19 Q.  You -- your voice got quiet on me there.
20 A.  Sorry.
21 Q.  You said that you were taking a psychology course; you had
22     some unofficial counseling sessions with that professor of
23     that course?
24 A.  Yes.
25 Q.  Who was that professor?

Page 43

1  A.  Burt Ozarow.
2  Q.  Okay.
3  A.  I think it's O-z-a-r-o, if I'm not mistaken.
4  Q.  All right.  And then did you say that as the situation got
5      worse you went to see a different counselor?
6  A.  Yes, the -- you know, the -- the traditional counselor who's
7      there for students experiencing difficulties, you know, at
8      college.
9  Q.  How did you come to see that different counselor?  Was that
10     something you decided to do or did Mr. Ozarow suggest it, or
11     what?
12 A.  He might have.  I was -- I was certainly seeking help at the
13     time, so it -- it may have been my decision.
14 Q.  Okay.
15 A.  It really wasn't something that I was against, certainly.
16 Q.  Okay.  So then you began seeing a regular counselor who's
17     designated to counsel -- to provide counseling to students?
18 A.  That's right.
19 Q.  Do you remember who that individual was?
20 A.  His name was Bert Montiegel.
21 Q.  All right.
22 A.  And I think his last name is M-o-n-t-e-i-g-e-l.  That's my
23     best guess.
24 Q.  Okay.  And what happened -- how many times did you see
25     Mr. Montiegel approximately, if you know?

Page 44

1  A.  Probably three or four times.
2  Q.  And what happened next in terms of the escalation of your
3       condition and interactions with Aquinas?
4  A.  I'd gone a few days without sleep, and at one point I, you
5       know, I left the dorm.  I think I was -- I tried to get help
6       so I went to the campus safety office, which I think at that
7       time was located in Hruby Hall, which is across the campus
8       from my dorm.
9  Q.  Okay.
10 A.  And -- and I sought help there.
11 Q.  Do you remember who you talked to?
12 A.  No.  It -- it was someone from campus safety, I think, or a
13      few people from campus safety.
14 Q.  All right.
15 A.  And I think they ended up calling the police, and the police
16      escorted me from there to St. Mary's Hospital.
17 Q.  Okay.  Were you then hospitalized once you got to St. Mary's
18      Hospital?
19 A.  At St. Mary's I talked to a -- a social worker there and he
20      decided that probably my best -- my best course of treatment
21      would be to go to the Coldwater Regional mental healthcare
22      facility, and that's in Coldwater, Michigan.  And that's
23      where I was treated.
24 Q.  Okay.  Did you -- did you have discussions with any Aquinas
25      personnel about feeling suicidal in that incident?

Page 45

1  A.  I did with Bert Montiegel, I believe, and maybe with
2       Burt Ozarow as well.
3  Q.  I think you said that this was an instance where you were
4       feeling that -- you don't ultimately think you would have
5       acted upon it but those were feelings you were having?
6  A.  Correct.
7  Q.  Okay.  Did you identify any triggers for this psychotic
8       episode happening?
9  A.  No, that was my -- my first one.  I had -- I had no
10      awareness that -- that I was potentially going to have a
11      problem in that --
12 Q.  Okay.  Even looking backward at this point now, is there
13      anything that you point to that you were experiencing in
14      your life at that time that you think caused that psychotic
15      episode to occur, or do you think it's just something that
16      happens?
17 A.  Well, you know, it was a high-stress situation, you know, as
18      far as -- like was there anything that a person attending
19      college would consider abnormal?  No, there wasn't really
20      anything abnormal going on.
21 Q.  Okay.
22 A.  It was -- it was a normal living situation for a college
23      student, which can be stressful.
24 Q.  Okay.  So when you went to Coldwater Regional, Coldwater --
25      is it Coldwater Regional center?  Is that what it's called?

Page 46

1  A.  Yeah, I think the full name was Coldwater Regional mental
2       healthcare facility.
3  Q.  Okay.  And so you were hospitalized there for a period of
4       time, and I think you indicated in your interrogatory
5       responses that was from February 12, 1988, through April 22,
6       1988.  Does that sound about right?
7  A.  Yes.
8  Q.  Okay.  Did you then go treat at an outplacement facility
9       after that in Hillsdale?
10 A.  Yes.
11 Q.  Okay.  Can you describe for me what that involved?
12 A.  I was under a psychiatrist's care there and I believe he was
13      prescribing antipsychotic medication, Haldol, at that time,
14      and I was also seeing a psychologist counselor at the time
15      and -- through that same facility.
16 Q.  Okay.  Where were you living at that time?
17 A.  I was living in Hillsdale, Michigan.
18 Q.  Were you living at your -- your childhood home or someplace
19      else?
20 A.  Correct, my childhood home.
21 Q.  Okay.
22 A.  Actually my -- my parents are divorced.  So I think the last
23      few years of high school I spent living with my father, but
24      when I came back to Hillsdale I was living with my mother.
25 Q.  Okay.

Page 47

1  A.  To be --
2  Q.  All right.
3  A.  -- complete and technical, yeah.
4  Q.  Okay.
5  A.  One of my childhood homes, yes.
6  Q.  Okay.  So you had enrolled in school for the spring semester
7       in 1988, starting in January, but then in February you had
8       to leave school because of this incident; is that correct?
9  A.  Correct.
10 Q.  All right.  And then do I understand you requested to return
11      in the fall of -- the fall of 1988 and to again live in the
12      residence hall?
13 A.  Yes.
14 Q.  All right.  And that was permitted?
15 A.  Yes.
16 Q.  Okay.  Do I understand correctly that the college also
17      allowed you to withdraw from the classes that you had begun
18      that previous spring semester rather than receiving
19      incomplete or failing grades in those classes?
20 A.  Yes, I believe so.
21 Q.  Okay.  So you came back to Aquinas for the fall semester of
22      1988?
23 A.  Yes.
24 Q.  Where did you live, do you remember?
25 A.  I think I lived in the same residence hall, in a different

Page 48

1   room, and I think I had -- I might have had -- I might have
2   had a different roommate or perhaps they put me in a -- into
3   a single room.
4   Q.   Okay.  Now, in the spring semester of 1989, which began in
5        January of 1989, do I understand that you again began that
6        semester but then had to withdraw from classes again that
7        following year?
8   A.   It sounds right.  I don't have it in front of me but I'm
9        relying on my response that I guess you have in front of
10       you.
11  Q.   Okay.  So in terms of credits, I don't know where -- exactly
12       where you were at, where you were, but in your second year
13       at Aquinas, that second February that you were at Aquinas,
14       do you have any independent recollection of what happened
15       that caused you to become hospitalized that time?
16  A.   I -- I do have some recollection.  I was -- I was involved
17       with a girl, I was having, you know, the same amount of
18       stress as a -- as a regular student, and so again the -- the
19       disorder, you know, realized itself and I ended up having
20       another psychotic episode.
21  Q.   Okay.  Was anyone at Aquinas involved in addressing with you
22       the psychotic episode that you experienced at that time?
23  A.   I don't think so.
24  Q.   All right.  Do you remember how it was that you came to be
25       hospitalized in -- in that instance, in your second year of

Page 49

1   college?
2   A.   I don't have an exact recollection but I'm assuming it was
3        the same type of thing that happened the first time, though
4        I think the second time it -- it was a quicker -- it was a
5        quicker manifestation.  So, you know, there wasn't a lot of
6        time to, like, seek counseling and this sort of thing.
7   Q.   Do you remember -- I mean, do you remember who, if anyone,
8        was involved in helping you get to a medical treatment
9        provider in that instance?
10  A.   Okay, I do remember.  I think for that second one I was
11       seeing a doctor named Jeffrey Herman, and that was through a
12       facility called Psychiatric Consultation Services.  And I
13       believe he helped me get into, again, the same hospital,
14       Coldwater Regional.
15  Q.   Okay.
16  A.   But you know what?  Come to think of it, I'm not -- I'm not
17       sure if I was seeing him at that time or if I was only
18       seeing him, you know, as a result of my third
19       hospitalization.  It's kind of unclear.
20  Q.   Okay.  Let me just --
21           COURT REPORTER:  It's kind of -- I'm sorry.  It's
22       kind of -- did you say it's kind of unclear?
23           THE WITNESS:  Right, because it's been so long ago
24       I'm not -- I know I was seeing Dr. Herman at some point but
25       I don't remember if it was during the second psychosis that

Page 50

1   I was under his care or during the third one.
2           COURT REPORTER:  Thank you.
3   A.   But that's probably going to be something you can find out
4        once you get the -- the medical records from -- I guess now
5        St. Mary's, right?
6   BY MS. SETTERINGTON:
7   Q.   Okay, yes.
8           So after your first instance where you went to
9        Coldwater Regional did -- when you were hospitalized there
10       did they have you on medication while you were there?
11  A.   I'm sorry, were you asking about the first one?
12  Q.   The first one, yes.
13  A.   Yes, I was on Haldol during the first one.
14  Q.   Okay.  Did you at any point -- around the summer of that
15       time period do you remember taking yourself off that
16       medication?
17  A.   Yes, during that summer I eventually did, yes.  I -- I
18       believe I did.
19  Q.   Okay.  Can you tell me the circumstances you recall that
20       caused you to do that?
21  A.   Yeah, I was -- so that's -- that's a pretty harsh
22       medication, Haldol.
23  Q.   Okay.
24  A.   And the side effects are not good.  It's not nice to be on
25       it at all.  It made me very uncomfortable.  And there was

Page 51

1   one period where I -- I got up maybe from -- from laying
2        down and ended up fainting.  And that I attribute to the
3        medication.  Eventually I just decided that I didn't -- I
4        didn't want to be on it and -- you know.
5   Q.   Okay.
6   A.   I guess -- I guess I was hoping that the, you know,
7        psychosis wouldn't return.
8           And, you know, some don't.  Sometimes a person
9        experiences one psychosis as a young person and they never
10       return.  But at that time I didn't know that I had bipolar
11       disorder so I was kind of walking blindly in the dark at
12       that time, you know.
13  Q.   Okay.  So you made the decision to take yourself off that
14       medication based on those side effects that you were
15       experiencing; is that correct?
16  A.   Correct.
17  Q.   All right.  A healthcare provider didn't tell you to go off
18       the medication?
19  A.   No.
20  Q.   Okay.
21  A.   Not -- not that I recall.  I don't think so.
22  Q.   Okay.  And let's see here.  Now, going back to that 1989
23       situation, which is in your second year at Aquinas, you were
24       trying to recall if there was anyone who assisted you in
25       getting to a hospital or getting hospitalized when you

Page 56

1   A.   I think March.
2   Q.   Okay.  And you don't have a recollection of interacting with
3        Aquinas personnel about your situation in that instance; is
4        that correct?
5   A.   That's correct.
6   Q.   Okay.  You think maybe your mom might have come to get you
7        and -- and she took you to Coldwater?
8   A.   I think so.
9   Q.   Okay.  And let's see here.  And your recollection is then
10       that you came back and took a couple eight-week classes in
11       the spring of that year?
12  A.   Correct.
13  Q.   Okay.  Now --
14  A.   Or -- or attempted to.  I'm not sure if I finished them or
15       not.
16  Q.   Okay.  Let's -- I'm going to show you another document
17       again.  It might be helpful to us.
18  A.   Okay.
19  Q.   Give me one second here.  This isn't the one I want to show
20       you.  Just a second here.
21            Okay.  So I'm going to flip this on its side so
22       maybe we can see it a little bit better.  But I'm showing
23       you a document which appears to me to be a transcript for
24       you.
25  A.   Okay.

Page 57

1   Q.   Will you take a look at that and tell me if you recognize
2        that document as being a transcript for you?
3   A.   Yes.
4   Q.   Okay.  So if you look over up in the left-hand corner it's
5        got some classes listed for fall of 1987.
6   A.   Uh-huh.
7   Q.   And it's got classes from Aquinas and from Kendall, I see.
8   A.   Right.
9   Q.   And then if you go over to the right -- let's see here.
10       Okay.  I guess it doesn't show any classes for you for
11       winter of 1990 -- or spring of 1998 [sic].  Is it your
12       understanding that you were just allowed to withdraw for
13       that entire term?
14  A.   Yes.
15  Q.   All right.  So that was something the college permitted you
16       to --
17  A.   It shows them, fall -- wait a minute.  Fall semester, '88.
18  Q.   So that's the next -- the next fall.  The winter '88 --
19  A.   Okay.
20  Q.   Spring of '88 it looks like there's nothing recorded for
21       you.
22  A.   Right, because I -- I took that entire semester off.
23  Q.   Gotcha.  Okay.
24  A.   I mean, I started the semester, but yeah, they -- they ended
25       up -- I think they withdrew me from the courses I had

Page 58

1        started.
2   Q.   Okay.  And then in the fall of 1998 you're coming back for
3        your second year and you've got a full semester's worth of
4        courses listed there.
5   A.   '88, yes.
6            COURT REPORTER:  I'm sorry?
7   BY MS. SETTERINGTON:
8   Q.   And then --
9            COURT REPORTER:  I'm sorry.  Your answer again?
10  A.   I was saying '88.  I think you might have misspoke and said
11       '98.
12  BY MS. SETTERINGTON:
13  Q.   Oh, thank you.
14  A.   But it was -- it was --
15  Q.   Thank you for catching me on that, 1988.
16  A.   Sorry to be such a stickler.
17  Q.   No, I appreciate that.  That's actually helpful for the
18       record.
19  A.   Okay.
20  Q.   And then I see here classes for the spring semester of 1989.
21       I think when Aquinas refers to the spring semester
22       they mean the semester that starts in January but ends in
23       April.  Is that your understanding though, or am I incorrect
24       about that?
25  A.   I believe you're incorrect.  I think the spring semester

Page 59

1        refers to what you'd think of as the first half of the
2        summer.
3   Q.   Okay.
4   A.   And winter is the second semester of a school year.
5   Q.   Okay.
6   A.   Which is -- which is going to be going from, you know,
7        January until perhaps April.
8   Q.   Okay.  So then in your second year at Aquinas, looking at
9        this transcript it suggests that when you left due to your
10       second psychotic episode you didn't come back and finish out
11       any classes for that semester that started in January; is
12       that correct?
13  A.   I think I enrolled in a couple of those eight-week courses,
14       but perhaps I wasn't able to finish them and withdrew from
15       those as well.
16  Q.   Okay.  Well, then you have a couple classes on your
17       transcript that are noted for the spring semester?
18  A.   When --
19  Q.   There are two classes there.  There's Intro to Fiction and
20       Social Psychology.  Are those different than the eight-week
21       courses that you're talking about or are those the
22       eight-week courses?
23  A.   I'm trying to remember.  I -- I know the Intro to Fiction --
24       yeah, that's -- no, those weren't the eight-week courses.
25       One of the -- one of the eight-week courses I was in was

Deposition of Joseph Bruneau                                    Joseph Bruneau v. Aquinas College

Page 60

1 Statistics. I had trouble with that. And I think I was in
2 another one as well but -- I guess if it's a withdraw they
3 don't put it on the transcript.
4       I really think that these two are from the summer,
5 but that's kind of my best guess.
6 Q.   Well, if we continue back up and over onto the other side of
7 the page there's a summer session, 19 --
8 A.   Okay, okay, okay, I'm sorry. I was confusing the Intro to
9 Fiction with the Fiction Writing Workshop.
10 Q.   Okay.
11 A.   So the Fiction Writing Workshop, that was definitely a
12 summer class.
13 Q.   Okay.
14 A.   So you're right, the spring semester 1989, that must be --
15 you are correct, I'm sorry. That must be the -- the
16 winter -- what you'd think of as the winter semester,
17 probably ending in April sometime.
18 Q.   Okay. All right.
19 A.   So that -- those might have been eight-week courses. I
20 really am not sure. I think I was trying to take Statistics
21 then too but I -- I had to withdraw from that and they
22 allowed me to withdraw from that.
23 Q.   When you say that you took Statistics, do you mean you were
24 taking Statistics in that term that started in January,
25 where you had to leave?

Page 61

1 A.   Well, no, I -- I think I was trying to take it as an
2 eight-week course, which begins after the spring break.
3 Q.   Okay. I'm going to stop sharing for just a minute and I'm
4 going to find a different document that might help us as
5 well.
6 A.   Okay.
7 Q.   Okay. I'm going to share my screen with you again.
8 A.   Okay.
9 Q.   Okay. We are both now looking at a document that is
10 entitled a Final Grade Report, and on the right-hand side
11 there's a little box in the middle that says date of report,
12 5/16 of 1989. So --
13 A.   Okay.
14 Q.   -- this looks to me like a grade report that would come out
15 for the semester that started in January. And this is a
16 grade report for you, and it identifies classes of
17 Introduction to Fiction, Social Psychology, Minds and
18 Machines, Statistics, and Introduction to Sociology.
19       Does this refresh your memory a little bit about
20 what classes you were taking that term that began in
21 January?
22 A.   Yes, it does. Okay. I think -- all right. Now I know
23 about the Statistics issue. That was a class I had started
24 as a 16-week course.
25 Q.   Okay.

Page 62

1 A.   But then I had the -- you know, the disorder before spring
2 break and I think reenrolled in that as an eight-week course
3 after returning.
4 Q.   Okay.
5 A.   Along with perhaps a few others; I'm not sure.
6 Q.   Okay.
7 A.   Perhaps one other anyway.
8 Q.   So it looks like -- this is a little bit hard to read here.
9 A.   Uh-huh.
10 Q.   It looks like there's an incomplete listed at this time in
11 Introduction to Fiction. Do you see that?
12 A.   Yes.
13 Q.   Okay. And then in Social Psychology it looks like there's a
14 grade of maybe a C minus?
15 A.   Yes.
16 Q.   And then the Minds and Machines is very difficult to see.
17 Let me see if -- if we zoom in if that helps us at all.
18       That appears to me to also be indicating an
19 I. Does that look to be the case to you as well?
20 A.   That's what it looks like to me.
21 Q.   Okay. And then in Statistics there's a no credit?
22 A.   Yes.
23 Q.   And then there's Introduction to Sociology which appears to
24 be a C?
25 A.   Yes.

Page 63

1 Q.   Okay. So did you make a request to have certain of these
2 grades treated differently as a result of you going back
3 into the hospital, if you recall?
4 A.   Yeah, I believe the -- Paul Nelson, who may have been the
5 dean for students at that time, we came to the agreement
6 that I think the Statistics would be -- the no credit would
7 be replaced with a withdraw and that -- that the withdraw --
8 the difference would be that it wouldn't affect my grade
9 point average. That's my recollection.
10 Q.   Okay.
11 A.   And that -- and that is because of the disorder, because of
12 the illness, right.
13 Q.   Okay. And let me see. I think I've got another document
14 here that might help us, so hold on one moment. All right,
15 bear with me for just a moment.
16       Can you still see me?
17 A.   As a thumbnail, yes.
18 Q.   Interesting. Here we go. Sorry about this. One more
19 moment here.
20       Okay, Mr. Bruneau. I'm going to -- I've got this
21 zoomed out here, so let me try to zoom it back in a little
22 bit --
23 A.   Okay.
24 Q.   -- so that you can see the whole thing.
25       So this is a document that appears to be a letter

Deposition of Joseph Bruneau                                    Joseph Bruneau v. Aquinas College

Page 64

1  from you to the registrar and it's dated October 10 of 1989.
2  A.  Okay.
3  Q.  Does this appear to you to be the means by which you made
4     your request to change that grade in Statistics from the
5     previous term that started in January of 1989?
6  A.  Yes.
7         It looks like --
8  Q.  Okay.
9  A.  -- I also requested to -- to drop the Minds and Machines
10     course.
11  Q.  Okay.  And so -- okay.  And so just kind of going back to
12     the chronology here, so you had that term that started in
13     January of 1989, you had the incident that happened right
14     before spring break and you were required to withdraw, and
15     that affected these classes that we're talking about here.
16  A.  Uh-huh.
17  Q.  And then you -- you attempted to take a class in the summer
18     as well; is that correct?  A fiction workshop or something
19     like that?
20  A.  Yes.  I think I -- I completed that course.
21  Q.  Okay.  And then you came back in the fall, and in October of
22     1989 you asked that these grades in Statistics and Minds and
23     Machines be changed and dropped from your record?
24  A.  Yes.
25  Q.  Okay.  And that request was granted; is that correct?

Page 65

1  A.  That's my recollection.
2  Q.  Okay.  And I think -- let me see here.  If we go back to the
3     final transcript for you and we look at that semester, it
4     looks like both of those classes that you requested to have
5     changed to withdrawals were in fact changed to withdrawals
6     because they don't show up on your transcript anymore; is
7     that correct?  And I'm referring to the spring semester of
8     1989 --
9  A.  Okay.
10  Q.  -- which doesn't show the Minds in Motion or Statistics any
11     longer, correct?
12  A.  Right.
13  Q.  Okay.  And up here on the right-hand side, this is the
14     Fiction Writing Workshop that you took during the summer of
15     1989 and it looks like you got a grade of a D in that one;
16     is that correct?
17  A.  Unfortunate to admit, but yes.
18  Q.  Yes.  And then -- but then we come back in the fall of 1989
19     and on October 10th of that semester you asked that those
20     two classes from back over in the spring semester of 1989 be
21     taken off, and that request was granted, correct?
22  A.  Sounds right.
23  Q.  Okay.  And then for that spring semester, even with those
24     two classes taken off of your transcript for that semester
25     it looks like for that term your grade point was a 1.233; is

Page 66

1  that correct?
2  A.  I guess -- I guess that's correct, yes.
3  Q.  Okay.  Okay.  Now, did you understand, Mr. Bruneau, that
4     ordinarily when a student -- under normal circumstances when
5     a student wants to request to withdraw from a class they can
6     only withdraw without academic penalty if they request that
7     withdrawal prior to the middle of the -- middle of the
8     academic term?  Did you understand that to be the general
9     rule?
10  A.  No.
11  Q.  Okay.  Do you have any reason to dispute that that's the
12     general rule?
13  A.  It's the first I'm hearing of it; no, I don't have any
14     reason to dispute it.
15  Q.  Okay.  In your case, though, you were allowed to make that
16     request a long time later and it was still granted for you,
17     right?
18  A.  Yes.  And I believe that was the suggestion of the dean at
19     the time.
20  Q.  Okay.  Kind of on a similar note, in the fall semester of
21     1988 you had taken a class that was Critical Thinking.
22     Let's see if it shows up here.  Fall, Marketing -- Intro to
23     Philosophical Thinking I think is the class.
24  A.  Okay.
25  Q.  And your final transcript shows you got a B minus in that

Page 67

1  class.
2  A.  Okay.
3  Q.  Do you remember originally having an incomplete in that
4     class for the fall?
5  A.  Yes, I do.
6  Q.  What were the circumstances of that?
7  A.  So, yeah, I -- I think I either asked the professor for --
8     for him to grant me an incomplete so I could finish work at
9     a later time to complete that course.
10  Q.  Okay.
11  A.  That's -- that's my best guess as to what happened.  And I
12     think -- I think I remember completing a final assignment
13     for that course, turning it in and then getting a final
14     grade of B minus.
15  Q.  Okay.  Was your -- was your incomplete in that class, was
16     that a function of your bipolar condition or just a --
17     another type of situation where you needed more time to get
18     the work done?
19  A.  You know, I really don't recall.
20  Q.  Okay.  And here, I'm going to stop sharing really quick
21     here.
22         All right.  I'm going to do this the old-fashioned
23     way really quick.  Okay.  I'm going to share my screen with
24     you one more time here.
25  A.  Okay.

Deposition of Joseph Bruneau                                   Joseph Bruneau v. Aquinas College

Page 72

1  Q.  No, it's not --
2  A.  -- find it?
3  Q.  I mean, only if you -- if you disagree.  It's -- it's -- I'm
4     just trying to be able to put together the chronology.
5  A.  Okay.
6  Q.  I can show you a document if that would be helpful.
7  A.  I might have it.
8          VIDEOGRAPHER:  Ms. Setterington?
9          MS. SETTERINGTON:  Yes.
10         VIDEOGRAPHER:  Can we take a quick break to change
11    the disc?
12         MS. SETTERINGTON:  Of course.  How long would you
13    like to take?
14         VIDEOGRAPHER:  Just five minutes.
15         MS. SETTERINGTON:  Okay.  So we will go off the
16    record?
17         VIDEOGRAPHER:  Yes.
18         MS. SETTERINGTON:  Kelly, do you want us to exit
19    the room or just mute ourselves or what?
20         (Brief discussion held.)
21         VIDEOGRAPHER:  This concludes disc one of Joseph
22    Bruneau.  We're off the record at 11:57.
23         (Recess taken from 11:57 a.m. to 12:05 p.m.)
24         VIDEOGRAPHER:  This is the beginning of tape two
25    in the deposition of Joseph Bruneau.  We're back on the

Page 73

1     record at 12:05.
2          MS. SETTERINGTON:  Thank you.
3  BY MS. SETTERINGTON:
4  Q.  Mr. Bruneau, before the break we were just talking a little
5     bit about you being put on academic probation in the course
6     of your time at Aquinas, and we were trying to figure out
7     the date of that.  I'm going to -- let's see here.  I'm
8     going to share my screen with you again --
9  A.  Okay.
10 Q.  -- just to help us identify that timing.
11         I'm looking at a letter here.  Do you see this
12    letter dated June 6 of 1989?
13 A.  Yes.
14 Q.  And I'm happy to scroll through it.  I can go below the logo
15    here and let you take a look at it.
16 A.  Okay.
17 Q.  Let me know when you want me to scroll.
18 A.  Oh, I'm sorry, go ahead.
19 Q.  Okay.
20 A.  I was just -- sorry about that.  I didn't know you were
21    waiting on me.
22 Q.  That's okay.  Again, just let me know when you want me to
23    scroll.  I think there's a second page.
24 A.  Okay, go ahead.
25 Q.  Okay.  Let me know when you're done.

Page 74

1  A.  Okay.
2  Q.  All right.  So does this refresh your recollection as to
3     June of 1989 being the time frame in which you were put on
4     academic probation?
5  A.  Yes, it does.  So for which semester are we -- are we saying
6     the infraction took place?
7  Q.  Were you on academic probation more than one time?
8  A.  Not to my recollection, no.
9  Q.  Okay.  So my question was just first, do you recall being
10    put on academic probation at any time during your enrollment
11    at Aquinas.  And I think you answered yes to that?
12 A.  Correct.
13 Q.  And now I just am pinpointing the time frame as being June 6
14    of 1989 is when you were notified of that, correct?
15 A.  Correct.
16 Q.  Okay.  And then --
17 A.  I'm just curious as to what semester we're talking about
18    that I -- that I had earned the status of academic
19    probation.  That would have been probably winter of '89,
20    right?
21 Q.  Yes, that would be my presumption.  I mean, the letter was
22    issued following that semester.
23 A.  Okay.
24 Q.  And then in the fall, after -- I mean, you took a class in
25    the summer and you came back then in the fall of '89.  And

Page 75

1     am I understanding correctly that the dean suggested to you
2     that you try to get a couple of your classes changed to Ws
3     to try and improve your grade point situation?  Is that
4     correct?
5  A.  Yes.
6  Q.  All right.  And you did pursue that and it was granted,
7     correct?
8  A.  Correct.
9  Q.  Okay.  As far as the Fiction Writing Workshop that you took
10    the summer after you received this letter do you recall if
11    you initially got an incomplete in that class and it was
12    later changed to a grade?
13 A.  I don't believe I did.
14 Q.  Okay.  So when you came back -- did you come back to school
15    then for the fall semester of 1989 for your third year at
16    Aquinas?
17 A.  I think so.
18 Q.  All right.  Do you remember where you were living for that
19    semester?
20 A.  I might have been in -- in Hruby Hall at that time, which is
21    a single-room dorm.
22 Q.  Okay.  Did you ever live in Regina Hall?
23 A.  No.
24 Q.  You never lived in Regina Hall?
25 A.  I think I spent my orientation in Regina Hall, but other

Page 76

1  than that I've never resided there.
2  Q.  Okay.  Was there an incident during the fall of 1989 that
3      resulted in you being disciplined by the college?
4  A.  I believe so.
5  Q.  What do you remember about that?
6  A.  About the incident itself?
7  Q.  Yes.
8  A.  Okay.  So there was a student who was asleep in the common
9      area of the dorm, of Regina Hall, and I think I -- as a
10     prank I -- I stacked some of the couch's pillows around this
11     individual, you know, to, like -- I don't know, when he
12     wakes up he's going to be inside of -- of a sort of
13     makeshift pillow fort, right?  And so I guess a resident
14     adviser did not appreciate that, and I think I was cited for
15     an infraction of, you know, violating a safe environment or
16     something.
17 Q.  Who was the student who was sleeping in the common area of
18     Regina Hall?
19 A.  I don't believe I knew his name then and of course can't --
20     can't recall it now.
21 Q.  Did a residence hall adviser instruct you to pick those
22     pillows up?
23 A.  She might have, yeah.
24 Q.  And did you --
25 A.  I don't -- I don't recall.  I requested from Aquinas in --

Page 77

1      in, I think, the document requests that they provide a copy
2      of that report but they were unable to do so.
3  Q.  Okay.  But I guess my question is, just in terms of the
4      recollection that you have, do you remember the residence
5      hall adviser telling you or someone from Aquinas telling you
6      you needed to pick those pillows up?
7  A.  That -- that might be what happened, yes.
8  Q.  And did you decline to do that?
9  A.  It might not be a recollection of it but it sounds like a
10     fair assessment of the possible events.
11 Q.  Okay.  Do you have any recollection of being asked to leave
12     the building and refusing to do so?
13 A.  There might have been an instance where that occurred.  But
14     I think I eventually left the building.
15 Q.  Okay.  Now --
16 A.  Upon -- upon further insistence or from an -- insistence
17     from another individual.
18 Q.  Okay.  So ultimately you received some kind of disciplinary
19     infraction for your conduct in that incident, correct?
20 A.  I think the infraction was for the pillow fort.
21 Q.  Okay.
22 A.  I don't think I was cited for refusing to leave the
23     residence hall.
24 Q.  And let's just see here.
25     Okay.  I'm going to share my screen with you

Page 78

1      again.
2  A.  Sure.
3  Q.  So we're looking at a document that appears to be dated
4      September 8th of 1989.  Do you see that, Mr. Bruneau?
5  A.  I believe that date looks to me like September 18th.
6  Q.  Oh, September 18th, 1989.  It's addressed to you; is that
7      correct?
8  A.  Yes.
9  Q.  Okay.  And would you like me to scroll down so you can
10     review this document?
11 A.  I think I recall it.
12 Q.  Okay.  Is this a document that describes the disciplinary
13     instance that you and I just discussed?
14 A.  It's a document that outlines the resolution for that
15     incident but it -- I don't think it describes the incident
16     itself.  That's my recollection of this document.
17 Q.  If we look at the first paragraph of the document it
18     says it's -- it is -- the second sentence, it is my
19     understanding that Kathy Otto and Jean Zegoski, the
20     residence advisers on duty that night in Regina Hall -- and
21     this is referring to September 1, 1989 -- confronted
22     you concerning what --
23 A.  You mean September -- September 18th?
24 Q.  September 18th?  No.  Well, let's make --
25 A.  Whoa, whoa, whoa, I'm sorry.  The date -- the date of the

Page 79

1      document of course refers to the incident that took place
2      earlier.  Okay, I'm sorry.
3  Q.  Right, right.  So it -- I mean, the letter begins, thank you
4      very much for meeting with me to discuss the incident
5      occurring on September 1, 1989.  It is my understanding that
6      Kathy Otto and Jean Zegoski, the residence advisers on duty
7      that night in Regina Hall, confronted you concerning what
8      they perceived to be a safety and health hazard which you
9      had created in Regina lounge.  Ms. Otto and Ms. Zegoski
10     asked you to return the cushions to their proper place but
11     you failed to heed their requests.  You also refused their
12     request to leave the building.
13     Is that a description of the incident that
14     occurred?
15 A.  Yes.
16 Q.  Okay.  And then she goes on to say, during our meeting we
17     discussed these two incidents in detail; in the end you
18     admitted that what was documented on the incident report did
19     actually happen, nevertheless your contention was that you
20     did not see your actions as being inappropriate at the time.
21     Is that consistent with your recollection of your
22     discussion with -- with the person who authored this
23     document, who was --
24 A.  Yes, it is.
25 Q.  Yes -- with Ms. Strobel?

Page 80

1  A.   Yes.
2  Q.   Okay.  And so she -- her letter goes on to indicate that she
3       finds you guilty of the violation, Section 13, disregarding
4       the directive of a college official.  Does that refresh your
5       recollection about what discipline you received?
6  A.   Well, yeah, it -- it points out -- it points out the
7       measures there, right, that I was to apologize and to write
8       some -- some form of document?  Yes.
9  Q.   Correct.  And it -- it specifies that the rule that you were
10      alleged to have violated was disregarding the directive of a
11      college official, right?
12 A.   Okay, but I -- I don't think it specifies if the directive
13      was to dismantle the pillow fort or to leave the building,
14      does it?
15 Q.   Well, regardless --
16 A.   I hate to --
17 Q.   -- the violation was disregarding the directive of a college
18      official, correct?
19 A.   Okay.
20 Q.   Okay.  I mean, do you claim that it was a different
21      violation than disregarding the directive of a college
22      official?
23 A.   No, it looks like that's what it was, but I'm just not sure,
24      and I don't think it's specified there, whether the
25      directive was dismantling the fort or leaving the building.

Page 81

1       But maybe that's not relevant.
2  Q.   Well, in the first paragraph, I mean, she talks about the
3       fact that you didn't put the cushions back nor did you
4       refuse -- or leave when they asked you to leave, correct?
5  A.   Correct.
6  Q.   Okay.  Did this incident have anything to do with your
7       bipolar condition, or no?
8  A.   I don't think so.
9  Q.   Okay.  So this is your third year at Aquinas and this
10      incident happens in September of '89, which is the fall
11      semester.
12 A.   Okay.
13 Q.   And then as you enter the winter semester did you -- do you
14      recall having another instance in which you had to leave
15      classes and were hospitalized?
16 A.   I don't have a specific recollection but they -- it probably
17      took place.
18 Q.   Okay.  You don't have a specific recollection one way or the
19      other?
20 A.   Not at this time, not unless something, you know, more
21      specific jogs my memory.
22 Q.   Okay.  Maybe we could -- give me one second here.
23 A.   Can you state the time period you're referring to again for
24      me?
25 Q.   I can, but I think I want to ask you one -- I want to go

Page 82

1       back and ask you one other question, too, and I'm going to
2       share my screen with you in order to do that.
3  A.   Okay.
4  Q.   I had asked you about your summer writing workshop in which
5       you received a D in the summer of 1989.  Do you remember
6       that?
7  A.   Yes.
8  Q.   And I had asked you if you had initially received an
9       incomplete, and you said you did not think that was the
10      case?
11 A.   Correct.
12 Q.   Okay.  So let me show you a document here that's entitled
13      grade change report.  And it's dated -- appears to be
14      August 9th of 1989, and it has your name on it.  And it
15      indicates that for the class number, which was EH 210A, you
16      were having your grade changed to a D --
17 A.   Okay.
18 Q.   -- from an incomplete.
19 A.   It looks like I was mistaken.
20 Q.   Yes.  Does that refresh your memory at all as to what
21      happened in that circumstance?
22 A.   Not a lot.  It -- it just looks like it's more plain to me
23      that I indeed did not complete the course and then I -- I
24      assume I had to finish something or perhaps take a test
25      that -- that then, you know, allowed me to finish.

Page 83

1  Q.   Okay.  Do you have any recollection as to whether this
2       initial incomplete grade had anything to do with your
3       bipolar condition or not?
4  A.   I'm -- I'm not really sure.  I can't say one way or the
5       other without -- without more information that I don't have.
6  Q.   Okay.
7  A.   And I don't recall.
8  Q.   So as far as what we can determine from this it appears that
9       your incomplete grade was allowed to be transitioned to a
10      letter grade, which was a D --
11 A.   Yes.
12 Q.   -- correct?
13      Okay.  Now, going back to that winter semester
14      or -- the semester that started in January of your third
15      year, that may be called spring semester under Aquinas
16      terminology but nonetheless it's the second semester of your
17      third year, which is in January 1990.  I asked you if you
18      recalled having another psychotic episode at that time and
19      having to become hospitalized and leaving school, and I
20      think you said you didn't recall for sure?
21 A.   If I had to guess I'd say I probably had one.  Winters are
22      bad for me.
23 Q.   Okay.  All right.  And I'm just checking to see here whether
24      I can provide any more context around that day.
25      All right.  So I'm going to share my screen with

Page 88

1  Q.  I'm talking about a situation where as of January you were
2      hospitalized -- and I'm going back up here -- it appears.
3      I'm looking at a record dated January 2nd of --
4      January 22nd of 1990 --
5  A.  Uh-huh.
6  Q.  -- where Paul Nelson is emailing or sending a memo to a
7      number of individuals indicating that you have been
8      temporarily hospitalized.  And all I'm looking for is any
9      recollection you have about that situation.
10 A.  Can we go back to the schedule?  Or the transcript?
11 Q.  Sure.  Here you go.
12 A.  Okay.  So -- so the Nature Study, I think -- okay, yeah, I
13     do kind of remember those classes.  You know, I'm not really
14     sure if I have a -- a clear memory of -- of, you know,
15     whether or not the disorder was a problem for me during that
16     time or not.
17 Q.  Okay.
18 A.  I know I didn't complete the Nature Study course; I'm not
19     sure that had any particular relevance to my disorder or
20     being more of a lazy student.  The other two, it looks
21     like -- did I finish them that semester?
22 Q.  I guess I'm asking you that.
23 A.  Well --
24 Q.  I mean, do you have a recollection of whether you finished
25     those classes?

Page 89

1  A.  See, the problem is, Conditioning II, for example, I'm not a
2      hundred percent sure if I didn't take that class on two
3      occasions.  Do you follow me?
4  Q.  Okay.
5  A.  So if this is the first time I took it and I got a B for it,
6      I guess maybe I only took that once.  Yeah, I think I only
7      took that one once.  And then the Dimensions of Being
8      Human -- I mean, I guess I finished them, so -- but then
9      again there's the memo that says that I was hospitalized in
10     January.
11 Q.  Right.  So I'm just trying to get any recollection you have
12     about that hospitalization.  And if -- if you don't have
13     one, you can just tell me that.
14 A.  I guess I don't really have one.  But -- but just so -- just
15     so -- just so I'm not speaking incorrectly, what semester
16     were the classes that we were looking at earlier where there
17     was the Journalism class and --
18 Q.  I think I -- I misspoke.  Because when you look at the --
19 A.  Okay.
20 Q.  -- fall semester of -- well, let's see.
21 A.  Yeah.
22 Q.  Fall of 1989 you've got --
23 A.  Yeah, the Journalism and the Intro to Drama, there I kind of
24     remember having a few issues with my disorder.  I'm not sure
25     if it resulted in a hospitalization or not, I just remember

Page 90

1      being somewhat not okay.
2  Q.  Okay.
3  A.  I don't -- I don't know how -- how it resolved itself.  But
4      then in the -- it says spring 1990.  There, I don't really
5      have a clear recollection at all.  I assume I did all right
6      other than the Nature Study, which I think was more a fault
7      of laziness than of the disorder.
8  Q.  Okay.  Your Dimensions of Being Human class, do you have any
9      specific recollection about whether you initially got an
10     incomplete in that class and then it was converted to a
11     grade, or not?
12 A.  I don't think it was.  I hope I'm not mistaken.  I know
13     there was one class by the same instructor where I did get
14     an incomplete, but I think that was another class.
15 Q.  Okay.
16 A.  And I think we've already looked at that incomplete
17     notification, the grade change request.
18 Q.  Who was that teacher?
19 A.  Denty, D-e-n-t-y.  That's his last name.
20 Q.  Okay.
21 A.  Michael Denty.
22 Q.  Okay.  One moment here.
23          Okay.  I'm going to share my screen with you
24     again.
25 A.  Okay.

Page 91

1  Q.  We are now looking at the final grade report.  It appears to
2      be dated 5/24 of '90.
3  A.  Uh-huh.
4  Q.  And it indicates these classes that we've just been
5      discussing.
6  A.  Right.
7  Q.  Nature Study indicates a grade of no credit, Conditioning II
8      notes a grade of B, and your Dimensions of Being Human class
9      here notes an I, which I think --
10 A.  It looks like then it was incomplete.
11 Q.  Yes.  So --
12 A.  So --
13 Q.  -- your final grade report shows that being a B minus, I
14     believe it was.
15 A.  I think that's right.
16          I can comment here, if I may, the -- the
17     Conditioning course was an eight-week course.
18 Q.  Okay.
19 A.  So perhaps what happened this semester is perhaps I was
20     having trouble in the first part of it, hence the memo from
21     Paul Nelson.  And then when I resumed I was taking
22     Conditioning in the second eight-week period of the semester
23     and -- and maybe -- maybe that's -- because you were asking
24     me if seeing this jogged my memory about whether I was
25     having issues with the disorder or not.  And so I'm trying

Deposition of Joseph Bruneau                    Joseph Bruneau v. Aquinas College

---

Page 92

1    to completely cover that now that I see this document.
2  Q.   Okay.  All right.  So -- yes.  And so you've got some ideas
3       but don't have a specific recollection of what happened that
4       term, correct?
5  A.   Well, yeah, my -- my prior statement that I just gave pretty
6       much sums up my -- my best piecing together of what probably
7       happened.
8  Q.   Okay.  But you acknowledge that you initially got an
9       incomplete in Dimensions of Being Human and at some later
10      point that was allowed to be converted to a letter grade?
11 A.   Yes.
12 Q.   Okay.  Now, one moment here.
13           So you returned to school for your fourth year for
14      the -- in the fall of 1990; is that correct?
15 A.   I think so.
16 Q.   Okay.  And let me see here.  Did you experience some
17      problems with your behavior or your condition during the
18      fall of 1990 that you can recall?
19 A.   I recall having problems at some point that I don't believe
20      we've already covered, so they probably took place there in
21      the fall.
22 Q.   What are the problems that you recall having that haven't
23      been covered?
24 A.   Like I remember sort of being either psychotic or borderline
25      psychotic on campus; eventually the police were notified and

Page 93

1       it resulted in my expulsion.
2  Q.   Okay.  Do you remember anything about your behaviors when
3       you were psychotic or borderline psychotic?
4  A.   I think -- I think I was behaving somewhat strangely at a
5       soccer game.  And I think -- I think on the night that I was
6       removed there was some bizarre behavior but nothing --
7       nothing resulting in any -- of any -- of any charges or
8       something like that.
9  Q.   Okay.  So there were no criminal charges that were brought
10      as a result of your behaviors that you've just referenced?
11 A.   That's my recollection.
12 Q.   Okay.  Do you recall any incident that happened with you
13      behaving erratically in the cafeteria?
14 A.   Yes.
15 Q.   What do you remember about that?
16 A.   I think I got up on a table at one point and then jumped
17      down.  And that's kind of what I remember from that.  And I
18      think -- I think I exited the cafeteria at that point.
19      Yeah.
20 Q.   Do you remember -- like looking back on that situation today
21      do you understand your behavior during that incident to have
22      been inappropriate?
23 A.   Yes.
24 Q.   Okay.
25 A.   But I'm not sure that it's warrant of expulsion.

Page 94

1  Q.   Do you remember making comments to a food service worker
2       about wanting power?
3  A.   The thing about that, there was -- there was a -- sort of
4       a -- I don't know, like a talk given, I think during the
5       summer semester, from a group, and there was an exercise we
6       did where someone -- it was a big crowd of students and
7       someone could, you know, raise their hand or was encouraged
8       to raise their hand, stand up and say, send me some energy.
9       And then a bunch of students would hoist this person up on
10      their shoulders, and then everyone would gather around and
11      make sort of this motion with their hands.  And it was -- I
12      don't know what the purpose of that exercise was, but I -- I
13      think I -- I mistook the -- the, you know, the directive
14      "send me some energy" and I -- I mistakenly thought it was
15      "I want some power" or something.  And I think at that point
16      is when I might have gotten up on the table.
17 Q.   Okay.  Do you remember where you had been prior to coming
18      into the cafeteria?
19 A.   No.
20 Q.   Do you remember anything about your appearance or your
21      clothing at that time?
22 A.   Are you talking about carrying the foil around with me?
23 Q.   No, I'm talking about in the cafeteria.
24 A.   Yeah, something kind of foggy, but I might have been wearing
25      one long sock and one short sock.  But other than that, no,

Page 95

1       I don't really have a recollection --
2  Q.   Okay.
3  A.   -- why.
4  Q.   Are you thinking --
5  A.   Is there -- is there something you're referring to?
6  Q.   I'm just asking you the questions right now --
7  A.   Okay.
8  Q.   -- Mr. Bruneau, but --
9  A.   Okay.
10 Q.   Do you -- were you taking -- were you on any medication at
11      this point?
12 A.   I don't recall.
13 Q.   So from the point that you took yourself off the medication
14      that you were on back in -- let's see here -- in the summer
15      of 1988, when is the next time that you remember being on
16      medication again after that?
17 A.   It was probably my next hospitalization.
18 Q.   Okay.  And so the next hospitalization, at least in terms of
19      Aquinas records, looks like it was the winter semester of
20      1989.  And so if you were hospitalized are you saying that
21      you would have gone back on medication at that point?
22 A.   For sure.
23 Q.   Okay.  Do you remember if you discontinued taking medication
24      after your second hospitalization?
25 A.   You know, without more to go on I can't really say.  At some

Deposition of Joseph Bruneau

Joseph Bruneau v. Aquinas College

| Page 96 |
|---|

1  point I'm sure I did but I just can't -- I can't tell you
2  exactly when that was.
3  Q.   Okay.  Do you remember your mother taking action to withdraw
4  you from the college right at the beginning of that semester
5  in 1990, the fall semester?
6  A.   Yeah, there -- there's -- you understand there's quite a
7  few, so I don't really -- I'm not clear about, like, how
8  many times she -- she came and took me from campus.
9  Q.   Okay.
10  A.   You know, I know -- I think it was at least two.  But
11  probably -- probably she did.
12  Q.   All right.
13  A.   I'm just saying there was probably at least two times when
14  she came to the -- to the campus to take me away.  But
15  whether it was that time -- it probably was.
16       It may have been more than twice.  So, you know,
17  with that many instances of something happening I can't
18  pinpoint when certain things happened necessarily because it
19  just all ends up sort of a jumble.
20  Q.   Okay.  So at this point you had had at least three prior
21  instances where you had had to leave the college and become
22  hospitalized because of psychosis, correct?
23  A.   Correct.
24  Q.   Okay.
25  A.   Psychosis or nearly there.

| Page 97 |
|---|

1  Q.   Okay.  And on -- after at least one of these incidences you
2  had been put on an antipsychotic medication that you
3  discontinued; is that correct?
4  A.   Yes.
5  Q.   Okay.  And so in the -- in the fall semester of 1990 we were
6  talking about some behaviors that you started experiencing
7  and we were talking about the cafeteria incident and what
8  your recollections of that were.
9  A.   Yes.
10  Q.   And do you recall Aquinas making a decision that you needed
11  to be suspended from school at that time?
12  A.   Yeah, I think so.  At one point I was suspended but then
13  allowed to return.  So if it was that time or a previous, I
14  can't really say.
15  Q.   Okay.
16  A.   But I do remember sort of being suspended at one point and
17  then being allowed to return.
18  Q.   Okay.  And in terms of efforts by your mother to withdraw
19  you from the school, you don't have a specific recollection
20  as to this time frame but there were multiple occasions when
21  she did do that?
22  A.   When you say withdraw me from the school, do you mean like
23  put in paperwork to -- to execute a formal withdrawal or do
24  you mean just that I was having trouble so she came and
25  picked me up and perhaps took me to the hospital or

| Page 98 |
|---|

1  something?
2  Q.   Right.  What I mean is to withdraw you from your, you know,
3  your active status at that time period.  Not just pick you
4  up and take you away physically but to, like --
5  A.   I'm not aware of her ever doing that.
6  Q.   Okay.
7  A.   Or at least I have no memory of it.
8  Q.   Okay.  Let's see here.
9       All right.  I'm going to share my screen with you
10  again.
11  A.   Okay.
12  Q.   Okay.  We're looking at a document that is dated 8/30 of
13  '90.
14  A.   Okay.
15  Q.   So that would be like right as you're coming back to school
16  for that fourth year, as we talked about, correct?
17  A.   Okay.
18  Q.   And this is a student withdrawal record.  Do you see that?
19  A.   Yes.
20  Q.   Okay.  And it appears to relate to you?
21  A.   Uh-huh.
22  Q.   Have you ever seen this document before?
23  A.   I don't think I have.
24  Q.   Okay.  And it's got some signatures on it from some various
25  Aquinas personnel.

| Page 99 |
|---|

1  A.   Okay.
2  Q.   And unfortunately it's cut off here down at the bottom, but
3  it appears to say --
4  A.   It says completed by Bradford Winkler, per -- something.
5  Q.   Instruction, it looks like to me.
6  A.   Okay.
7  Q.   Of -- and I'm wondering if that's Diane Bruneau.  But you
8  don't know?
9  A.   It looks like it is --
10  Q.   Okay.
11  A.   -- by looking at the partial --
12  Q.   So do you -- I mean, does this give you any recollection as
13  to whether your mom requested to withdraw you at that time?
14  A.   You mean this document by itself?
15  Q.   Yes.
16  A.   Well, I don't recognize my mom's handwriting on it.
17  Q.   Okay.
18  A.   Other than it says completed by Bradford Winkler per
19  instruction, perhaps, of Diane Bruneau.
20  Q.   Right.
21  A.   I mean, if we're going by that then I guess we could look at
22  this as potential evidence that she did.  But as far as it
23  jogging my memory, the problem with that is I was never
24  aware that -- that she had tried to do this.
25  Q.   And that's fine, that's all I'm trying to get at, is --

Litigation Services and Technologies of Michigan, LLC

Page 100

1  A.  Okay.
2  Q.  -- does this spark any recollection by you that she did or
3      do you just simply have no knowledge about whether she did
4      or didn't?
5  A.  Yeah, I have no knowledge I can recall of whether she did
6      it.  I -- you know, to this point I was unaware that she did
7      but it looks like, according to this anyway, that she might
8      have.
9  Q.  Okay.  Let me see here.
10          Do you have a recollection then of -- of being
11     suspended but then allowed to return in the fall of 1990?
12 A.  I have a recollection of being suspended and allowed to
13     return.
14 Q.  Okay.
15 A.  If it was '90, 1990, I guess it wouldn't surprise me but I'm
16     not -- I can't say when it was.
17 Q.  Was it shortly before you were expelled?
18 A.  I think so.
19 Q.  Okay.  And then let me see here.
20 A.  And you understand most of the recollection at this point
21     comes from, you know, the documents, the paper trail, not an
22     actual --
23 Q.  I understand.
24 A.  -- recollection of, oh, Mr. Bruneau, you're now expelled.
25     Like I -- I don't remember -- or your suspended.  I don't

Page 101

1      remember that ever being said to me, for example.
2  Q.  Okay.
3  A.  But because -- because of the papers that exist, yes.
4  Q.  When I show you these papers, Mr. Bruneau, the reason that
5      I'm doing it is to see if it strikes any recollection for
6      you of those events.
7  A.  Okay.
8  Q.  If it doesn't, you can simply tell me that it doesn't; if it
9      does then you can tell me what you recall.
10 A.  Okay.
11 Q.  So that's --
12 A.  I'm seeing some of these documents for the very first
13     time --
14 Q.  Okay.
15 A.  -- which I didn't -- I didn't think there was anything you
16     hadn't shared yet.  And I -- I'd like to have them if you
17     can give them to me.
18 Q.  Well, you can -- we can talk about that after the
19     deposition.
20 A.  Okay.
21 Q.  If there -- I mean, you had the opportunity to make document
22     requests.  But we can talk about these specific documents,
23     and that's fine.  So --
24 A.  I'll just -- I'll just request all documents at some point
25     then.

Page 102

1  Q.  Well --
2  A.  Because I -- I thought that they had all been shared
3      already.
4  Q.  Okay.  Well, we can talk about what it is you want, but
5      there's a discovery period in the case and you had the
6      opportunity to request documents, so --
7  A.  Yeah, yes, I know, but I didn't -- I wasn't aware that there
8      were more that hadn't already been shared.  So that's --
9      that's why I'm saying I'm having a problem with some of
10     these because I'm seeing them for the very first time
11     sometimes.
12 Q.  Okay.  Well, let's talk about -- I'm imagining this next one
13     is a document that you have seen.
14 A.  Okay.
15 Q.  Okay.  And so you mentioned recalling, without a particular
16     date, a situation where you were suspended but then allowed
17     to come back shortly before you were expelled, correct?
18 A.  Correct.
19 Q.  All right.  And I'm just showing you a letter right now that
20     is addressed to you and I believe is a letter that you have.
21     Do you recognize this document?  And I'm happy to scroll
22     down if you would like me to at any point.
23 A.  I think I have a copy of this document and I've seen it,
24     yes.  Yeah, but please scroll down.
25 Q.  Sure.  Hold on.

Page 103

1  A.  Okay, there.  Summarily suspending you, okay, right.
2  Q.  Yes.  And this is from Bradford Winkler --
3  A.  Right.
4  Q.  -- who was the dean of student development; is that correct?
5  A.  Correct.
6  Q.  And he indicates that your readmittance to Aquinas College
7      at any point in the future will require convincing evidence
8      from a licensed psychologist indicating you're ready to
9      return to college and have received treatment for your
10     condition.  Should ongoing treatment be recommended by your
11     psychologist, such treatment may become a condition of your
12     reenrollment.  Correct?
13 A.  Okay.
14 Q.  And so do you remember receiving this letter?
15 A.  Okay.  Not necessarily receiving it at the time.
16 Q.  Okay.
17 A.  But since I've had a copy of this letter for quite -- for
18     quite a long time, you know, in the past I've referred to it
19     and been reminded of it.  So --
20 Q.  Okay.  Okay.
21 A.  Yeah.
22 Q.  Mr. Winkler goes on to say, Joe, I hope you realize that
23     those of us here at Aquinas sincerely care for your
24     well-being but can't care for you more than you care for
25     yourself.  Twice before you have stopped taking the

Deposition of Joseph Bruneau | Joseph Bruneau v. Aquinas College

---

Page 104

1   medication you need to function in the academic community.
2   On both these occasions you met with serious problems as a
3   result of this decision.  It is our hope that the present
4   time is used to get the treatment you need to return to your
5   education.  I implore you to work with the psychologist who
6   -- whose care you are under to return soon.
7           So we talked about one instance in which you
8   stopped your medication, which was in the summer of 1988
9   after your first incidence of psychosis, correct?
10  A.   Yes.
11  Q.   Do you dispute that there was another one or do you just not
12  remember?
13  A.   Another what?
14  Q.   Another instance where you stopped taking medication.
15  A.   No, I don't dispute that.
16  Q.   Okay.  Now, what do you remember happening next after you
17  were suspended in this instance with respect to your
18  education at Aquinas?
19  A.   Well, I -- if memory serves I think they -- they outlined
20  some steps that I could take in order to return, I think,
21  and I think I completed those and -- and returned.  Or -- or
22  as the letter said, they wanted, you know, verification from
23  a -- from a -- from a treatment professional that -- that I
24  could -- that I could perhaps return.
25  Q.   Okay.

Page 105

1   A.   And so I provided that and was allowed to return.
2   Q.   When you left the campus at that time were you hospitalized,
3   do you recall?
4   A.   I don't recall.
5   Q.   Okay.  Let's see here.
6   A.   It's -- it wouldn't surprise me.
7   Q.   I'm going to share my screen with you.
8   A.   Okay.
9   Q.   And what I'm showing you is a page from your interrogatory
10  responses.
11  A.   Okay.
12  Q.   I can show you the whole document if you'd like, but if
13  you'd take a look at that you might recognize it and you can
14  tell me if that's the case.
15  A.   So the time period we are talking about is, when?
16  Q.   So this would be in the fall of 1990.
17  A.   Okay.
18  Q.   And it looks like -- you don't have more specificity here,
19  but you indicate that you were hospitalized for a week at
20  Foote Hospital in Jackson.  Do you remember anything about
21  what caused you to be hospitalized or where you were before
22  you were hospitalized in that instance?
23  A.   It's likely that I was at Aquinas before that.
24  Q.   Do you remember or are you just presuming?
25  A.   Well, I'm presuming after having, you know, recently been

Page 106

1   shown by you those -- those documents that show I was
2   enrolled and are -- of course you brought up the -- the
3   instances of -- of certain behavior there on campus.
4   Q.   Yes.  And I'm just -- and seriously, Mr. Bruneau, I'm just
5   asking if you remember.  If you don't remember, just simply
6   tell me you don't remember; if you do remember, then I want
7   to hear what you remember.
8   A.   Okay.  Memory is a pretty funny thing.
9   Q.   I understand.
10  A.   First of all, what specifically are you asking me if I
11  remember in this --
12  Q.   Well, I'm asking you right now if you remember anything
13  specific about this instance of hospitalization in the fall
14  of 1990 for a week where you were hospitalized at Foote
15  Hospital in Jackson.
16  A.   I do sort of remember being in that hospital in that time
17  period, yes.
18  Q.   Do you remember where you were prior to being hospitalized
19  there?
20  A.   Can I refer to my -- my own memory and go back to those
21  moments?  No, my memory is not that good.
22  Q.   Okay.  All right.
23  A.   But looking at the documents you've shown me and because,
24  you know, I'm aware I was enrolled in college in that time
25  and sort of have memories of those classes, I can tell you,

Page 107

1   yes, I was in college --
2   Q.   Okay.
3   A.   -- prior to being sent to the hospital.
4   Q.   Okay.  So you don't think you were at home and then went in
5   for a psychosis to Jackson, you think you were at Aquinas
6   and left school for a psychosis and went -- were
7   hospitalized in Jackson?
8   A.   That's my -- that's my best recollection.
9   Q.   Okay.
10  A.   But -- that's what I assume happened, but maybe I was home
11  for a few days before going to the hospital.
12  Q.   Okay.
13  A.   It's tough for me to really --
14  Q.   Okay.
15  A.   -- to really know.
16  Q.   There may be other records that will help us piece that
17  together.
18  A.   Okay.
19  Q.   But then you indicate also in the fall of 1990 you were
20  hospitalized for a period of ten days at Bixby Hospital in
21  Adrian.
22  A.   Right.
23  Q.   Do you have any recollection of whether those two
24  hospitalizations were connected to one another or whether
25  there was a break between them?

Deposition of Joseph Bruneau                    Joseph Bruneau v. Aquinas College

| | Page 108 |
|---|---|
| 1 | A.   There was no break.  There -- I was transferred from Foote |
| 2 | to Bixby.  So -- |
| 3 | Q.   Do you know why? |
| 4 | A.   Sorry I wasn't more clear there, but yeah, there was no |
| 5 | break in between those two. |
| 6 | Q.   Okay.  Do you know why you were transferred? |
| 7 | A.   Yeah, here -- the way it worked out was I was at Foote |
| 8 | Hospital, and from there, after being there a week, the |
| 9 | doctor decided that he couldn't -- he couldn't keep me |
| 10 | there, that I could sign an AMA and leave.  And that's what |
| 11 | I tried to do, and then I was committed by my mother and |
| 12 | they sent me to Bixby Hospital right from there. |
| 13 | Q.   What is an AMA? |
| 14 | A.   Against medical advice. |
| 15 | Q.   Okay.  So you were at Foote -- |
| 16 | A.   Right. |
| 17 | Q.   -- and you signed a document stating that you were leaving |
| 18 | against medical advice? |
| 19 | A.   I -- I may have signed such a document, yes. |
| 20 | Q.   Okay.  But then your recollection is your mother had you |
| 21 | committed and you were placed then in Bixby Hospital |
| 22 | instead? |
| 23 | A.   Yes. |
| 24 | Q.   Okay.  Did you ever succeed in leaving Foote Hospital before |
| 25 | you were committed by your mother? |

| | Page 109 |
|---|---|
| 1 | A.   No. |
| 2 | Q.   Okay. |
| 3 | A.   They decided to just keep me there -- |
| 4 | Q.   Okay. |
| 5 | A.   -- until the transfer went through or whatever. |
| 6 | Q.   Okay. |
| 7 | Okay.  Just going back to your suspension letter |
| 8 | here, had Mr. Winkler indicated in this letter -- and this |
| 9 | is the letter we just looked at that's dated September 6 and |
| 10 | it relates to your behavior on Thursday, August 30, 1990. |
| 11 | Mr. Winkler states, I must judge your behavior to pose |
| 12 | serious harm to yourself.  Do you question whether he |
| 13 | legitimately believed that at that time? |
| 14 | A.   I can't speak to what he believed. |
| 15 | Q.   Okay.  Now, you do have a recollection of returning to |
| 16 | school after this suspension though? |
| 17 | A.   Yes. |
| 18 | Q.   Okay.  And what do you remember about how that came about, |
| 19 | your -- your coming back to the school? |
| 20 | A.   I remember visiting Mr. Winkler in his office and he had a |
| 21 | form there waiting for me that he -- he required me to sign |
| 22 | it as a condition of being allowed to go back to my dorm. |
| 23 | Q.   Okay.  What was that form, if you recall? |
| 24 | A.   I think the nature of it was that -- that I agreed that I |
| 25 | would take medication. |

| | Page 110 |
|---|---|
| 1 | Q.   Did -- and did you agree to take medication? |
| 2 | A.   Well, I signed the form; it was the only way for me to move |
| 3 | back into my dorm. |
| 4 | Q.   Did Aquinas request that you authorize it to receive |
| 5 | information from your treatment provider about whether you |
| 6 | were complying with treatment recommendations? |
| 7 | A.   You mean did the form also have a release of information |
| 8 | attached? |
| 9 | Q.   Yes, or did Aquinas request that of you.  Did they say, if |
| 10 | you're going to come back we want to be able to get |
| 11 | communication from your treatment provider, if you recall? |
| 12 | A.   It -- it sounds like they did.  It sounds like I -- I |
| 13 | mean, I remember there was something to that effect, yeah. |
| 14 | I don't know -- I don't know how it was executed or how they |
| 15 | would have gotten that information, I'm not clear about |
| 16 | that, but yeah, I do recall something in the paperwork about |
| 17 | them needing verification that I was continuing medication. |
| 18 | Q.   Okay.  So then did you move back into a dorm after you |
| 19 | signed that paperwork? |
| 20 | A.   Yes. |
| 21 | Q.   What dorm were you living in? |
| 22 | A.   Hruby Hall. |
| 23 | Q.   Okay.  And did you -- were you enrolled in classes or did |
| 24 | you have to reenroll in classes at that point? |
| 25 | A.   My guess is I was still enrolled; I don't have a clear |

| | Page 111 |
|---|---|
| 1 | recollection though. |
| 2 | Q.   Okay.  So in this time frame you've -- you've told me a |
| 3 | little bit about what you recall about being at Jackson and |
| 4 | signing an AMA and your mother then having you committed. |
| 5 | Do you remember what your doctors were recommending for you |
| 6 | in terms of any medication for your condition at that time? |
| 7 | A.   I -- I don't really recall.  It -- are you asking me do I |
| 8 | know the specific -- or do I know the specific medication |
| 9 | they were recommending or whether or not they were |
| 10 | recommending one? |
| 11 | Q.   Well, let's answer both. |
| 12 | A.   Okay. |
| 13 | Q.   Were they recommending medication for you at that time? |
| 14 | A.   I assume they were. |
| 15 | Q.   All right. |
| 16 | A.   But -- |
| 17 | Q.   Do you remember specifically what kind? |
| 18 | A.   And that, I definitely don't remember. |
| 19 | Q.   Okay.  Do you remember -- |
| 20 | A.   I could guess, but it would be a guess. |
| 21 | Q.   Okay.  Do you -- |
| 22 | A.   Perhaps lithium. |
| 23 | Q.   I'm sorry, go ahead. |
| 24 | A.   In that time period it might have been lithium. |
| 25 | Q.   Okay.  Do you remember whether you followed your doctor's |

Page 112

1  recommendations and took that medication or not?
2  A.   I did initially.
3  Q.   Okay.  And when you say you did initially, does that mean --
4       when does that mean?  When was that treatment recommended
5       for you?
6  A.   Well, it was recommended during those hospitalizations at
7       Bixby and before that at Foote, and then they prescribe it
8       to you as an outpatient.  And so it's -- it's recommended
9       once you're leaving.  And of course Brad Winkler had the
10      document that says basically, you know, we need you to be
11      taking medication, and I signed that agreement.  And then I
12      was taking it at that time and for a while at least after
13      moving back into Hruby Hall.
14 Q.   Okay.  All right.  And then at some point did you cease
15      taking the lithium or whatever medication it was that was
16      being prescribed?
17 A.   Yeah, I think I did.
18           The problem is, you know, it can be hard to know,
19      like, what comes first, onset of symptoms or going off the
20      medication.  Usually it's not a case of making a healthy
21      decision to -- to get off the medication and then things
22      happen and then you're hospitalized; usually it's more of,
23      well, you can be having symptoms, the symptoms affect your
24      judgment, bad judgment makes you get off medication and then
25      you end up hospitalized.  It can be more like that.

Page 113

1           So it's not always a conscious decision, I would
2       say, a rational decision, let's say.
3  Q.   Do you have a particular recollection in this case as to
4       whether you made a conscious decision or a rational or an
5       irrational decision to -- strike that.  Let me ask that in a
6       better way.
7           Do you have a recollection in this case whether
8       your decision to stop the medication was rational or not?
9  A.   Okay.  It's -- it's -- I guess it depends on how you define
10      rational.  I know I already used that term in describing a
11      possible series of events, but -- I don't know.  Now I'm --
12      now I'm fogging over and I'm kind of losing my train of
13      thought.
14 Q.   Okay.
15 A.   Can you -- can you ask the question again?
16 Q.   Do you consider yourself responsible for your decisions
17      whether to take medicine or not?
18 A.   Yes.
19 Q.   Okay.  Do you have -- do you remember the circumstances
20      under which you decided to stop taking medications in the
21      fall of 1990?
22 A.   After I was allowed to come back after the suspension?
23 Q.   Yes.
24 A.   I think I was taking medication for a time and complying
25      with it.  At some point I think symptoms of the disorder

Page 114

1  manifested and those symptoms affected my judgment, they led
2  me to make the decision to get off the medication.  Whether
3  or not I define that decision as a rational one, you know, I
4  don't know.
5           At the time I probably might have thought of it as
6  less rational than I do today, but, yeah, at some point I
7  think I did sort of go off it.  However, you know, I had
8  been taking it prior to that and, who knows, my level of it
9  might have still been a therapeutic range of the medication.
10 Q.   Okay.  So once you came back from that suspension and you
11      were living back at school do you have any recollection of
12      any further behavioral incidents with you occurring at that
13      time?
14 A.   You know, I have certain recollections of, you know, bizarre
15      behavior, but we may have already covered those.  And I
16      can't say if those happened from the time periods that we've
17      already covered or if they actually happened during this
18      time period.  Do you follow me?
19 Q.   Understood.
20 A.   Because, you know, you can remember -- at least the way my
21      memory works, I can remember certain events and certain
22      instances but I can't really construct a valid timeline,
23      like this happened before this or this happened at this
24      time --
25 Q.   Okay.

Page 115

1  A.   -- not earlier, that sort of thing.  And I don't know, if
2       you mention an incident it's possible I'll -- I'll recall
3       it.
4  Q.   Okay.  Do you have any recollection of having any
5       confrontation with Aquinas personnel about an academic
6       grievance process?
7  A.   Yes.
8  Q.   What do you remember about that?
9  A.   So this may have actually started from someone else's
10      grievance that I sort of felt I should get involved in.  I'm
11      not -- I'm not sure it pertained to -- to my academic
12      grievance.
13           Is there any way you can tell me -- is there a
14      specific course you're referring to, or a professor?
15 Q.   I truly don't -- I don't know, I don't have that level of
16      detail.  I just am trying to recall what you remember.  Who
17      did you have interactions with about that, do you know?
18 A.   I was talking to a professor named Rodger Remington about
19      someone else's case, someone else's grievance, for the
20      reason I -- I felt I should get involved in that.
21           As far as -- as my grievance, I don't know.
22      Like -- like I can't remember if there's a particular one
23      that I was involved in or not.
24 Q.   Was your -- I mean, looking back at this now was any of your
25      behavior with Mr. Remington inappropriate?

Page 132

1 behavior, and they may be -- they may have been speaking of
2 behavior that occurred at the soccer field.
3 Q.  Let me -- let me ask you this way:  You have a recollection
4 of speaking with the goalie after the game and --
5 A.  Yes.
6 Q.  -- that resulting in perhaps some yelling; is that correct?
7 A.  Yes.
8 Q.  What do you remember doing next?
9 A.  I remember going away, I didn't want to aggravate the
10 individual any further, and then I don't really remember
11 what I did next.  The game was over; at some point I left.
12 Q.  Do you remember where you went?
13 A.  No.
14 Q.  Do you remember the next interaction you had with any
15 Aquinas personnel after that soccer game?
16 A.  No, but if you -- if you mention something I might recall
17 it, but I don't really remember, no.
18 Q.  What do you remember about your expulsion being communicated
19 to you?
20 A.  I was in the snack bar in Wege Center, I think my mom was
21 there, and there was someone there as well, maybe someone
22 from campus safety but I can't -- I can't be a hundred
23 percent sure.  And I think they were in the process of, you
24 know, getting me to a hospital, and I was --
25 Q.  Why were they -- why were they doing that, Mr. Bruneau?  Why

Page 133

1 were they trying to get you to a hospital, if you know?
2 A.  Well, I guess they thought that I was undergoing a -- a
3 mental health issue.  And I was given the letter notifying
4 me of my expulsion at that time; I don't remember who -- who
5 gave me the letter.
6 Q.  Do you have any recollection of Grand Rapids police being
7 present at any point during that exchange?
8 A.  Yeah, they arrived there at some point.  I don't know if it
9 was after I was given the letter or before I was given the
10 letter.
11 Q.  Okay.  Do you remember -- do you remember any kind of
12 physical struggle between yourself and anyone else during
13 that exchange?
14 A.  Yes, I remember I went to pick up my foil, and I think the
15 police officer probably regarded that as a potential threat,
16 so he restrained me and I think -- I think he placed me in
17 handcuffs and then I was escorted off campus.
18 Q.  Was more than one person involved in restraining you, if you
19 remember?
20 A.  I think it was just one.
21 Q.  So, Mr. Bruneau, I'm going to share my screen with you.
22 A.  Okay.
23 Q.  And I'm showing you a document that is a release of
24 information document.
25 A.  Okay.

Page 134

1 Q.  And it covers a period of 9/17/1990 to May 16, 1991.  Is
2 that your signature, or no?
3 A.  It is.
4 Q.  Okay.  And it looks like you signed this on September 17th
5 of 1990?
6 A.  Looks right.
7 Q.  Have you ever seen -- have you ever seen this document?
8 You signed this document; is that correct?
9 A.  Yes, I did.
10 Q.  All right.  I don't see anything in this document about
11 requiring that you take medication.  Is this the document
12 you're referring to when you say you had to sign something
13 to come back from your suspension?
14 A.  No, it isn't.
15 Q.  Okay.  So you're saying there was something different?
16 A.  Yes.
17 Q.  What's your -- do you have any recollection of why and when
18 you signed this document?
19 A.  Well, if you want me to tell you why I signed it, there's --
20 it's a release of information so that my doctor can share
21 information with the college.
22 Q.  Okay.
23 A.  You mean -- you mean was this signed at the same time I
24 signed the other document?
25 Q.  I -- I don't know.  I mean, I'm asking you.  What's your

Page 135

1 recollection of this document?
2 A.  You know, I really don't have a clear recollection of
3 signing this.  I recognize my signature, but the -- the
4 awareness I have of this document more pertains to the
5 sharing of information that took place afterward than this
6 time period.
7 Q.  Okay.  Hold on a second here.  I'm going to share my screen
8 again with you.
9 We're now looking at a document that is also dated
10 September 17, 1990, and it's addressed to you and it's from
11 Bradford Winkler, it looks like.
12 A.  Right.
13 Q.  Have you seen this document before?
14 A.  Yes, but again my recollection of it pertains more to the
15 sharing of documents that took place after the time period.
16 Q.  Okay.  So you -- you had said earlier that in order for you
17 to return from your suspension there were some conditions
18 laid down for you.  Do you recognize this as the document
19 that sets forth those conditions or do you not know?
20 A.  Okay.  Yeah, I was speaking generally about conditions laid
21 down after the suspension in order to return.  So this
22 says -- okay.  This is -- it looks like more or less a
23 warning.
24 Are you asking if I believe there was another
25 document involved?  Yes.  This isn't the document that Brad

Deposition of Joseph Bruneau                                   Joseph Bruneau v. Aquinas College

---

Page 140

1    VIDEOGRAPHER:  Can we change the disc once again?
2    MS. SETTERINGTON:  We can.
3    And, Mr. Bruneau, I should ask you, we have blown
4    through lunch.  Are you a lunch person?  Do you need to take
5    a break for a meal or would you prefer to just take a break
6    and continue on with this?
7    THE WITNESS:  I'm good with a little break.  I
8    don't -- I don't need to take a --
9    MS. SETTERINGTON:  Just a little break?  Okay.
10   All right.
11   THE WITNESS:  -- at this time.  If you want to
12   continue I'm okay with that.
13   MS. SETTERINGTON:  All right.  Kelly, what about
14   you, and Jeff, what about you?
15   (Brief discussion held.)
16   VIDEOGRAPHER:  This concludes disc two of Joseph
17   Bruneau.  We're off the record at 2:01.
18   (Recess from 2:01 p.m. to 2:15 p.m.)
19   VIDEOGRAPHER:  This is the beginning of videotape
20   number three in the deposition of Joseph Bruneau.  The time
21   is 2:15.  Please continue.
22   MS. SETTERINGTON:  Thank you.
23   BY MS. SETTERINGTON:
24   Q.  Mr. Bruneau, before the break we were talking about the
25   events surrounding your expulsion from Aquinas College in

---

Page 141

1    1990, correct?
2    A.  Yes.
3    Q.  All right.  And you were telling me what you remembered
4    about how the exchange went when your expulsion was
5    communicated to you.  Do you recall being taken away from
6    the campus by the Grand Rapids Police Department?
7    A.  Yes.
8    Q.  And where were you taken from there, do you remember?
9    A.  I think I was taken to St. Mary's.
10   Q.  Okay.  And were you hospitalized at that point?
11   A.  From there I was probably transferred to a different mental
12   hospital.
13   Q.  Okay.  And is it the case that you were hospitalized for a
14   period of about three months from that date of you being
15   expelled?
16   A.  It could have been, right.
17   Q.  Okay.  All right.  If that's what you had indicated in your
18   interrogatory responses that would be accurate, correct?
19   A.  Yes, it would.
20   Q.  Okay.  Now, after you were expelled you made some efforts to
21   have that expulsion revoked; is that right?
22   A.  That's right.
23   Q.  Or to appeal your -- your expulsion?
24   A.  The term we were kicking around was to have it rescinded,
25   yes.

---

Page 142

1    Q.  Okay.  All right.  And ultimately that effort was not
2    successful and your expulsion was not rescinded; is that
3    correct?
4    A.  Well, the effort from my point of view was successful but,
5    you're correct, it was not rescinded.
6    Q.  Okay.
7    A.  But the effort put forth in order to meet the qualifications
8    that the college set forth -- I mean, I met those
9    qualifications but, you're correct, they did not rescind the
10   expulsion.
11   Q.  Okay.  And are you referring to requirements that you
12   demonstrate the ability to perform at another college?
13   A.  Yes.
14   Q.  Okay.  And what was your understanding of the requirement
15   that was set forth for you?
16   A.  That if I could complete two semesters successfully at
17   another college that Aquinas would let me back.
18   Q.  And so did anyone ever say specifically to you whether those
19   semesters could be nonconsecutive or whether they needed to
20   be consecutive?
21   A.  I don't recall.  I'm sure it's in the documentation, but at
22   this time I don't recall.
23   Q.  Okay.  When you were expelled obviously you didn't complete
24   the term, correct?
25   A.  Correct.

---

Page 143

1    Q.  At Aquinas?
2    A.  Correct.
3    Q.  All right.  And you weren't charged tuition for that
4    semester in which you were expelled, were you?
5    A.  I probably was not.  I'm not a hundred percent sure.
6    Q.  Okay.  Do you recall if you were charged at all for housing?
7    A.  I don't recall.
8    Q.  All right.  Did you pay for your own school, or was that
9    paid for by your parents, or how did that work?
10   A.  Well, by this point it was -- it was primarily between me
11   and of course financial aid and/or loans.
12   Q.  Okay.
13   A.  I think on my first semester I got some help from my
14   parents, a little bit anyway.
15   Q.  Okay.  In -- in a communication that you made -- do you
16   recall making a communication to Aquinas asking just to
17   visit the campus?
18   A.  Yes.
19   Q.  Do you remember saying in your letter that you were
20   committed to staying on lithium?
21   A.  Yes, I remember that.
22   Q.  Why did you say that?
23   A.  At the time it was true.
24   Q.  Okay.  Had you not been committed to staying on lithium
25   before that?

---

Page 148

1  health issue.

2  Q.  Okay.  So in terms of appealing your expulsion or attempting

3      to get your expulsion rescinded from Aquinas, did you

4      ultimately file an Office of Civil Rights charge about that

5      issue?

6  A.  Yes.

7  Q.  Did you file two, actually?

8  A.  What time frame are we talking about?

9  Q.  Well, this would be after you were expelled.  Do you

10     remember filing more than one charge with the Office of

11     Civil Rights, or no?

12 A.  I filed one and then I spoke with them later, like in this

13     time period.

14 Q.  What time period?

15 A.  Well, in -- in the modern time period, like -- we're talking

16     about in the last few years.

17 Q.  Okay.

18 A.  But I don't think -- I don't think it resulted in an actual

19     complaint the second time, I was just speaking with them

20     about it.

21 Q.  Okay.  So the other time that you filed a charge with the

22     Office of Civil Rights, was that something that was resolved

23     by some kind of agreement between the parties?

24 A.  Was it resolved by an agreement?  In a way you could say

25     that.

Page 149

1  Q.  Okay.  How would you describe it?

2  A.  I would describe it as we -- we tried to -- sort of

3      circumvent the full-blown complaint procedure in order to

4      have an informal resolution.  And the informal resolution

5      took place but it's not something that I was satisfied with.

6  Q.  Okay.  Was it the informal resolution that you had agreed to

7      undertake?

8  A.  Yes, I agreed to undertake the informal resolution.

9  Q.  Okay.

10 A.  But -- but it's not like, you know, they said, this is how

11     it's going to be resolved, do you agree with this or not.

12     You know, they say, do you agree to have it resolved in this

13     manner; then you say, yes, I agree to have it resolved in

14     this manner.  And then it's -- you know, the result of which

15     can go many ways, right?

16 Q.  Okay.  And is that what happened in your case?

17 A.  Yes.

18 Q.  Okay.  And was that resolution one that -- do you remember

19     when that was completed?

20 A.  No, no, I don't really remember exactly.  But I think all

21     these documents are dated, right?

22 Q.  All right.  Let's just take a look here.  Okay.  I'm going

23     to share my screen with you.

24         All right.  I'm showing you a document,

25     Mr. Bruneau, that's dated August 26, 1993, addressed to you.

Page 150

1  And I am happy to scroll down and allow you to review this

2  document.  Would you like me to do that?

3  A.  Okay.

4  Q.  Do you need to read that top part or do you want me to go

5      ahead and scroll down at this point?

6  A.  You can scroll down.

7  Q.  Okay.  Let me know when you want me to go further.

8  A.  You can go further.

9  Q.  Okay.  Is this -- Mr. Bruneau, is this a letter that

10     reflects the agreement that was made for that informal

11     resolution that you talked about?

12 A.  Yeah, it's -- it's part of it, I think, yes.

13 Q.  What are you recalling there being in addition to this

14     letter, if anything?

15 A.  Well, okay.  So -- so it talks about the conference call

16     that we had, and from what I remember about this situation

17     the president of the college at that time, Paul Nelson I

18     believe, he had already received word from my psychiatrist

19     that she felt it was fine for me to return to college.  And

20     I guess Paul Nelson felt it necessary to have another

21     opinion on the matter, and that's how Mr. Richard

22     Kolinski -- no, no, I'm sorry, Dr. Raubolt is involved at

23     that point.  So the college, I think, contracted with him to

24     give me another medical examination.

25 Q.  Okay.

Page 151

1  A.  Mental health examination.

2  Q.  Okay.  So you mentioned Richard Kolinski.  It looks like he

3      is a representative of the Office of Civil Rights; is that

4      correct?

5  A.  Right.

6  Q.  Which is part of the U.S. Department of Education?

7  A.  Right.

8  Q.  So there was a conference call involving the Office of Civil

9      Rights, you, and Aquinas College's representatives; is that

10     correct?

11 A.  Yes.

12 Q.  And that resulted in an informal resolution which is

13     purported to be documented in this letter, correct?

14 A.  Yes.

15 Q.  And you -- you've signed that, that's your signature on the

16     bottom?

17 A.  Yes.

18 Q.  And that's Mr. Nelson's signature, correct?

19 A.  Yes.

20 Q.  Okay.  So was this the end of your OCR charge?

21 A.  If it wasn't it was very close to -- to that, right,

22     because -- yeah, because from what I remember the Office of

23     Civil Rights' representative spoke with me and we talked

24     this over.  And the presumption of Mr. Nelson of Aquinas was

25     that this independent examination would occur, that probably

Page 152

1    this person would be in agreement with my own doctor and
2    recommend that I could return, and then I would be allowed
3    to return.
4  Q.   Okay.
5  A.   So -- so that, of course, would -- would resolve, you know,
6    my complaint if I was allowed to return, and that would be
7    the end of it, correct.
8  Q.   Okay.  Was there further activity that happened on your
9    charge after this agreement?
10  A.   On my charge?
11  Q.   Yes.  Did you file a complaint or a charge with the Office
12    of Civil Rights?
13  A.   No, after -- after this -- well, yeah, this was the
14    complaint and then this -- at this point the complaint is
15    pretty much finished, and so that -- that would be the
16    resolution of the complaint.
17  Q.   Okay.
18  A.   My understanding.
19  Q.   Did you file any subsequent complaint with the Office of
20    Civil Rights after this one?
21  A.   No.
22  Q.   Okay.
23        COURT REPORTER:  I'm sorry to interrupt, but the
24    audio for Mr. Bruneau has fallen way down.
25

Page 153

1        MS. SETTERINGTON:  Agreed.
2        Can you maybe sit a little closer to your
3    computer, Mr. Bruneau?  It's gotten really quiet all of a
4    sudden.
5        THE WITNESS:  I can.
6        Is this better now?
7        MS. SETTERINGTON:  A little bit.  It's not
8    wonderful but it's a little better.
9        THE WITNESS:  You know what?  Let me go into my
10    system preferences, and I think I remember there was a
11    setting for input volume.  So let me turn that all the way
12    up.
13        MS. SETTERINGTON:  Okay.
14        THE WITNESS:  It's just going to take me a moment
15    to find it.
16        Okay.
17  BY MS. SETTERINGTON:
18  Q.   Okay.  So Mr. --
19  A.   Oh, I think it's -- for some reason it went down.  Okay, is
20    this --
21  Q.   Much better.
22  A.   Much better, okay.  I don't know why it went done like it
23    did, but maybe I did something and -- maybe I did something
24    in the room or something to cause that.
25  Q.   Okay.  So, Mr. Bruneau, do you understand yourself to be

Page 154

1    responsible for understanding what you signed in this
2    document that's dated October 26, 1993?
3  A.   Yes.
4  Q.   Okay.  And after the date of this letter I guess the
5    question I wanted to ask you is, did you file any other
6    charges with the Office of Civil Rights regarding Aquinas?
7  A.   I was -- I was in contact with them and I was -- you know, I
8    was talking with them about it.  I don't think it resulted
9    in filing another charge, but --
10  Q.   When --
11  A.   Hm?
12  Q.   When was that?
13  A.   That was fairly recently.  It was -- it was after 2016.
14  Q.   Okay.
15  A.   You know, I'm -- I'm having a little trouble with my Zoom
16    window.  Can someone tell me how to expand it once it --
17    once it goes down to a small size?
18  Q.   Yes.  If you hover on it -- let me see.  I'm going to stop
19    sharing with you.  This is probably why.
20        Is that -- does that make it better for you?
21  A.   Okay, yeah, now it's -- now it's back to normal.
22  Q.   Okay.  There's also -- sometimes you hover it -- over it and
23    it will give you a little arrow, a little looped arrow that
24    will make it bigger for you again as well.
25  A.   Okay.

Page 155

1  Q.   Okay.  And so the evaluation that you underwent as a result
2    of the agreement that we were just looking at, that did not
3    result in you being reinstated to Aquinas, correct?
4  A.   Correct.
5  Q.   Okay.  And then what was the next -- did you undertake any
6    further efforts between 19 -- let's see.  Oh, my gosh.
7        And do you recall when you underwent that
8    investigation or that evaluation that was referenced in the
9    agreement?
10  A.   It's -- it's there in the document, I think.  And the person
11    who evaluated me was not the person named in that letter, it
12    was actually Dr. Boyd.
13  Q.   Okay.
14  A.   Sort of substituting for the one who's named in -- in the
15    letter.
16  Q.   Okay.  And then --
17  A.   It took place within a few months afterward, I think.
18  Q.   Okay.  So then let me see here.
19        All right.  I'm going to make your screen small
20    again --
21  A.   Okay.
22  Q.   -- as I show you a document.
23  A.   All right.
24  Q.   Okay.  We're now looking at a document that's dated
25    January 6 of 1994, addressed to you on Aquinas College

Page 156

1   letterhead, and it's signed by Paul Nelson, who is the
2   president, correct?
3 A.  Yeah, at that time he was, I think, right.
4 Q.  Okay.  And so he indicates in this letter:  As I indicated
5   to you on the phone yesterday, based on the recommendation
6   of Dr. Don Boyd, licensed psychologist, I have decided not
7   to readmit you to Aquinas at this time.  And then he urges
8   you to schedule an employment with Dr. Boyd.
9      So after your receipt of this letter did you
10   undertake further efforts to have your expulsion rescinded?
11 A.  Yes.
12 Q.  What further efforts did you undertake?
13 A.  I started emailing Aquinas after the February 10th incident
14   about my desire to return.
15 Q.  Okay.  So between January 6th of 1994 and February of 2016
16   there wasn't any further activity to rescind your expulsion
17   but you did resume contact in -- after February of 2016?
18 A.  Yes.
19 Q.  Okay.  All right.  The contact that you had with Aquinas
20   following the February 2016 incident, that was about
21   rescinding or lifting the no trespass order, correct?
22 A.  I made it clear to them that my intention was to resume
23   studies there.
24 Q.  Okay.
25 A.  I -- I guess I saw the lifting the no trespassing order as

Page 157

1   sort of a first step.
2 Q.  Okay.  Did you ever say anything to Aquinas from 2016 on
3   about, oh, yeah, and I want my expulsion rescinded from the
4   1990s?
5 A.  I guess I took it as pointless to badger them about that
6   when -- when they apparently believed that a no trespassing
7   order on me was necessary.
8 Q.  Okay.  So you didn't have any contact between January 6 of
9   1994 and -- well, let me ask you this:  Did -- was there --
10   did you have any contact or interaction with Aquinas College
11   between -- or between January 6, 1994, and February 10 of
12   2016?
13 A.  I believe at one point there was an occasion where the --
14   the city's fencing club was going to do a demonstration at
15   Aquinas.  And so I asked Paul Nelson if I could attend that
16   because, you know, an expulsion means don't step foot on
17   campus, right?  And he allowed me to do that.  And so
18   that's -- that's the only -- that's the only contact I'm --
19   I'm recalling from that time period.
20 Q.  When did that happen?
21 A.  I think it was a few months after this letter, so maybe in
22   the spring of '94.
23 Q.  Okay.
24   Can you expand my window again, Stephanie?
25 Q.  Of course.  Sorry about that.

Page 158

1 A.  That's okay.
2 Q.  Okay.  So between January 6 of 1994 and February 10 of 2016
3   the only communication you recall with Aquinas was a request
4   you made to Paul Nelson to allow you to be on campus for a
5   fencing competition that was happening there?
6 A.  An exhibition, yes.
7 Q.  Okay.  And he granted that request?
8 A.  Yes.
9 Q.  Okay.
10     COURT REPORTER:  I'm sorry to interrupt again.
11   The audio fell off.  Can you do the same adjustment that you
12   did before, please?
13     THE WITNESS:  I can.  I wish I knew why it was
14   doing that.  I should just probably keep the window open so
15   I can constantly -- the level of -- of that.
16     Yep, it went down again.  I don't know what's
17   going on.  Okay.  I'll keep the window open and hopefully it
18   won't do that anymore.
19 BY MS. SETTERINGTON:
20 Q.  Okay.
21     Okay.  I'd like to talk with you a little bit
22   about the interim between that window of time we just talked
23   about of January 6 of 1994 to February of 2016.  So did you
24   attend classes at Grand Rapids Community College during
25   1994, if you remember?

Page 159

1     Are you there?
2 A.  I'm here.
3 Q.  Maybe -- I thought maybe you froze.  Did you hear my
4   question?
5 A.  Yes, I did.
6 Q.  Okay.
7 A.  So I attended Grand Rapids Community College prior to 1994;
8   I'm not sure if I was still going there afterward or -- or
9   not.  But that's all -- that's all in the --
10 Q.  Records?
11 A.  -- the academic information I've provided, I think.
12 Q.  Okay.  Did you ever have an instance at Grand Rapids
13   Community College where you were thought to be engaging in
14   inappropriate behavior involving a fencing foil?
15 A.  There was one instance in the field house where there was
16   like an open gym activity going on, and a friend of mine
17   went there to fence and -- and they weren't having it.  So
18   if that's what you're speaking of, there was that.  But
19   they -- they just told us, look, you can't do this here at
20   this time and -- and we said okay and -- and left.  I think
21   we spoke with college officials afterward and they said,
22   yeah, sorry, we can't have you fencing during open gym time.
23 Q.  Okay.  Did they issue you anything in writing about that?
24 A.  No.
25 Q.  Were you a student at the time, or no?  If you recall.

Deposition of Joseph Bruneau

Joseph Bruneau v. Aquinas College

Page 188

1 BY MS. SETTERINGTON:
2 Q.  Okay.  Mr. Bruneau, we just finished up talking about some
3      incidents that occurred at Grand Valley State and I just
4      want to confirm.  Do I understand from your previous
5      statement on the record that you're not prepared to talk
6      with me today about any criminal history or incarceration
7      matters other than what I might bring up to you?
8            Shoot.  You froze.
9 A.  I was saying, yes, that's -- I was saying, yes, that's my
10     preference.
11 Q.  Okay.  Then we'll just defer on those and I may ask you
12     about a couple other things I'm aware of but we'll handle
13     the rest of it after the -- after the court hearing.
14 A.  Okay.
15         I can go into my reasoning, if you like, on
16     that --
17 Q.  No.
18 A.  -- but --
19 Q.  No, it's okay.
20 A.  Okay.
21 Q.  I think you already did, and we --
22 A.  All right.
23 Q.  -- can handle that at the hearing, that's fine.
24 A.  Okay.
25 Q.  Mr. Bruneau, was there a situation in which you got a broken

Page 189

1      nose within the past several years?
2 A.  Yes.
3 Q.  What were the circumstances that resulted in that?
4 A.  I was involved in an altercation with an individual.
5 Q.  All right.  We lost you there, Mr. Bruneau.  Yes, it froze
6      again.  All I heard was, I was involved in an altercation
7      with an individual.
8 A.  Yep, that's -- that's the answer.  That's all I said.
9 Q.  Okay.  Who was the individual?
10 A.  A stranger.
11 Q.  When did this occur?
12 A.  When?  I don't have an exact date, but I guess -- I guess my
13     medical record will point to a date.
14 Q.  How did this altercation occur?
15 A.  I was walking on the sidewalk and there was someone
16     bicycling on the sidewalk also, which is not legal, so I
17     made a gesture to him and I told him, you know, you're not
18     allowed to bicycle on the sidewalk.  And this caused him,
19     you know, to crash, and then he, you know, got up from the
20     crash and -- and attacked me.
21 Q.  How did this -- your actions towards him cause him to crash?
22 A.  I guess he was distracted by me and he lost control of the
23     bike.
24 Q.  Okay.  What was the gesture you gave to him?
25 A.  I think I just sort of pointed at him like this

Page 190

1 (indicating).
2 Q.  How close were you to him?  How close was your hand to him
3      when you did that?
4 A.  Well, it was pretty close.  The sidewalk is about three and
5      a half feet wide, and I'm on one side of it, he's on the
6      other.  I think I was able to sort of tap him on the
7      shoulder.
8 Q.  Were there any criminal charges that arose out of that
9      situation?
10 A.  No.
11 Q.  Were you experiencing any kind of psychosis or borderline
12     psychosis at that time?
13 A.  No.
14 Q.  Okay.  Did -- do you feel that that incident arose at all
15     due to your bipolar condition or it was just an event that
16     happened?
17 A.  It was just an event that happened.
18 Q.  Okay.  I want to talk with you a little bit about the 2016
19     event at Aquinas that you've referenced in your -- in
20     your case.
21 A.  Okay.
22 Q.  Do you have an independent recollection of the incident that
23     occurred on Aquinas's campus on February 10, 2016?
24 A.  I have recollections of it, yes.
25 Q.  All right.  Tell me what you recall about your activities

Page 191

1      during that -- on that date?
2 A.  Okay.  So earlier --
3 Q.  You've frozen.
4 A.  Okay.
5 Q.  All I heard was earlier.
6 A.  Earlier that day I had missed a Greyhound bus that I
7      intended to take, so I was sort of stranded, and I went from
8      downtown to the Aquinas campus.  Now, I was kind of in a
9      state of -- I guess you'd say again a state of mental
10     disarray.  And, you know, it was -- it was winter, it was
11     February 10th, it wasn't warm.  And I don't know if I had --
12     I don't think I had enough money on me for a hotel.
13         Anyway, you know, I decided to try to go to
14     Aquinas, because it's somewhere where I once felt
15     comfortable, I guess.  And so when I went there I believe I
16     asked -- you know, I -- I think I tried to get into the art
17     and music center and -- and maybe -- I think there were some
18     students there in the doorway or something, and maybe they
19     weren't sure why I was there or something, and eventually I
20     ended up in the library.
21 Q.  You've frozen again.  You said, eventually I ended up in the
22     library, and then I couldn't --
23 A.  Yeah.
24 Q.  -- hear anything.  And you're still frozen.
25 A.  I was at the library.  I think I had gotten a ride from a

Deposition of Joseph Bruneau

Joseph Bruneau v. Aquinas College

Page 192

1   campus safety officer on a golf cart.
2 Q.  Mr. Bruneau?
3 A.  Yes?
4 Q.  I -- none of what you just said has come through.  I got,
5   eventually I wound up at the library, and then I think
6   you're trying to give me your answer again and none of it is
7   coming through.
8 A.  Okay.  I don't know what we can do.  Are we -- are we better
9   now?
10 Q.  At the very moment it seems a little bit better, if you want
11   to try again.
12 A.  So before the library at some point I got a ride with a
13   campus safety officer in a golf cart, and he took me
14   somewhere on campus from point A to point B, I don't quite
15   remember where.  A little later I think I went to the
16   library.  You know, it was -- it was warm there, at least I
17   could -- I could stay a while there before they closed.
18       And then the library -- I don't know if I looked
19   out of place or what, but there were a few students who were
20   trying to get me to leave.  I don't know, by my dress or
21   something maybe they thought I was a homeless person.
22   Definitely maybe I didn't look like a student, I'm a little
23   overage, I guess.  But the librarian sort of, you know, got
24   in between the situation.  He told them, look, you know,
25   we're -- we're open, he can stay, he's allowed to stay here.

Page 193

1       So I stayed there in the library.  I think because
2   of, you know, I was listening to some music or a video on my
3   phone, it was kind of loud to be in a library doing that, so
4   I was -- I was warned that -- you know, not to be loud.  So
5   at some point I -- you know, I stopped doing that and, you
6   know, remained more calm.  I was allowed to stay in the
7   library for the rest of the time there until they closed.
8       When they closed, you know, I left the library on
9   my own accord, and I ended up -- I think I went at some
10   point afterward to the campus safety office.  You know, I --
11   look, I didn't have anywhere to go, right?  It was cold, I
12   was tired.  I guess at the time I thought maybe it would be
13   appropriate for them to find, you know, an empty dorm room
14   where I could stay or something.  Of course that wasn't
15   something that they were wanting to do, and they were
16   probably concerned, you know, why is this guy here, why
17   won't he leave.  In the report certainly it says that I was
18   asked to leave; I don't really remember point-blank being
19   asked to leave.
20       And at some point they ended up calling the
21   police.  The police arrived --
22 Q.  You're freezing again.  Mr. Bruneau?
23 A.  Uh-huh.
24 Q.  You -- you said at some point they called the police, the
25   police arrived, and then I couldn't hear anything.

Page 194

1 A.  And then I spent about 30 minutes with the police there
2   before they took me to the jail; I was arrested for
3   trespassing.
4 Q.  Did you say anything inappropriate to any of the students in
5   the library?
6 A.  Anything inappropriate to students in the library?  I think
7   I might have had a few conversations with some of the
8   students; they might have regarded them as inappropriate.
9 Q.  Do you remember any details about those?
10 A.  Not really.  I think I complimented one student on her eyes.
11   There was one male student, I think it's in the report that,
12   you know, that I touched his arm and said, you know, you're
13   a big guy or something.  That, on its face, is kind of
14   inappropriate, especially in -- in, you know, 2020.  But
15   when I was growing up, you know, I guess people behaved
16   somewhat differently and maybe that wouldn't have been
17   regarded as inappropriate some 30 years ago.  But today it's
18   not, so it's kind of frowned upon.  So there's that.
19       Other than that, I think in the report it's
20   mentioned -- recall that, but, you know --
21 Q.  I'm sorry, you started to freeze on there.  You said other
22   than that?
23 A.  So did you get the part where I said in the report it's down
24   that I bumped into someone?
25 Q.  In the report it's down that you bumped into somebody?  No,

Page 195

1   I did not hear that part of your answer.  So --
2 A.  Okay.  Well, let's make that part of my answer then.
3 Q.  Okay.  Anything else?
4 A.  But, you know, I don't know how inappropriate that is.
5   People bump into each other, you know.  It's not a big
6   deal until -- until I do it, I guess.
7 Q.  Okay.  As far as the people that you interacted with at
8   Aquinas that night were any of those people the same people
9   that you interacted with at the time you were a student?
10 A.  Not that I can recall.
11 Q.  Okay.  Earlier in the day before you went to Aquinas had you
12   had any encounters with the police?
13 A.  Yes.
14 Q.  What were those encounters?
15 A.  There at the bus station I believe -- and this is in the
16   report -- the -- the police officer said that I pretended to
17   pull a gun on him or something.  I think I might have done
18   this (indicating), you know, put my hand in my coat and
19   then -- exactly this.  This is my finger, not a gun.  And,
20   you know, it's -- it's not really a crime to point a finger
21   at a police officer.  Like if --
22 Q.  Why did you do that?
23 A.  Why did I do that?  I don't always behave in a hundred
24   percent explainable fashion when I'm having a psychotic
25   breakdown or a hypomanic phase, as I might have been in at

Deposition of Joseph Bruneau                                    Joseph Bruneau v. Aquinas College

Page 196

1    the time.
2    Q.   Okay.
3    A.   Anyway --
4    Q.   Would you agree that it's not appropriate to pretend to
5         shoot a police officer?
6    A.   I didn't pretend to shoot the police officer.
7    Q.   Okay.  To make a motion --
8    A.   You can't shoot someone --
9    Q.   -- as though you had a gun?
10   A.   You can't shoot someone with a finger.
11   Q.   Okay.
12   A.   I didn't even say bang.  I mean, I just -- I did this and
13        did that, that's all.
14   Q.   All right.  So you -- you --
15   A.   I didn't go like this, I didn't, you know, say you're dead
16        or --
17   Q.   You reached as though you were pulling out a gun but then
18        you pulled out your finger; is that correct?
19   A.   Well, I didn't have a gun.  I didn't have anything in my
20        pocket.
21   Q.   Okay.
22   A.   I did this and did this.  That's all I did.
23   Q.   So, and I just want the record to reflect what it is you're
24        showing us on the screen right now.  You --
25   A.   I did that and --

Page 197

1    Q.   -- moved your finger over to the side as though you were
2         pulling something out of a pocket and then made a --
3    A.   Right.
4    Q.   -- gun motion with your finger and pointed it at the
5         officer?
6    A.   Well, if you want to call it a gun --
7    Q.   Do you think that was a prudent thing to do?
8    A.   Is it a prudent thing to do?  Is any interaction with the
9         police a prudent thing to do?
10   Q.   No, I'm asking you about this interaction --
11   A.   Right.
12   Q.   -- of pulling your hand out and making a gun motion at the
13        police.
14   A.   I did it as a -- I didn't mean it as any kind of a threat.
15   Q.   Okay.
16   A.   The one officer, I think he was a bit perturbed by it but
17        his -- his -- his partner who was there, he said something
18        like, you know, calm down, it's no big deal.
19   Q.   Okay.  So in the course of your deposition earlier today you
20        mentioned that you had received copies of the campus safety
21        report regarding what happened at Aquinas on February 10th
22        and that was in response to your efforts to get that
23        material for another case; is that right?
24   A.   Yes.
25   Q.   Okay.  So you've had a chance to review those?

Page 198

1    A.   Yes.
2    Q.   Okay.  I want to go back just a minute here and ask you
3         about -- prior to 2016 you -- you listed some other
4         incidents in which you were hospitalized for psychosis.
5    A.   Okay.
6    Q.   There was an incident in September 2014.  Do you have any
7         independent recollection of what the circumstances were
8         around that one?
9    A.   Not without being given further details about it.
10   Q.   Okay.  Do you remember a situation in which you assaulted a
11        nurse while you were hospitalized on that occasion?
12   A.   In 2014, I think you're talking about a situation at
13        Hillsdale Hospital.  Now, you're asking me if I remember the
14        actual incident?
15   Q.   Well, I guess I will start by asking you that, yes.  Do you
16        remember an incident in which you assaulted a nurse?
17             You're frozen.
18   A.   Okay.
19   Q.   Try again.
20   A.   I think I may have shoved a nurse, and I think I threw a
21        racquetball at a -- a different nurse, or perhaps he's
22        actually an orderly, I'm not sure.  But those were -- those
23        were the two incidents I recall that -- that might be
24        construed as assault, although I was not charged with an
25        assault.

Page 199

1    Q.   Okay.
2    A.   I mean, emergency rooms, things of that nature kind of
3         happen.  I'm not trying to excuse my behavior, but I was
4         psychotic at the time.
5    Q.   Why did you do it?  Was it just because you were psychotic
6         or was there a reason you took these actions?
7    A.   You know, I don't -- I don't really recall.  I'm not a
8         hundred percent sure.  I can't say.
9    Q.   Okay.  As far as before you entered the hospital at that
10        time were you on any medications?
11   A.   No.
12   Q.   Prior to that hospitalization do you remember the last time
13        you had been on any medications?
14   A.   So if you look at my disclosure of the treatment timeline,
15        if you -- that I was on medication during that time period.
16   Q.   You froze just a little bit.  You said, if I look at the
17        chronology of your treatment timeline, and then I didn't
18        hear it.
19   A.   Then you can find the last instance that I was on
20        medication.  It's going to correspond with when I was
21        treated.
22   Q.   Okay.  So at this point the time frames where you're
23        medicated are corresponding with the time frames that you're
24        hospitalized?
25   A.   Yes.

Page 200

1  Q.   Okay.  And so -- all right.  Okay.  So I can just look at
2       your interrogatory responses and conclude when you were last
3       medicated?
4  A.   Correct.
5  Q.   Okay.  Now, have you had any other instances where you've
6       assaulted people than what we've talked about?  I'm not
7       talking about criminal charges, I'm just talking about in
8       general.
9  A.   No, nothing I can recall.
10 Q.   Okay.  And so we were talking about the campus safety
11      report, which you did obtain and have had the opportunity to
12      read in connection with a separate lawsuit that you brought
13      against another entity, correct?
14 A.   Yes.
15 Q.   All right.  And you've also had the opportunity to review
16      the Grand Rapids police report of the incident on
17      February 10th of 2016, correct?
18 A.   Correct.
19 Q.   Do you dispute any of the information that is set forth in
20      those reports?
21 A.   Of course they're very often inaccurate.
22 Q.   Well, is there anything specifically where you look at that
23      and you say, I dispute that, that did not happen?
24 A.   Are we talking about the Aquinas report or the Grand Rapids
25      police report?

Page 201

1  Q.   I want to talk about both of them.  We can start with the
2       Aquinas report if you'd like.
3  A.   Okay, let's -- let's do that.  Do you have a copy of the
4       Grand Rapids report?
5  Q.   I believe I do, unless you've got something that you haven't
6       provided me in response to discovery that you might have.  I
7       don't know if I have everything you have.
8  A.   Okay.  Well, if you have the, you know, the Grand Rapids
9       report, and I have it, then we probably have the same
10      report.  And I can speak on that if you already have it.  As
11      far as the Aquinas report, we know we've both got copies of
12      that, right?
13 Q.   Yes, okay.  So --
14 A.   I'm not -- I just -- I just wasn't sure if you had the
15      Grand Rapids report.  I wasn't really wanting to speak on
16      that, you know, unless you have a copy of it already.  It's
17      kind of pointless to -- to --
18 Q.   I have a Grand Rapids -- let me show you.  I have a Grand
19      Rapids Police Department incident report form that is dated
20      9/11 of 2016.  Is that the same thing you have?
21 A.   9/11?
22 Q.   Oh, I'm sorry, my eyes are so terrible.
23 A.   That's okay.
24 Q.   2/11 of 2016.
25 A.   Okay.  So, yeah, the February 11th incident, I do have that

Page 202

1       somewhere.
2  Q.   Okay.  So let's start with the Aquinas report.  Is there
3       anything that's set forth in this Aquinas report that you
4       dispute as being untrue or inaccurate?
5  A.   Okay.  Well, let's see.  I guess we can start with the top
6       line.  It says disorderly conduct, disorderly in public.
7       You know, my behavior was a little bit not normal, not
8       expected, you know, but as far as disorderly conduct, they
9       never charged me with disorderly conduct so I kind of
10      dispute them saying that at the top of it.  I mean, I was --
11      I was charged with trespassing.
12 Q.   Are you talking about the -- you were charged criminally
13      with trespassing by the Grand Rapids Police Department?
14 A.   Yes.
15 Q.   Okay.  So because the --
16 A.   But in the Aquinas report it says -- in the Aquinas report
17      it says disorderly conduct, so I kind of dispute that.
18 Q.   Okay.  But that's -- just because you're not charged with a
19      crime doesn't mean you weren't disorderly, does it?
20 A.   It doesn't in itself, but we're talking about what I did
21      that night.  And, you know, some of my behavior wasn't
22      really mainstream behavior but that doesn't mean I would
23      call it disorderly conduct.
24 Q.   Okay.
25 A.   So that's where I say --

Page 203

1  Q.   Okay.
2  A.   -- that I disagree with that.
3  Q.   Okay.  What else?
4  A.   Okay.  Officers received a report that someone was
5       interrupting patrons of the library.
6  Q.   Where are you in the report, Mr. Bruneau?  Where is that?
7  A.   I'm on -- I'm on page 1, about halfway down.
8  Q.   Okay.
9  A.   I'm not disputing that the officers received a report that
10      someone was interrupting patrons of the library, but, you
11      know, I don't -- I didn't really -- as doing that.  I --
12      I -- I looked at it as, you know, making conversation with a
13      few people.
14 Q.   Okay.
15 A.   Okay?  I don't --
16 Q.   So you did flick out just a little bit, Mr. Bruneau, so I
17      just want to make sure I understood what you were attempting
18      to say.
19 A.   Okay.
20 Q.   You said, I don't dispute that the officers received a
21      report but I didn't see my behavior as interrupting patrons
22      of the library?
23 A.   Correct.
24 Q.   Okay.  You saw it more as making conversation?
25 A.   That's right.

Page 204

1  Q.  Okay.  All right.
2  A.  And then it's sort of -- I guess whoever is giving this
3      report is using sort of a shorthand by saying officer
4      investigated, warn, engaged and then removed subject; person
5      was arrested for trespassing.  I mean, that sounds like what
6      happened -- that he's describing an event that could have
7      taken place over a five- or ten-minute time frame, and
8      that's not what occurred.  So I guess that's an issue with
9      that.
10 Q.  So you think that sounds like it happened over too short of
11     a time period?
12 A.  Well, I mean, if you just read it one sentence after the
13     other it could be interpreted that way.
14 Q.  Okay.
15 A.  But the events that actually happened took place over a
16     longer period of time.
17 Q.  Okay.
18 A.  Okay?  I'm not saying he's wrong to say it that way, I'm
19     just saying that that's sort of a shorthand way of
20     describing what is probably, in his interest, what he should
21     be describing, right?
22 Q.  Okay.
23 A.  Being a -- being, I guess, a safety officer of the college.
24         Okay.  I can tell you, just on the record, I want
25     it to be known that my copy of the Aquinas report has names

Page 205

1      redacted, which I don't have a problem with that, that was a
2      concern of the college initially, that's their initial
3      reason for not providing me the copy of the report when I
4      asked them, and then when the Court was going to compel them
5      to anyway -- well, you're aware of this, you're the person
6      who I dealt with on that case, correct?
7  Q.  Correct.  And I have the redacted report as well, so we can
8      refer to that together.
9  A.  Okay.  There on page 2 it says, halfway down, that my
10     demeanor was belligerent.
11 Q.  What do you dispute about that?
12 A.  In my opinion at no time was I belligerent.  In my
13     estimation I was someone, you know, who was in a tight spot,
14     and I was trying to get some help.  Okay?  I mean, when the
15     police came and arrested me, that was without incident.  I
16     didn't have any physical altercations with any Grand Rapids
17     or Aquinas officers, you know.  Belligerence, to me, that
18     means, oh, you're in a heated argument or possibly a
19     physical confrontation with someone, and that's not what
20     occurred.
21 Q.  Okay.
22 A.  Okay.  Going down to page 3, Officer Shurr had dealt with
23     individual earlier in the day and stated that Roberts -- I
24     assume that means me -- had pretended to pull a weapon on
25     him.  I mean --

Page 206

1  Q.  Where does that appear on the page, Mr. Bruneau?
2  A.  That's at the very top --
3  Q.  Okay, I see that.
4  A.  -- of page 3.
5  Q.  Yes.  Okay.
6  A.  So if a police officer wants to say that someone, you know,
7      pointing a finger at him is pretending to pull a weapon on
8      him, sure.  But I don't -- I don't see that as accurate.  I
9      didn't see it as accurate at the time.
10 Q.  Do you deny that Officer Shurr told the Aquinas personnel
11     that?
12 A.  No, I don't deny that he told them that, but if you're
13     talking about, like, overall, like, do I -- do I agree with
14     everything in here, I'm going and saying, although he might
15     have told someone that I pretended to pull a weapon on him,
16     I'm going to tell you, if I'm the person that he's talking
17     about, you know, I wasn't trying to convince him with a
18     finger that it was indeed a gun and I was going to hurt him.
19 Q.  All right.  Yes, and you've described to us what you -- how
20     you -- how you perceive what you did.  And I'm --
21 A.  Right.
22 Q.  -- only asking that question just to clarify.  I want to
23     make sure I understand what you're disputing and what you're
24     not, so --
25 A.  Okay.  Okay.

Page 207

1  Q.  Mr. Bruneau, while you are taking a look at that would you
2      all mind if we went off the record for just one minute?  I
3      want to grab a document while he's taking the opportunity to
4      read this.  Okay?
5  A.  That's fine.  Would you like me to try to go through the
6      entire document and place a check mark at every point where
7      I feel there's a discrepancy?
8  Q.  Anything we can do to expedite would be great.  So yes, feel
9      free to read on and just make a note and then we can talk
10     about things when -- when you get through the report.
11 A.  Sounds good.
12 Q.  Okay.
13         VIDEOGRAPHER:  This concludes disc three of
14     Joseph Bruneau.  We're off the record at 4:07.
15         (Recess taken from 4:07 p.m. to 4:18 p.m.)
16         VIDEOGRAPHER:  We're back on the record.  This is
17     the beginning of tape four in the deposition of Joseph
18     Bruneau.  We're back on the record at 4:18.
19 BY MS. SETTERINGTON:
20 Q.  Okay.  Mr. Bruneau, you had the opportunity to re-review the
21     Aquinas campus safety incident report from the February 10,
22     2016, incident, and I was asking you to share with me any
23     information within that report you felt was inaccurate.
24 A.  Okay.
25 Q.  So we had gotten through at least the top of page 3 before

## Page 208

1     the break, so can you pick up from there and let me know any
2     other areas of the report you believe are inaccurate?
3 A.   Sure. About halfway down the document -- I'll just start on
4     the left-hand side -- there's a line, light, then set them
5     aside for retrieval the following day. At this time
6     Person E entered the academic building and asked students in
7     the hall if they had seen a man fitting Bruneau's
8     description. One student reported that a man fitting the
9     description entered their classroom during class and had
10     been kicked out by the professor.
11         I recall that as -- as -- I don't even think I
12     entered the classroom, I think I was there at the doorway.
13     I think I made a comment or two. And whether or not I
14     was -- I don't know about that, but I -- I just remember it
15     as me leaving after making those comments.
16 Q.   All right. So --
17 A.   But it was not like I intended to stay in the class until
18     the professor told me to leave. It wasn't really like that.
19 Q.   Okay. And so I just want to be clear here. You're
20     disputing whether you in fact entered the class or were
21     kicked out, correct?
22 A.   Right. I'm not disputing whether the student reported that
23     I did that, I'm just disputing that -- you know, that event
24     may not have occurred as it's described.
25 Q.   Okay. All right, thank you.

## Page 209

1 A.   A few lines down from there. Bruneau -- if he needed help
2     with anything. Bruneau claimed that he was fine and did not
3     need assistance -- and I believe began receiving calls from
4     Grace Hauenstein library about a man who fit Bruneau's
5     description, unsettling students.
6         Here I'm not disputing that someone received that
7     call, but, you know, defining my behavior as unsettling
8     students when it wasn't my intention to unsettle anyone. So
9     there's that.
10 Q.   Okay.
11 A.   Whether or not the students were unsettled or not, that's,
12     you know, not for me to decide of course.
13         About ten lines down from there -- students, if
14     Bruneau had done or said anything inappropriate. The
15     students indicated that Bruneau wasn't being inappropriate
16     but was making them nervous and uncomfortable. But again,
17     I'm not disputing that someone, you know, didn't report
18     that -- according to this.
19 Q.   We lost you there. Can you repeat that answer, please?
20 A.   Sure. The --
21 Q.   It happened again. We still cannot hear.
22 A.   Do you want the whole answer?
23 Q.   Probably.
24 A.   Okay. So it says the students indicated that Bruneau wasn't
25     being inappropriate but was making them nervous and

## Page 210

1     uncomfortable. I don't have any issue that a student
2     reported that I was making people nervous and uncomfortable,
3     but that wasn't my intention. So there's that.
4 Q.   Okay.
5 A.   Page 4, about eight lines down, spoke to Person K. Person K
6     requested officers be dispatched as Bruneau apparently
7     refused to move from his spot at the student's table. So,
8     you know, again, someone may have reported that, I'm not
9     disputing that, but I don't remember being asked to move
10     from a table and then saying, no, I refuse to remove from
11     this table. If that's how they want to, you know, describe
12     my actions, on the accuracy of it I can't really say, you
13     know.
14 Q.   Okay.
15 A.   If there's security cameras or something it might have a
16     better indication of that, of what actually took place, but
17     I -- I don't believe that I would refuse to move from
18     someone asking me to.
19 Q.   Okay. And so you dispute whether you actually did refuse to
20     move, you don't dispute that that was the report that was
21     made to campus safety?
22 A.   Right, I don't dispute that the -- that the report was made.
23 Q.   Okay. All right. Anything else?
24 A.   Yeah, there's something -- so about 15 lines down from there
25     it says Person M stated to Bruneau, you can't --

## Page 211

1 Q.   We lost you. Can you --
2 A.   -- cooperative and more agitated. You know, someone again
3     is reporting that I became less cooperative and more
4     agitated. You know, I'm not sure about what I actually did,
5     it's not really specified what I actually did, but I'm not
6     sure I would have described it as uncooperative and
7     agitated.
8 Q.   Mr. Bruneau? Just because --
9 A.   Yes?
10 Q.   -- you did freeze up on us a little bit there I want to just
11     confirm with you that I've got the right part. You're
12     referring to a part of the report that -- a line that says
13     Person M stated to Bruneau, you can't stay here and you need
14     to take all of your stuff. Bruneau grew less cooperative
15     and more agitated. And your comment is that you don't know
16     what they mean by that but you don't believe that you were
17     uncooperative or agitated?
18 A.   Well, that's right, I don't believe I was, but unfortunately
19     there's nothing factual in the report that indicates --
20 Q.   You froze up on us.
21 A.   -- less cooperative and --
22 Q.   You've frozen up.
23 A.   Okay.
24 Q.   You said there's nothing -- the detail isn't in the report
25     describing how you became less cooperative or more agitated?

Page 212

1  A.  Right.

2  Q.  Okay.  So you don't know --

3  A.  So --

4  Q.  -- what those details are?

5  A.  Well, I don't know what they are because, you know, my

6     recollection may be a little unclear, and secondly it should

7     be in the report.  If it's something factual that I did --

8     you know, it just says less cooperative, less cooperative

9     and more agitated.  It's -- it's better to have factual

10    information -- to say I was agitated.  Well, what does that

11    mean?

12  Q.  You're saying it's better to have factual information, is

13    that what you said?

14  A.  It would have been -- is less cooperative and more agitated.

15    What wasn't I cooperating with?

16  Q.  Okay.

17  A.  Or how was I -- how was I agitated.  Agitated speaks more to

18    a state of mind.  I mean, were my hands shaking, you know,

19    was I -- was I giving loud sighs?  Something.  But there's

20    nothing like that, it just says he became more agitated, he

21    was less cooperative.

22  Q.  Mr. Bruneau, how old were you at the time of this incident?

23  A.  We're talking about 2016, so I think I was around 46.

24  Q.  Okay.  The officer that gave you a ride in the golf cart,

25    what do you remember about that individual?  Do you remember

Page 213

1    what he looked like, or she, or whatever?

2  A.  You know, I think he -- he had dark hair, if I remember

3    right, he was a young man.  I probably wouldn't be able to

4    identify him.

5  Q.  Okay.

6  A.  But he seemed nice.

7  Q.  All right.  Are you aware that some campus safety officers

8    at Aquinas are actually undergraduate students?

9  A.  I'm aware of that, yes.

10  Q.  Okay.  All right.  But in any event, you --

11  A.  There is something else.  There are, I think, other -- other

12    asterisks I made.

13  Q.  Sure.  Let's talk through them.

14  A.  Okay.  So just continuing on from that point it says,

15    Bruneau then --

16  Q.  Mr. Bruneau, we've lost you again.

17  A.  Sure.  So --

18  Q.  Can you try again?

19  A.  -- continuing from there, Bruneau then began asking

20    inappropriate questions about whether or not the officers

21    wanted to have sexual relations with him and stated that

22    he'd just die instead of leaving.  This is making it sound

23    like I might have approached each officer asking for sex or

24    something and that's not what happened.  I might have made

25    that statement once, my memory is a bit unclear, but saying

Page 214

1    Bruneau then began asking inappropriate questions and then

2    using officers subsequently in the plural, it really sounds

3    like that's what I was doing to a number of officers.  And

4    that's not what happened.

5  Q.  Well, what do you remember doing?  What do you remember

6    doing, Mr. Bruneau?

7  A.  You know, it might be accurate that I asked one officer that

8    question, which is inappropriate, you know, I admit that.

9  Q.  Do you remember -- do you remember the words that you used

10    when you asked that question?

11  A.  They're probably similar to what's there.  I don't remember

12    the exact words.

13  Q.  How about, do you have any recollection of saying, do you

14    just want to take me home and fuck me?

15  A.  I don't recall saying that, no.

16  Q.  Okay.  Do you not recall it either way or do you dispute

17    that you said it?

18  A.  It doesn't sound like something I would have said.  Do I

19    dispute saying it?  So I -- you know, I can't really say.

20    It just doesn't sound like --

21  Q.  You're saying you can't say, you don't know for sure?

22  A.  I can say -- I can say it doesn't sound like something I

23    would have said.

24  Q.  I'm sorry, Mr. Bruneau, you've frozen again.

25  A.  I was saying that if I had to guess as to what I said I

Page 215

1    would not use those words, no.  So, you know --

2  Q.  Okay.

3  A.  -- by telling me that's what was said, it's a surprise to

4    me.

5  Q.  What about, do you remember asking, in terms of sexual

6    relations, do you remember asking one or both of the

7    officers whether they would be a porn star in a video for

8    you?

9  A.  I don't remember asking that.

10  Q.  Okay.  Do you have an interest in porn movies?

11  A.  I've had such interests, yes.

12  Q.  Have you had an interest in actually creating porn movies?

13  A.  It's something that I've thought about, yes.

14  Q.  Okay.  All right.  Okay.  Well, in any event, let's talk

15    about the other areas of the report that you dispute.

16  Q.  Okay.  So page 6, it's -- it's the second line from the top.

17    In the middle of the line it says, and observed strange

18    behavior from Bruneau.  You know, again --

19  Q.  We've lost you again, Mr. Bruneau.

20  A.  Okay.  So, you know, it says observed strange behavior but

21    it doesn't specify what behavior.

22  Q.  Okay.

23  A.  And if -- you know, it'd be -- it's good to rely on facts,

24    you know, say this behavior was observed or that behavior

25    was observed.  All they're doing is describing behavior.

Page 220

1   walked by Person D, bumping into her as she walked passed.
2   Person D and Person B were very uncomfortable and wanted
3   campus agents to know what had happened. All parties
4   cleared at approximately 10:55. Okay. So I guess that's it
5   from that.
6   Q.   Do you dispute that or are you -- or were you just reading
7        through to the end?
8   A.   I was reading through to the end to see if my asterisk meant
9        that I had disagreed with more of that statement. But I
10       guess it's only about the acting strangely.
11  Q.   Okay. So aside from those areas that you've identified for
12       me --
13  A.   Oh, wait, I'm sorry. And the interrupting students. I
14       mean, interrupting students, you could take that to mean I
15       went up to every student in the library and interrupted
16       them. And that's not what happened.
17  Q.   Where do you see that?
18  A.   A few students -- it's right after the "very strangely."
19       Bruneau was interrupting students, making noise, moving from
20       his seat repeatedly, and talking in a loud manner.
21  Q.   Okay. And so is the reason that you dispute that because
22       you think it could be construed as you were interrupting
23       every student?
24  A.   Well, I'm not saying that, but there's no way to know just
25       from that statement, you know.

Page 221

1   Q.   Okay.
2   A.   If I went up -- went up to a few students and in the process
3        of trying to initiate a conversation with them I happened to
4        interrupt them, then technically that would be interrupting
5        students.
6   Q.   Okay.
7   A.   But saying Bruneau was interrupting students, it kind of
8        sounds like that's what they're -- that's what I was there
9        to do, and that's not the case.
10  Q.   Okay. So is your reason for disputing that because you
11       think it makes it sounds like you were intending to
12       interrupt students when that was not in fact your intent?
13  A.   Correct.
14  Q.   Okay.
15  A.   And it also implies -- it also could imply that I was doing
16       that in a more frequent and ongoing, you know, mode than I
17       actually was.
18  Q.   Well, what's your recollection --
19  A.   And if I --
20  Q.   -- of what you actually did, Mr. Bruneau?
21  A.   I engaged a few students in conversation.
22  Q.   Okay. And then --
23  A.   And technically -- technically I may have interrupted a few
24       of them, but if I was such a nuisance there, as you could
25       read into these statements, they would have asked me to

Page 222

1   leave. And they never did that. I left the library when it
2   closed. They said I -- it's apparent from the report here
3   that on a few occasions they told me if your behavior, you
4   know, continues, if you continue talking with students or
5   doing this or doing that, we will ask you to leave. But
6   they never did.
7   Q.   Okay.
8   A.   So some of this language, it sort of indicates this is what
9        I was doing, I was doing these -- these bad behaviors, but
10       that's not all I was doing. I was there, you know, to get
11       some warmth and have a little bit of rest.
12  Q.   Okay.
13  A.   I wasn't there to make a nuisance of myself. But -- but
14       there's no way to -- there's no way to describe that in this
15       type of report. All they're doing is trying to report my
16       bad behavior. So when you read it you come to the
17       conclusion that I must have been behaving badly the entire
18       time. And that's not the case. That's -- that's all I'm
19       saying about that.
20  Q.   Okay.
21  A.   Or that's what I'm trying --
22  Q.   Okay.
23  A.   -- to say about that.
24  Q.   Okay. And so then what about the GRPD report?
25  A.   Okay.

Page 223

1   Q.   Is there any part of that that you dispute the accuracy of?
2   A.   I'm going to have to find that report first.
3   Q.   And if you want I can maybe show it to you on the screen.
4   A.   Maybe we'll have to do that.
5   Q.   Okay.
6   A.   Oh, no, I have it here, I have it right here. Do you want
7        me to similarly go through this report and asterisk items I
8        disagree with?
9   Q.   Why don't we, and why don't we just go off the record while
10       he does that, if that's okay, everybody?
11       COURT REPORTER: Sure.
12  A.   Can I just ask you, how much of this report do you actually
13       have?
14  BY MS. SETTERINGTON:
15  Q.   I have -- one, two, three -- four pages in my report. Is
16       that different than yours?
17  A.   I have five.
18  Q.   Okay. Well, maybe when you point to the parts that you --
19       my first page is a Grand Rapids Police Department incident
20       report form dated 2/11/2016 at 2:15 hours.
21  A.   That's my first page.
22  Q.   Okay.
23       VIDEOGRAPHER: Do you still want to go off?
24       MS. SETTERINGTON: Maybe let us just go through
25       this really quick and then we'll go off.

Page 224

1  BY MS. SETTERINGTON:
2  Q.   My second page indicates the report date and time in the top
3       left-hand corner, and then it's got a blank line, and then
4       it says vehicles involved and then property involved.  Is
5       that different than your second page?
6  A.   Yes, it is I think.  There's nothing -- there's no --
7  Q.   We lost you, Mr. Bruneau.  What?
8  A.   There's nothing on my second page about a vehicle.
9  Q.   It doesn't have any data filled in, it's just a -- line
10      that exists.  You don't have that?
11 A.   Well, I've got a line at the top of this form after the date
12      that says property make, slash, drug type.
13 Q.   Oh, yes, I've got that.
14 A.   Okay.  And then it says property model, serial number,
15      owner.
16 Q.   Yep.
17 A.   This says book bag, serial number none, owner Bruneau,
18      Joseph Robert.
19 Q.   Yep.
20 A.   Do you have that as page 2?
21 Q.   I do.
22 A.   Okay.
23 Q.   And then page 3 is more like a -- it's a narrative.  It's
24      got three separate narratives on it.  The first one is from
25      2:15 on 2/11 and it's by Reporting Officer Shurr.

Page 225

1  A.   Okay.
2  Q.   And then there's --
3  A.   Okay.
4  Q.   -- another narrative by Dijon Jones and another narrative by
5       Thomas Gootjes, or something like that.
6  A.   Okay.
7  Q.   Is that your third page?
8  A.   I have actually a page in between those, and it -- yeah,
9       it's a -- I have an extra page then, I guess, in between
10      those two.
11 Q.   Okay.  Well, I guess we'll have to deal with that page.
12 A.   Okay.
13 Q.   I mean, however you want to deal with it.
14 A.   I guess that's where we're getting the extra page from.
15 Q.   Okay.  Well, if you want to read pages one, two, three, and
16      five of your report and tell me if there's anything you
17      dispute about those, we can cover that.
18 A.   You mean one, two, four and five?
19 Q.   One, two -- oh, okay.  I thought my extra page was your page
20      four but you say it's page three.  Okay, yes.
21 A.   That's correct.
22 Q.   One, two, four, and five.
23 A.   My page four is Reporting Officer Shurr, Christopher at the
24      top, and my page 5 is Reporting Officer Orinth Alan
25      (phonetic) at the top.

Page 226

1  Q.   Now, it sounds like your report looks a little different
2       than my report.
3  A.   Yeah, this happens.
4  Q.   And the thing is, Mr. Bruneau, I mean, regarding this, I
5       feel like this particular incident is very central to your
6       claims, and if you're going to, you know, refuse to talk
7       about it until after the motion hearing we'll just have to
8       deal with that.  But this is not quite like asking about
9       other events not related to Aquinas.  So I'll leave it to
10      you.  If you'd prefer to wait until after the motion hearing
11      and we can talk about it then, that's fine with me.
12 A.   I'm willing to talk about all the pages that you already
13      have.
14 Q.   Well, but I'm not sure, based on what you're saying, if our
15      reports are going to be the same, because my second page has
16      lines on it that say vehicle involved and property involved
17      and property status safekeeping, and that sounds different
18      than yours.
19 A.   I've got that language on my second page, too, but not at
20      the top.  I've got property make and drug type at the top.
21 Q.   Yes, it's -- it's a -- our documents are different than one
22      another's.  So maybe --
23 A.   Okay.  But that's --
24 Q.   -- we are better off --
25 A.   That's a problem.  Well, maybe we could just put this whole

Page 227

1  one aside.  I mean, I understand your argument that this
2  report is sort of, you know, part of the issue about what
3  happened that night, but you've got to understand,
4  everything that's in this Grand Rapids police report is from
5  the last half hour that I was there on campus.  And my
6  interaction with the Grand Rapids police is in a way
7  separate than my interaction with any students, officers or
8  not.  Because they took --
9  Q.   You know what?  It all matters to me, Mr. Bruneau, and --
10 A.   That's understandable.
11 Q.   And I think we just -- I don't know what you have and I
12      won't know what you have until you decide or are ordered to
13      produce the document.  So I think we postpone questioning on
14      that document until we get the discovery issue resolved.
15 A.   Okay.  Good thing everyone has agreed to come back to this
16      if necessary.
17 Q.   Yes, yes.  Okay.  Let's see here.
18           So do you have a -- do you have a recollection
19      then of trying to get into the art and music center that
20      evening?
21 A.   Yes.
22 Q.   All right.  And do you remember talking with a student and
23      asking if you could put your bags in his room and spend the
24      night?
25 A.   I think I remember that, yes.

Page 228

1  Q.  Okay.  Do you remember what you were carrying in your bags

2      that night?

3  A.  I had a number of items with me, I was traveling.  And so

4      these are the personal items I had with me --

5  Q.  Okay.

6  A.  -- you know, for my travels.

7  Q.  Did you have dildos and bondage paraphernalia in your bag?

8  A.  Yes.

9  Q.  Okay.  What about -- okay.  And I think you've told me,

10     regarding the academic building your recollection is that

11     you didn't go into a classroom but you stood in a doorway

12     and maybe said a couple things and then left without being

13     kicked out; is that right?

14  A.  That's my best recollection.  I may have taken a few steps

15     into the classroom, I'm -- I'm not a hundred percent clear

16     in my memory.

17  Q.  Okay.  Do you have any recollection of going to any dorm

18     buildings that night?

19  A.  I received a ride from the security officer; I think it said

20     he took me to St. Joseph Hall.  I'm not sure if I went into

21     the common areas of the dorm or not.  I just don't have a

22     clear memory of that.

23  Q.  Okay.  Okay.  Now, the Aquinas library is for Aquinas

24     students, correct?

25  A.  I believe it's also, you know, there to serve members of the

Page 229

1     community as well who -- who want to use it.  I mean, that

2     was -- that was the initial argument between me and some

3     students.  The librarian intervened, and his indication was

4     that I could -- I could use the library.  That's -- that's

5     what I remember from being a student, anyway, was that

6     people from the community could also use the library when it

7     was open.

8  Q.  So that might be a practice, that Aquinas would exercise

9     discretion to allow people from the public to use that

10     library, correct?

11  A.  What do you mean by exercise discretion?

12  Q.  You don't think they're obligated by law to be open to the

13     public, do you?

14  A.  Are they obligated by law to be open to the public?  I'd

15     say, no, they're not obligated to be open to the public.

16  Q.  Okay.

17  A.  However, if they are open as a matter of policy, to be open

18     to the public, then there are discrimination laws that would

19     prevent them from keeping certain individuals out of the

20     library on the basis of handicap, sexual orientation --

21  Q.  Okay.

22  A.  -- that sort of thing.

23  Q.  Okay.  But the library is a place that is utilized by

24     students in connection with Aquinas's educational program,

25     correct?

Page 230

1  A.  Correct.

2  Q.  Okay.  And so students that are there studying are engaged

3     in an academic activity for the college, correct?

4  A.  At times.

5  Q.  Okay.

6  A.  Yeah, if they're studying then that's an academic activity,

7     sure.

8  Q.  Okay.  So my understanding is that GRPD came, you say you

9     had about 30 minutes of interaction with them, at which time

10     they arrested you for trespassing; is that right?

11  A.  Correct.

12  Q.  Can you give me any more detail about that arrest that

13     occurred?

14  A.  I think it was pretty straightforward, what -- what took

15     place.  I think it says in your report that they read me my

16     rights and I was babbling something, or something.

17  Q.  Okay.

18  A.  But I don't have a clear recollection of that.

19  Q.  And that's what I'm getting at right now is what is your

20     recollection of the event.  Do you remember the police

21     arriving at the college that night?

22  A.  Yes.

23  Q.  Do you remember any of your communications or interactions

24     with them?

25  A.  No.

Page 231

1  Q.  Okay.  Do you remember whether you --

2  A.  I mean, other than -- other than being handcuffed.  And, you

3     know, it doesn't surprise me that they would read me my

4     rights, but I don't specifically recall it.

5  Q.  Okay.

6  A.  And I don't recall -- no, it says -- it says I was babbling

7     something.  I don't recall that.

8  Q.  Okay.  You do remember being handcuffed?

9  A.  I -- I think I do.

10  Q.  Okay.  But you don't remember the other details of what you

11     might have been saying or what was said to you?

12  A.  That's correct.

13  Q.  Okay.  And what about your interactions with the Aquinas

14     campus safety personnel?  Is it the same sort of situation?

15     Do you have an independent recollection of what you said or

16     did?

17  A.  I do.  I'm not -- I can't tell you it's a hundred percent

18     accurate, but I -- I remember certain things.

19  Q.  Okay.  And I think you testified that the people that you

20     were interacting with from Aquinas that evening -- was there

21     anybody you were acting -- interacting with that you knew?

22  A.  No.

23  Q.  Okay.  As far as like the students in the library, for

24     example, do you have any information that would suggest they

25     knew who you were?

Page 232

1  A.  No.
2  Q.  And as far as the librarian, any information to suggest that
3      that person knew who you were?
4  A.  No.  The only thing I can say about the librarian and the
5      other students is that maybe I looked out of place.
6  Q.  Okay.
7  A.  And so maybe they thought I was not a student.  Other than
8      that, no.
9  Q.  Okay.  And as far as the students you dealt with in the --
10     in the art building or the arts building -- what was it?
11 A.  The art and music center, I think is what it was called.
12 Q.  Art and music center, yes.  You don't have any indication
13     that they had any idea who you were; is that correct?
14 A.  Correct.
15 Q.  And the same for the campus safety personnel that you dealt
16     with?
17 A.  That's correct.
18 Q.  Okay.  And so then you remember being put in handcuffs.  Do
19     you remember being taken away from the campus?
20 A.  You mean driving in the car?
21 Q.  Yes.
22 A.  I don't really remember that, no.
23 Q.  Okay.  What's the next thing you remember after being placed
24     in handcuffs?
25 A.  You know, other than to say I ended up at the Kent County

Page 233

1      jail, I -- I don't really remember events that occurred
2      while I was in the car; I don't really have a clear memory
3      of going from the car to the building of the jail.
4  Q.  Okay.
5  A.  So, yeah.
6  Q.  What's the next event you can remember that has anything to
7      do with Aquinas related to this incident?
8  A.  Nothing, unless I'm misinterpreting your question.
9  Q.  Well, maybe I should ask my question differently.  So after
10     you found yourself at the Kent County jail were there any
11     other events that you experienced that involved Aquinas?
12 A.  Are we talking about like emails sometime later and phone
13     calls with Aquinas personnel?
14 Q.  Well, how about, while you were at the jail do you remember
15     any other events you experienced that related to Aquinas in
16     particular?
17 A.  Not other than, you know, the fact that I had to defend
18     myself on a charge of trespassing which originated on the
19     Aquinas campus.
20 Q.  Okay.  And --
21 A.  Are you following me?
22 Q.  Go ahead.
23 A.  I was just asking if you follow that.
24 Q.  I think I do.
25     And so what was the ultimate disposition of that

Page 234

1      charge?
2  A.  I pled guilty to trespassing.
3  Q.  Okay.
4  A.  And by -- by the time that it went in front of the judge and
5      I entered that plea I had exceeded the maximum sentence for
6      trespassing and I was -- there weren't any -- any, you know,
7      monetary damage charges involved that I had to pay, they --
8      they just -- well, he extended his maximum time, serving
9      112 days, and -- and then I was released.
10 Q.  Okay.  So you -- you plead guilty to trespassing at
11     Aquinas's premises?
12 A.  Yes, I did.
13 Q.  Do you have any recollection of receiving a letter from
14     Aquinas while you were at the jail?
15 A.  I might have been given a letter.  I know that in the
16     reports there is talk of -- like if you want to say
17     February 11th, later on in the day.  So there was a no
18     trespassing order that was issued and someone transported it
19     to the jail with instructions to give it to me.  I may have
20     been given that letter in the jail, yes.
21 Q.  Do you have any independent recollection of that or are you
22     going solely based off the documents at this point?
23 A.  It's -- it's more going off the documents.  Actually what I
24     think might have happened is that they put that letter in my
25     property at the jail, and then once I was released then I

Page 235

1      had a copy of it and there it was.
2  Q.  So is the first time you remember seeing that no trespass
3      letter when you were ultimately released from jail?
4  A.  Yes.
5  Q.  Okay.
6  A.  I mean, I -- I knew I was charged with the crime of
7      trespassing, of course, that's why I was there, but actually
8      receiving that letter, yeah, I'm not -- I'm not sure.  Maybe
9      if they gave a copy to me, I don't really recall, but I
10     think what they did is put it in my property.
11 Q.  Okay.
12 A.  And it was given to me along with the rest of my property
13     when I left.
14 Q.  How long were you in jail following the February 10, 2016,
15     incident?
16 A.  I believe 112 days.
17 Q.  Okay.  So your best recollection is that you first really
18     have an awareness of this notice of trespass letter 120 days
19     after February 10th, so that's around June of 2016?
20 A.  That's my best recollection, yes.
21 Q.  Okay.  And let me see here.  I've got to pull up a new
22     document here.
23     Okay.  Mr. Bruneau, I'm going to share my screen
24     with you again.
25 A.  Okay.

Page 248

1   February 11, 2016. With that in mind could you please
2   explain to me how you reached your decision to continue your
3   order which forbids me from accessing the campus.
4   A.   Right.
5   Q.   So, Mr. Bruneau, do you maintain today that you didn't
6   maintain any of those criteria for issuing a no trespass
7   order?
8   A.   Yes.
9   Q.   You had committed criminal activity, correct?
10  A.   Not in my opinion.
11  Q.   Well, you pled guilty to trespass at Aquinas, correct?
12  A.   A not guilty plea would have necessitated numerous trips
13  back to Grand Rapids.
14  Q.   Okay.
15  A.   My home is in Toronto. I had already served the maximum --
16  please let me finish. I had already served the maximum
17  days, exceeded it in fact. There was no benefit to dragging
18  it out and -- and, you know, necessitating a --
19  Q.   We lost you again, Mr. Bruneau. You have frozen.
20  A.   -- being that there would have been no benefit to
21  necessitating a trial in the matter. I had already exceeded
22  my maximum amount of sentence before I could even go before
23  the judge and -- and plead one way or the other. So
24  pleading not guilty and -- and necessitating my trips back
25  and forth from Canada, which I really couldn't afford,

Page 249

1   it served -- it would have served no purpose. I already had
2   a criminal record.
3   Q.   That is not my question though.
4   A.   Okay.
5   Q.   My question is, you pled guilty to trespass at Aquinas,
6   correct?
7   A.   Right.
8   Q.   And you were convicted of trespass, correct?
9   A.   Correct.
10  Q.   Okay. And then as far as -- you dispute -- I know that in
11  later communications you dispute that you threatened,
12  harassed, or intimidated any members of the college
13  community, correct?
14  A.   Correct.
15  Q.   All right. What about disrupting academic business of the
16  college?
17  A.   I did not do that to any significant extent.
18  Q.   Do you agree that your behavior was disruptive to the
19  students on the campus?
20  A.   Not -- not in any substantial way.
21  Q.   Okay. But you said you didn't commit any of those
22  infractions, you didn't say I only committed a mild
23  infraction. Do you admit that you did at least disrupt
24  academic business of the college by your behavior?
25  A.   Can I give you an analogy?

Page 250

1   Q.   I just would like an answer.
2   A.   What's the question?
3   Q.   Do you admit that you disrupted academic business of the
4   college by your behavior in the library?
5   A.   I don't believe so. If I was then they would have asked me
6   to leave the library and they did not.
7   Q.   Okay.
8   A.   So by their own actions it's almost like they're saying I
9   did not disrupt the academic goings-on of the college.
10  Q.   Okay. In any of your other interactions there on campus do
11  you believe those disrupted the affairs of the college
12  community?
13  A.   Well, if you want to argue that, you know, I -- I caused
14  some inconvenience to the campus safety officers, that's
15  kind of their job, right? I mean, my situation was I had no
16  place to stay and it was getting cold and it was late at
17  night. All right?
18  Q.   Aquinas doesn't offer housing to the public, does it?
19  A.   I understand that. But I was in a situation that, you
20  know --
21  Q.   We've lost you here, Mr. Bruneau.
22  A.   It was a bad situation to be in, and a little more
23  understanding from the college instead of a by-the-book
24  "you're trespassing" or by-the-book -- you know, some amount
25  of understanding I think would be acceptable.

Page 251

1   Q.   Okay. Do you maintain that you didn't get any level of
2   understanding from Aquinas College that evening that you
3   were on campus?
4   A.   I'm not sure --
5   Q.   Okay.
6   A.   -- about what level of understanding that I was given. I
7   just know what their actions were.
8   Q.   Okay.
9   A.   And their actions were, we need to call the police on this
10  guy, which, you know, to be fair, I would say, you know,
11  it's not necessarily I have a -- I have a huge dispute with
12  it, the charge of trespass; just because I don't dispute how
13  they handled it doesn't mean, you know, that I believed I
14  was trespassing.
15  Q.   Okay.
16  A.   It doesn't mean I believe I was overly disruptive.
17  Q.   Okay. So in any event, you sent this letter on -- or this
18  email on July 14, 2017, kind of further challenging the
19  issuance of the no trespass order, and then you sent another
20  email on July 31st --
21  A.   Well, it's maintenance. The issuance is --
22  Q.   I'm sorry, I should speak more carefully. Well, you said
23  you didn't commit any of the infractions that would warrant
24  a no trespass order, correct?
25  A.   I don't believe I did, that's correct.

Deposition of Joseph Bruneau                                    Joseph Bruneau v. Aquinas College

Page 256

1    restriction on visiting the campus.
2        So, Mr. Bruneau, at this time you did not yet have
3    possession of the campus safety reports or any police
4    reports regarding your -- or did you have a -- did you have
5    a copy of the GRPD report at that point?
6 A.  I might have had a copy of the GRPD report at that point.
7 Q.  Okay.
8 A.  The GRPD report references the Aquinas report, and so
9    technically they should have had that report at the GRPD as
10   well. I tried to get a copy of that from them, and after a
11   bunch of running around with, you know, Freedom of
12   Information Act requests and what have you, they told me,
13   oh, we can't find it.
14 Q.  Okay. So at the time of this email you did not have the
15   Aquinas College campus safety report even though that was
16   referenced in the Grand Rapids Police Department report?
17 A.  That's correct.
18 Q.  Okay. And you seem to be indicating that, because you were
19   only criminally charged with trespassing, that's the only
20   behavior you could possibly have engaged in? Is that
21   correct?
22 A.  Okay. Can we go back to the previous one? Because I'm kind
23   of losing the -- train here.
24        Okay. Here I'm being asked, your freedom request
25   from the Grand Rapids Police Depart -- Department, whatever

Page 257

1    records you may be entitled to receive from it. So in the
2    next email I'm trying to tell Brian, look, the only
3    information that's in the Grand Rapids Police Department
4    report is about trespassing. Right?
5 Q.  Okay.
6 A.  So I think my concern with Mr. Matzke, in the email I'm now
7    seeing of November 7th, is that there's no indication of
8    disruptive behavior or, you know, the other types of
9    behavior that they're referencing as a reason to keep me off
10   in the Grand Rapids Police Department report. So I'm asking
11   him for specific information from him or --
12 Q.  We lost you, Mr. Bruneau.
13 A.  -- that would lead them to believe that my behavior was
14    disruptive, intrusive, and harassing.
15 Q.  Okay.
16 A.  Because that seems to be the reason why they're maintaining
17   the no trespass order.
18 Q.  Do you understand that Aquinas College did not have any
19   legal obligation to provide you the documentation that you
20   requested?
21 A.  I -- I can't speak to that, you know.
22 Q.  Okay.
23 A.  As -- as you're well aware, I'm not a lawyer.
24 Q.  Okay.
25 A.  But, you know, I never -- I didn't exactly insist that they

Page 258

1    provide it, I just -- I just told them, look, if you're
2    telling me, you know, you're maintaining a certain course of
3    action based on these facts then please give me evidence of
4    those facts. I think that's --
5 Q.  All right.
6 A.  -- a pretty -- I think that's an understandable and basic
7    request to me --
8 Q.  Do you have --
9 A.  -- from anyone in --
10 Q.  I'm sorry. Do you have any awareness of how Aquinas treats
11   other situations in which non-students request information
12   from the college?
13 A.  Okay. No, I don't.
14 Q.  Okay. So then we get to November 20 --
15 A.  But if this is information that pertains to them, you know,
16   I think it's -- I think it's not asking too much to -- to
17   share that information. Right?
18 Q.  I understand that you -- you believe that it would be
19   reasonable --
20 A.  I mean a-- situation. I'm intimately -- intimately involved
21   in this situation, right?
22 Q.  Mr. Bruneau, my question is simple though.
23 A.  Yeah.
24 Q.  Do you know what the college's usual practice is when it
25   comes to providing information to -- to non-students?

Page 259

1 A.  No.
2 Q.  Okay. So then we go to November 29, 2017, and you draft an
3    email to President Quinn. And basically you're just
4    informing him of what Mr. Matzke's decision was and you
5    indicate in the third paragraph, Mr. Matzke's allegation
6    that my behavior was harassing, intimidating, and disruptive
7    is without merit. I was charged with trespassing and
8    trespassing alone by the GRPD. I have asked Mr. Matzke to
9    provide a source of evidence for his allegations but he
10   refused. He now seems unwilling to discuss the matter with
11   me further. So I'm asking you to rescind the order that I
12   not visit campus in the future so that I may further pursue
13   my education at Aquinas College.
14        What -- what are your plans for pursuing your
15   education at Aquinas College, Mr. Bruneau?
16 A.  I have -- I'd like to study literature there and writing.
17 Q.  When would you plan on enrolling?
18 A.  Could be fairly soon.
19 Q.  Would you be -- do you have plans to pursue a degree with
20   Aquinas in literature and writing?
21 A.  I don't think I need or want a degree. I might be close to
22   getting like an English major, so maybe I could tack that on
23   to my existing degree.
24 Q.  Okay. You haven't informed anybody at Aquinas that you have
25   a specific desire to pursue a literature and writing degree