# EXHIBIT 36

Stanciel v. Donahoe, 570 Fed.Appx. 578 (2014)

30 A.D. Cases 335

570 Fed.Appx. 578
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Milton STANCIEL, Plaintiff–Appellant,

v.

Patrick R. DONAHOE, Postmaster General,
United States, Defendant–Appellee.

No. 13–1921.
|
July 1, 2014.

**Synopsis**
**Background:** Employee brought action against his former
employer, the United States Postal Service, alleging that it did
not accommodate his mental disability and terminated him
solely because of his disability, in violation of Rehabilitation
Act. The United States District Court for the Eastern District
of Michigan, 2013 WL 1914314, entered summary judgment
for employer. Employee appealed.

**Holdings:** The Court of Appeals, Griffin, Circuit Judge, held
that:

[1] employee did not establish that employer's proffered
legitimate, nondiscriminatory reason for his discharge was
pretext for disability discrimination, and

[2] employee did not make request for accommodation, as
required to support failure to accommodate claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (3)

[1]  **Civil Rights**  ⌕  Particular cases

78  Civil Rights
78II  Employment Practices
78k1215  Discrimination by Reason of Handicap,
Disability, or Illness
78k1220  Particular cases
United States Postal Service proffered
legitimate, nondiscriminatory reason for
discharging employee with mental disability,
namely, his numerous attendance violations,
during discrimination action under the
Rehabilitation Act. Rehabilitation Act of 1973, §
504(a), 29 U.S.C.A. § 794(a).

2 Cases that cite this headnote

[2]  **Civil Rights**  ⌕  Disparate treatment

78  Civil Rights
78II  Employment Practices
78k1215  Discrimination by Reason of Handicap,
Disability, or Illness
78k1222  Disparate treatment
Employee with mental disability did not
establish that United States Postal Service's
proffered legitimate, nondiscriminatory reason
for his discharge, namely, numerous
attendance violations, was pretext for disability
discrimination under the Rehabilitation Act;
employee had history of attendance problems,
Postal Service proposed to terminate employee
at least five times before for similar attendance
violations, and employee had no evidence that
he was treated any differently from similarly
situated non-disabled employees. Rehabilitation
Act of 1973, § 504(a), 29 U.S.C.A. § 794(a).

4 Cases that cite this headnote

[3]  **Civil Rights**  ⌕  Requesting and choosing
accommodations; interactive process;
cooperation

78  Civil Rights
78II  Employment Practices
78k1215  Discrimination by Reason of Handicap,
Disability, or Illness

78k1225   Accommodations

78k1225(4)   Requesting and choosing
accommodations; interactive process; cooperation
Employee with mental disability made no
request for an accommodation, as required
to support prima facie case of failure to
accommodate against United States Postal
Service under the Rehabilitation Act; Postal
Service did not need to accommodate plaintiff
in order for him to understand or comply
with attendance policy and procedures at issue,
and, although employee requested revised work
schedule, he never told Postal Service that
he needed this accommodation because of his
disability. Rehabilitation Act of 1973, § 2 et seq.,
29 U.S.C.A. § 701 et seq.

8 Cases that cite this headnote

**\*579**  On Appeal from the United States District Court for
the Eastern District of Michigan.

Before GRIFFIN and DONALD, Circuit Judges; and
GRAHAM, District Judge.[*]

[*]     The Honorable James L. Graham, Senior United
States District Judge for the Southern District of
Ohio, sitting by designation.

**Opinion**

GRIFFIN, Circuit Judge.

Plaintiff Milton Stanciel sued his former employer, the United
States Postal Service, alleging that it did not accommodate his
mental disability and terminated him solely because of that
disability, all in violation of the Rehabilitation Act of 1973,
29 U.S.C. §§ 701–797. The district court granted summary
judgment to defendant on both claims. We affirm.

I.

Plaintiff suffers from a mental disability. He was first
diagnosed with a learning disability when he was 12 years
old, as a 6th grade student in the Detroit Public School
system. Plaintiff's disability makes it difficult for him to
understand directions he is given, and he finds that it greatly

aides his ability to learn or understand when people repeat
instructions to him or speak to him slowly. Notwithstanding
this disability, plaintiff graduated from high school with the
assistance of special education classes. He then attended
Wayne Community College for some time, and later the
Detroit Business Institute. Plaintiff has an IQ of 69.

Plaintiff began working for defendant as a bulk mail handler
in January 1991 and was a member of the National Postal
Mail Handlers Union, Local 307. Because of his mental
impairment, defendant hired plaintiff through a special, non-
competitive hiring process. This process excused plaintiff
from taking the standard service entrance exams to determine
literacy or ability to serve as an employee. Included among
the paperwork completed during the hiring process is a
certification of disability form which lists plaintiff as having
disability code 90, defined as "mental retardation." All agree
that plaintiff excelled at his job as a "sack sorter," keying in
zip codes of mail as it passed him on a conveyor belt.

However, plaintiff had serious attendance problems. Plaintiff
received thirteen multi-day suspensions for attendance
infractions between July 1994 and June 2009. He also
received five notices of removal during his tenure that
ultimately were modified to provide him with another chance
to retain his employment. Admittedly conscious of his
attendance issues, plaintiff utilized various strategies to avoid
infractions. For example, when he knew he would be late, he
would call and ask his supervisor, Donna Bright, to punch him
in before he arrived. Bright complied initially but later refused
after plaintiff made the request "too many times." Plaintiff
also took his timecard home with him overnight so he could
clock in at the first time clock he encountered when entering
the facility, rather than at the clock closest to his work station,
where his timecard normally would be kept. Further, plaintiff
obtained Bright's permission to use his annual leave to cover
the time he missed when tardy. And, despite the fact that
defendant disciplined **\*580**  plaintiff for being absent without
leave on many occasions, plaintiff was aware of the form he
needed to complete to comply with the general procedure for
requesting time off.

In 2008, plaintiff developed an alcohol abuse problem. He
admitted that he had been drinking daily, even before work
and on his lunch breaks, and that he had also been using
marijuana and cocaine. He also admitted that his drinking
problem caused him to be late.

In September 2009, plaintiff participated in another pre-disciplinary interview for attendance problems. Under the attendance policy in effect at plaintiff's location, if an employee has more than three attendance infractions over a ninety-day period, the computer notifies the supervisor to conduct an attendance review. Plaintiff does not dispute that he incurred four violations during the relevant time period: two tardies and two absences. During the meeting, plaintiff cited "car problems" and "transportation" as the reason for his absences. Bright did not offer plaintiff an accommodation for his disability at this time because she did not know one was needed, nor was she ever told that defendant had previously certified that plaintiff was mentally disabled. She was also unaware that plaintiff had a drinking problem, and plaintiff did not inform her of his problem during the interview.

After the investigation was complete, on September 22, 2009, Betty Mitchell, acting Supervisor Distribution Operations, issued a letter of removal notifying plaintiff of his termination effective October 30, 2009. Plaintiff subsequently checked himself into rehabilitation for alcoholism and drug abuse, and on October 8, 2009, he returned to work and worked until his removal date.

In May 2010, as a result of a successful union grievance process related to his termination, plaintiff signed a "redress mediation settlement agreement" with defendant. Under that agreement, plaintiff could have returned to work if he, among other things, passed a drug test. However, plaintiff later decided that the drug test requirement was unfair, and he rejected the settlement. Plaintiff's grievance was ultimately denied on December 15, 2010, when an arbitrator found that defendant had "just cause" to terminate plaintiff's employment.

In April 2011, plaintiff filed the instant suit against defendant, raising a variety of claims under state and federal law. By 2013, as a result of plaintiff's subsequent abandonment of certain claims and the district court's ruling on defendant's motion to dismiss, [1] only two claims remained: (1) disability discrimination under the Rehabilitation Act—based on the above-described mental disability and alcoholism; and (2) gender discrimination under Title VII of the Civil Rights Act. Defendant filed a motion for summary judgment on both claims, which the district court granted. Plaintiff timely appealed, challenging only the ruling related to his disability discrimination claim based on his mental disability.

[1]    Plaintiff does not challenge this ruling on appeal.

## II.

### A.

We review de novo the district court's grant of summary judgment. *Geiger v. Tower Auto.,* 579 F.3d 614, 620 (6th Cir.2009). Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. **\*581** Fed.R.Civ.P. 56(a); *Burley v. Gagacki,* 729 F.3d 610, 618 (6th Cir.2013).

### B.

Plaintiff first argues that he has created a genuine issue of material fact on whether defendant terminated his employment "solely because of" his disability in violation of the Rehabilitation Act. We disagree.

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity ... conducted by any Executive Agency or by the United States Postal Service." 29 U.S.C. § 794(a). To prevail on a claim of discriminatory discharge under the Act, a plaintiff must "prove that he was fired *solely* by reason of his disability." *Jones v. Potter,* 488 F.3d 397, 409 (6th Cir.2007) (internal quotation marks, ellipses, and citation omitted); *see also Lewis v. Humboldt Acquisition Corp., Inc.,* 681 F.3d 312, 317 (6th Cir.2012) (en banc) ("The sole-cause standard ... is a creature of the Rehabilitation Act[.]"). An employer makes a termination decision "solely" because of its employee's disability when "the employer has no reason left to rely on to justify its decision other than the employee's disability[.]" *Monette v. Elec. Data Sys. Corp.,* 90 F.3d 1173, 1183 n. 9 (6th Cir.1996), abrogated on other grounds by *Lewis,* 681 F.3d at 313–14.

In assessing Rehabilitation Act discrimination claims based on circumstantial evidence—as is the case here—we apply the three-step *McDonnell Douglas* framework. *Gribcheck v. Runyon,* 245 F.3d 547, 550 (6th Cir.2001). First, a plaintiff must set forth evidence from which a jury could conclude a

prima facie case of discrimination has been established. *Macy v. Hopkins Cnty. School Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir.2007). Then, the burden shifts to the employer to articulate some "legitimate, nondiscriminatory reason" for its actions. *Id.* Finally, if the defendant meets that burden, "the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Id.*

To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must show that (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of his disability; and (5) either the position remained open; he was replaced by a non-disabled person; or similarly-situated non-disabled employees were treated more favorably. *DiCarlo v. Potter*, 358 F.3d 408, 418 (6th Cir.2004).

In this case, the district court assumed that plaintiff has established a prima facie case. Defendant does not challenge this determination on appeal. Accordingly, we turn to pretext.

[1] Defendant has articulated a legitimate, non-discriminatory reason for terminating plaintiff's employment—his numerous attendance violations. Plaintiff may demonstrate that defendant's rationale is a pretext designed to mask intentional disability discrimination with proof that the attendance rationale had either (1) no basis in fact; (2) did not actually motivate defendant's termination decision; or (3) was insufficient to motivate termination. *Jones*, 488 F.3d at 406. On this record, plaintiff cannot make that showing.

[2] Plaintiff does not dispute that he has a history of attendance problems or that defendant's attendance policy states **\*582** that "Failure to be regular in attendance may result in disciplinary action, including removal from the Postal Service." Plaintiff also does not dispute that defendant proposed to terminate plaintiff at least five times before for similar attendance violations, and plaintiff had only retained his job through union grievances and two so-called "Last Chance Agreements." Thus, no reasonable jury could find that defendant's attendance rationale has no basis in fact or was insufficient to motivate defendant's decision to end plaintiff's employment.

Likewise, no reasonable jury could find that defendant's attendance rationale did not actually motivate defendant's decision. Plaintiff argues that he has established pretext because (1) he has offered affidavits from two co-workers showing that Bright was dishonest when asked during her deposition if she knew of his disability; (2) discipline for attendance violations is left to the "arbitrary" discretion of his supervisors; and (3) he was the only employee that was asked to take a drug test in addition to the regular medical clearance exam in order to be reinstated in connection with his final "Last Chance" agreement. This evidence does not allow a reasonable jury to conclude that defendant's attendance rationale did not actually motivate its decision to terminate plaintiff's employment.

First, even if we agree with plaintiff that his co-workers' affidavits create a fact question on whether Bright was lying when she said that she did not know that he was disabled, a determination in plaintiff's favor would not support an inference that he was fired "solely by reason of" his disability because he admits to the attendance violations and because the Rehabilitation Act does not prohibit an employer from discharging someone for egregious misconduct, even if the misconduct was "causally related to" a disability. *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 847 (6th Cir.1995), abrogated on other grounds by *Lewis*, 681 F.3d at 313–14; *see also LaPorta v. Wal–Mart Stores, Inc.*, 163 F.Supp.2d 758, 769 (W.D.Mich.2001) ("*Maddox* and its progeny ... stand for the proposition that an employer may lawfully discharge an employee for egregious misconduct, even when the misconduct is allegedly induced by a disability.").

Second, the record does not support plaintiff's argument that his supervisors arbitrarily issued discipline for his numerous attendance violations. Bright testified that when the computer notifies her that the employee has had three attendance incidents in the prior ninety days, she considers the reasons for the infractions and she makes a decision as to whether to start the disciplinary process or to continue to watch the person's attendance. Further, plaintiff does not dispute that he has a long history of attendance violations and that defendant had previously issued a series of progressive disciplinary actions, including multi-day suspensions and repeat proposals of termination. No reasonable jury could find that defendant's termination of plaintiff's employment was an arbitrary disciplinary action designed to conceal intentional disability discrimination.

Third, defendant's requirement that plaintiff submit to a drug test as part of his final "Last Chance" agreement does not show pretext. Plaintiff fails to come forward with any evidence that any other employee who had a "Last Chance"

agreement based on attendance problems had admitted abusing illegal drugs but was not required to take a drug test as part of a reinstatement package. In other words, plaintiff has no evidence that he was treated any differently than similarly-situated non-disabled employees.

**\*583** In sum, although plaintiff has established a prima facie case of disability discrimination, he has offered no evidence from which a reasonable jury could conclude that defendant's proffered rationale for its termination decision—numerous attendance violations—was pretextual.

## C.

Next, plaintiff argues that he has created a genuine issue of material fact on whether defendant failed to accommodate his disability in violation of the Rehabilitation Act. Again, we disagree.

To establish a prima facie case of failure to accommodate under the Rehabilitation Act, a plaintiff must show that (1) he has a disability; (2) he was qualified for the position; (3) the agency was aware of his disability; (4) an accommodation was needed, "i.e., a causal relationship existed between the disability and the request for accommodation;" and (5) the agency failed to provide the accommodation. *Gaines v. Runyon,* 107 F.3d 1171, 1175 (6th Cir.1997). If the plaintiff establishes a prima facie case, "the burden shifts to the employer to demonstrate that the employee cannot reasonably be accommodated, because the accommodation would impose an undue hardship on the operation of its programs." *Id.* at 1175–76.

**[3]** Plaintiff cannot establish the fourth element of his prima facie case because he never requested that defendant accommodate his disability. "It is well settled in cases brought under the Rehabilitation Act ... that reasonable accommodation is not at issue if the plaintiff has never requested accommodations." *Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042, 1046 n. 4 (6th Cir.1998) (citing *Lue v. Moore,* 43 F.3d 1203, 1206 (8th Cir.1994); *Wood v. President of Spring Hill College,* 978 F.2d 1214, 1222 (11th Cir.1992)). The rule is justified by the sensible policy that the "employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Id.* at 1046–47.

In this case, plaintiff claims that he "arguably" requested an accommodation because he (1) asked supervisors for help with "policies and procedures" regarding certain attendance forms; (2) requested a "revised work schedule"; and (3) made a "blanket, permanent" request for reasonable accommodations in his certification of disability form completed during the hiring process in 1991. This evidence does not show that plaintiff actually requested defendant to accommodate his disability.

First, the record does not demonstrate a causal relationship between plaintiff's disability and his request for help with "policies and procedures." Plaintiff's deposition testimony reveals that he understood the relevant policies and his work history shows that he was capable of reporting to work as scheduled. In other words, defendant did not need to accommodate plaintiff in order for him to understand or comply with the attendance policy and procedures at issue.

Second, although plaintiff requested a "revised work schedule," he admits that he never told defendant that he needed this accommodation because of his disability. Moreover, plaintiff explained that what he meant by a "revised work schedule" was being granted permission to use annual leave when he was late, even though it was not scheduled—a practice that his supervisors apparently allowed for some time. Under these circumstances, defendant would have no reason to know that plaintiff was requesting an accommodation under the Rehabilitation Act when he asked for a "revised work schedule." *See Enica v. Principi,* 544 F.3d 328, 338 (1st Cir.2008) ("[T]he employee must prove that the request was sufficiently direct and specific so as to put the employer on notice of the need for an accommodation.").

**\*584** Third, and similarly, nothing in plaintiff's certification of disability form shows that he made a "blanket, permanent" request that defendant grant him unidentified accommodations for unidentified aspects of the job throughout the duration of his employment. The document merely contains a certification from the Michigan Rehabilitation Services that a counselor has:

> reviewed the job requirements and the job site and certify that the above-named applicant for the cited position in Detroit, Michigan [ ] has a severe disability, code # 90(LD), and: a. Has the ability to perform the duties of

the position; b. Is qualified to do the work without hazard to self or others; and c. Is physically and socially competent to maintain self in a work environment, either independently, or with continuing help as has been provided in after-work hours living.

In no way can this passage be reasonably construed as a perpetual request for an accommodation under the Rehabilitation Act.

Additionally, because we find that plaintiff did not request an accommodation, plaintiff alternatively argues that he should be excused from making such a request. Citing an unappealed district court opinion that applies out-of-circuit case law and interprets dicta from two of our unpublished opinions, plaintiff argues that the application of the general rule that a plaintiff must request an accommodation in order to establish a prima facie case is not warranted if: (1) the disability at issue is a mental disability that is obvious or otherwise known to the employer without notice from the employee; (2) the employer had reason to believe that the employee is experiencing work problems because of that disability; and (3) the nature of the disability impairs the employee's ability to request an accommodation. *See Moloney v. Home Depot U.S.A., Inc.,* No. 11–10924, 2012 WL 1957627, \*14 (E.D.Mich. May 31, 2012). Assuming arguendo that this three-part conjunctive test is the law of the circuit—which it is not—plaintiff cannot meet the second element.

Plaintiff does not point to any evidence in the record that would lead a reasonable trier of fact to conclude that defendant should have known that he was not arriving on time or was absent without leave because of his disability. Although plaintiff was disabled throughout his entire tenure with defendant, he displayed an ability to meet the requirement for regular attendance in the first two years of his employment and for significant periods after that. Plaintiff also told defendant that there were a number of other reasons why his attendance suffered, from transportation issues to drug and alcohol abuse, but never mentioned his disability as one of those reasons. Further, it is undisputed that, except for the circumstances surrounding his hiring, he never told his supervisors that he even had a mental disability. Consequently, this record does not create a genuine issue of material fact on whether defendant had a reason to know that this disability caused attendance issues.

In sum, because plaintiff made no request for an accommodation, and because he is not excused from making the request under the circumstances presented, there is no evidence from which a reasonable jury could find that defendant failed to accommodate plaintiff's disability.

### III.

For the foregoing reasons, we affirm the judgment of the district court.

**All Citations**

570 Fed.Appx. 578, 30 A.D. Cases 335

---

**End of Document**      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Wurzel v. Whirlpool Corp., 482 Fed.Appx. 1 (2012)

26 A.D. Cases 521, 45 NDLR P 40

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by  Shelton v. City of Cincinnati,  S.D.Ohio,  November 1, 2012

482 Fed.Appx. 1
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Brian WURZEL, Plaintiff–Appellant,

v.

WHIRLPOOL CORP., Defendant–Appellee.

No. 10–3629.
|
April 27, 2012.

**Synopsis**
**Background:** Employee who suffered from Prinzmetal angina sued his employer, claiming discrimination in violation of the Americans with Disabilities Act (ADA). The United States District Court for the Northern District of Ohio, 🚩 2010 WL 1495197, entered judgment against the employee, and he appealed.

**Holding:** The Court of Appeals, Mark Goldsmith, District Judge, sitting by designation, held that the employer's determination that the employee posed a direct threat to his own safety and that of others in a plant was reasonable.

Affirmed

**Procedural Posture(s):** On Appeal.

West Headnotes (1)

[1]  **Civil Rights** 👈 Employment qualifications, requirements, or tests

Employer's determination that an employee suffering from Prinzmetal angina posed a direct threat to his own safety and that of others in a plant was based on a reasonable medical judgment, which relied on the most current medical knowledge and best available objective evidence and reflected an individualized assessment of the employee's abilities, thus defeating the employee's claim of an ADA violation in connection with work restrictions and an unpaid leave; the employee's condition was life-long, he worked close to dangerous automatic machinery and, at times, out of the sight of other employees, he had once previously been found on the worksite doubled over and close to passing out, and that numerous times he had required the assistance of a fellow employee. Americans with Disabilities Act of 1990, § 201 et seq., 42 U.S.C.A. § 12131 et seq.; 29 C.F.R. § 1620.2(r).

26 Cases that cite this headnote

***1** On Appeal from The United States District Court for The Northern District of Ohio.

Before BOGGS and MCKEAGUE, Circuit Judges; and GOLDSMITH, District Judge. *

**OPINION**

MARK GOLDSMITH, District Judge.

****1** Plaintiff Brian Wurzel appeals the district court's order granting Defendant Whirlpool Corporation's motion for summary judgment in this employment discrimination case, brought principally under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* The district court granted summary judgment, in part, based on Wurzel posing a direct threat to his own safety and that of others in the plant. Although we employ a different analysis than did the district court, we ultimately conclude that the record establishes, as a matter of law, that Wurzel did pose a direct threat. In particular, the record establishes that Whirlpool's determination that Wurzel posed a direct threat was based on a reasonable medical judgment, which relied on the most ***2** medical knowledge and best available

objective evidence and reflected an individualized assessment of Wurzel's abilities. The record also establishes that there is no evidence of a reasonably based medical judgment supporting the view that Wurzel did not pose a direct threat. Accordingly, we **AFFIRM**.

### *FACTS AND PROCEDURAL HISTORY*

### I. Facts

Brian Wurzel began working for Whirlpool in 1983. In 2003, Wurzel was employed as a materials handler at Whirlpool's Clyde Division manufacturing site. Wurzel's primary duty was to drive a tow motor (forklift) to transport boxes containing product literature to and from a subassembly area. This entailed driving throughout the factory floor among pedestrian co-workers at a speed of between five and seven miles per hour. Being able to safely operate a tow motor is an essential function of the materials-handler position.

Whirlpool's Clyde Division employs over 2,500 employees and contains six operating assembly lines, all of which include moving machinery. Numerous vehicles are used onsite, including tow motors weighing 10,000 pounds. Tow motors and pedestrians share space; tow motor lanes and pedestrian lanes are separated by painted lines only. The site also has other machinery including presses, drills, cutting machinery, and moving assembly lines carrying large parts and products. The machines are automated and many of them move at a fast pace.

Wurzel's medical problems related to this case first began in April 2003 when Wurzel visited a hospital emergency room because of chest pain. Wurzel Dep. at 43 (R. 35). In May 2003, Wurzel visited Whirlpool's Employee Health Center (EHC) with chest pain. Patient Note of 5/15/03 (R. 30–15). In November 2007, Wurzel was diagnosed with Prinzmetal angina. Wurzel Dep. at 28.

Prinzmetal angina causes spasms in the coronary arteries. Issa Dep. at 9 (R. 38). There is no way for Wurzel to predict when a spasm will occur, how severe it will be, or how long it will last. *Id.* at 10; Wurzel Dep. at 40. When he has a spasm, Wurzel experiences tightness in his chest, shortness of breath, numbness in his left arm, pain in his neck, and sometimes dizziness and fatigue. Wurzel Dep. at 33–34. When Wurzel begins to experience a spasm, he takes nitroglycerin pills to relieve his symptoms. *Id.* at 29. Wurzel was directed to take up to three nitroglycerin pills, five minutes apart; if his

symptoms were not relieved after that, he should go to an emergency room. Issa Dep. at 76–77, 87. A side effect of nitroglycerin is hypotension, which can also lead to dizziness, lightheadedness, and fatigue. *Id.* at 46–47, 77.

**\*\*2** Despite his affirmation that he did not know when a spasm would occur, Wurzel contends that he would be able to stop what he was doing before becoming incapacitated. Wurzel Dep. at 130 (R. 36). At the beginning of a spasm, he would feel something akin to indigestion, and then when he was not "feeling right" he would "stop and see how things progressed." *Id.* at 130, 144. If he felt safe, then he continued working; if he did not feel safe, he would let his supervisor know that he was not able to continue working. *Id.* The parties agree that Wurzel had a clean record driving the tow motor. *Id.*

Over the course of the relevant time period, Wurzel visited, or was reviewed by, several doctors, including Dr. Robert Marshall (Whirlpool's plant physician), Dr. Mark Issa (Wurzel's treating cardiologist), Dr. Frederick Stockton (a cardiology specialist who also treated Wurzel), and Dr. **\*3** Haridas Biswas (a cardiologist who conducted an independent medical examination on Wurzel).

In November 2007, Wurzel underwent a heart catheterization performed by Dr. Stockton, who recommended that Wurzel could work with no restrictions. Note of 11/8/07 (R. 42–1 at 35). Wurzel then met with Whirlpool's plant physician, Dr. Marshall, for a return-to-work evaluation. Marshall Dep. at 19–20 (R. 43). Dr. Marshall's job as plant physician is to treat injured workers and to evaluate workers to confirm that they are medically able to perform their jobs. *Id.* at 5. At the meeting, Wurzel informed Dr. Marshall that he had been diagnosed with Prinzmetal angina, and that he took nitroglycerin pills to relieve his symptoms. Marshall Note of 11/8/07 (R. 37–2 at 23). Wurzel told Dr. Marshall that he was not having any problems at the time, and that he had to use nitroglycerin about once every two months, but "that takes care of it." *Id.* After confirming that Dr. Stockton understood Wurzel's job duties and their safety-sensitive nature, Dr. Marshall returned Wurzel to his materials-handler job without restriction. *Id.*

On March 11, 2008, Wurzel had an angina spasm and visited the EHC. Wurzel Dep. at 98–99 (R. 35). Wurzel had not taken his nitroglycerin pills and was instead "trying to fight it." *Id.* Wurzel was fatigued, felt that he could not safely operate a tow motor, and went home. *Id.* In Wurzel's return-to-work evaluation with Dr. Marshall two days later,

Wurzel told Dr. Marshall that he had experienced two spasms back-to-back, but that his symptoms resolved after he took nitroglycerin. Marshall Note of 3/13/08 (R. 37–2 at 24). Dr. Marshall noted his concern that Wurzel might be at risk for sudden incapacitation, and stated that he would await further information from Wurzel's treating cardiologist, Dr. Issa, regarding Wurzel's status and whether he should be driving. *Id.*

However, when Wurzel saw Dr. Issa, Wurzel was not entirely forthcoming about his medical history. He informed Dr. Issa that he had experienced "rare episodes of chest tightness relieved with nitroglycerin," but Wurzel "otherwise denied any cardiac symptoms." Wurzel Dep. at 107 (R. 36); Issa Notes of 3/13/08 (R. 37–2 at 25). Wurzel did not tell Dr. Issa that he had gone to the EHC because of a spasm, or that he had left work early due to his own concerns related to fatigue and safety. *Id.;* Issa Dep. at 50. Although Wurzel states that he told Dr. Issa that he operated a tow motor, Wurzel Dep. at 109, Dr. Issa testified at his deposition that he did not know what type of machinery Wurzel operated, nor was he familiar with the Whirlpool plant or Wurzel's working environment. Issa Dep. at 57–58. Dr. Issa concluded that Wurzel could return to work without restrictions, noting that Wurzel was not at any more risk for sudden incapacitation "than any other [patient] being treated for angina." Issa Note of 3/13/08 (R. 42–1 at 37).

**\*\*3** Despite Dr. Issa's conclusion, Dr. Marshall remained concerned about Wurzel's risk for sudden incapacitation because Dr. Marshall understood that a person with angina is at a higher risk for incapacitation than a person who has no heart condition at all. Marshall Aff. ¶ 5 (R. 30–14); Issa Dep. at 56. Dr. Marshall decided, based upon the risk for incapacitation and Wurzel's working environment, that Wurzel should be returned to work and be restricted from driving a tow motor or any other company vehicle. Marshall Aff. ¶¶ 4–5. [1] Whirlpool assigned Wurzel to the **\*4** temporary job of gatekeeper/tollkeeper until he could successfully bid on a permanent position that did not require driving. Schulz Aff. ¶ 7.

From June to September of 2008, Wurzel experienced numerous spasms while at work. Shortly before June 10, 2008, Wurzel had five spasms in four days. On June 10, Wurzel's supervisor transported Wurzel to the EHC by cart because Wurzel was lightheaded and tired and did not feel comfortable walking without assistance to the EHC. Although Wurzel stated that he was beginning to feel better after taking a nitroglycerin pill, the nurse's notes state that he appeared

very fatigued and wanted to go home. Notes of 6/10/08 (R. 37–2 at 21); Wurzel Dep. at 153–55. On June 17, 2008, Wurzel's supervisor again brought Wurzel to the EHC after a spasm. Wurzel had a rapid pulse, and he experienced additional angina at the EHC. Wurzel went home. Notes of 6/17/08 (R. 37–2 at 21). [2] On August 4, 2008, another employee reported that Wurzel was "ready to pass out." Wurzel told the employee that he would be fine as soon as he took his medicine. Lopez email of 8/19/08 (R. 42–1 at 22). On August 6, 2008, another employee reported that Wurzel was doubled over on a bench and "ready to pass out." Wurzel's wife took him home that day. *Id.* On September 5, 2008, Wurzel went to the EHC after what he called a "really bad" bout of angina. Wurzel was red in the face and short of breath. He left the EHC and went home. Notes of 9/5/08 (R. 37–2 at 21). On September 26, 2008, Wurzel's supervisor again brought Wurzel to the EHC after Wurzel had experienced another bad spasm and taken three nitroglycerin pills. Wurzel was dizzy and fatigued, so he went home. Notes of 9/26/08 (R. 37–2 at 21); Wurzel Dep. at 182.

After the September 26 spasm, Barbara Dewey, the human resources administrator in charge of the EHC, told Wurzel that Dr. Marshall would have to clear him to return to work. Wurzel Dep. at 183–84. On October 2, 2008, Wurzel saw Dr. Roush (a cardiologist filling in for Dr. Issa). Dr. Roush submitted the same one-page form recommendation that Dr. Issa had submitted previously, stating that Wurzel could return to work with no restrictions, and that Wurzel was not at any greater risk for sudden incapacitation than any other patient being treated for angina. Roush note of 10/2/08 (R. 37–2 at 44). Wurzel also saw Dr. Marshall on October 2 for a return-to-work evaluation. Marshall Note of 10/2/08 (R. 37–2 at 42). Dr. Marshall reviewed Dr. Roush's recommendation, but remained concerned that Wurzel posed a safety risk. [3] *Id.;* Marshall Aff. ¶¶ 6–7. **\*5** Accordingly, Dr. Marshall obtained Wurzel's permission to follow up with Dr. Issa. Wurzel Dep. at 186. According to Dr. Marshall, "[a]lthough Dr. Issa stated Mr. Wurzel could return to work, he provided no confirmation that Mr. Wurzel was not at risk for sudden incapacitation. Accordingly, I allowed Mr. Wurzel to return to work, but kept the restriction that Mr. Wurzel could not drive a tow motor unless he was spasm-free for six months." Marshall Aff. ¶ 7. Wurzel returned to work on October 7, 2008.

**\*\*4** In October 2008, Wurzel bid on, and obtained, a position as a multi-process team member in the paint department. Wurzel Dep. at 191–93; Schulz Aff. ¶ 8 (R. 30–11). The position did not involve driving a tow motor. After a review

Wurzel v. Whirlpool Corp., 482 Fed.Appx. 1 (2012)
26 A.D. Cases 521, 45 NDLR P 40

of the position's duties, Whirlpool determined that Wurzel could perform the job. Restriction Review of 10/8/08 (R. 41–1 at 18). Wurzel's duties in the paint department included inspecting the finish on washer cabinets and lids, transferring cabinets that needed to be painted a different color, and tooling, which involved placing parts on a conveyor line to be painted, then removing the parts from the conveyor line after they were finished. Schulz Aff. ¶ 8. Each of these duties was performed on a rotating basis, meaning that Wurzel rotated from one position to the next every half hour. Wurzel Dep. at 194. Employees are required to rotate so as to vary their muscle group usage and avoid excessive muscle fatigue or injury. *Id.* ¶ 9. Whirlpool asserts, and Wurzel does not challenge, that the ability to rotate through all of the positions is an essential function of the job. *Id.* ¶ 10. Of particular importance, in the "tooling" position, the conveyor line is low-hanging and moves continuously. *Id.* ¶ 8. In addition, one of the rotations required Wurzel to work alone on the upper floor of the plant. *Id.*

Shortly after returning to work, Wurzel experienced at least one additional spasm. On October 22, 2008, Wurzel visited the EHC complaining of chest pain. He took nitroglycerin and was driven home by his wife. EHC Record of 10/22/08 (R. 37–2 at 47). [4] After this spasm, the EHC nurse told Wurzel he would have to be cleared by Dr. Marshall before returning to work. *Id.*

Dr. Marshall ordered an independent medical exam (IME) for Wurzel with cardiologist Dr. Biswas. Marshall Aff. ¶ 8; Dewey letter of 11/4/08 (R. 37–2 at 48). Before Wurzel's IME, Dr. Marshall wrote Dr. Biswas to inform him about Wurzel's condition and symptoms, and that Wurzel worked in a "manufacturing environment where there are many machines, tow motors, and other safety sensitive issues at play." Marshall Letter of 11/4/08 (R. 40–1 at 1–3). Dr. Marshall asked Dr. Biswas to evaluate "the documentation and physical examination of Mr. Wurzel and make recommendations with regards to your opinion of his ability to work safely in this type of environment." *Id.* at 2. Wurzel saw Dr. Biswas on November 13, 2008. Notably, **\*6** Wurzel specifically denied having dizziness, chest pain, or palpitations "at the time of the evaluation," and apparently did not inform Dr. Biswas of any history of dizziness, lightheadedness, or fatigue. Biswas report of 11/13/08 at 2, 3–4 (R. 40–1). Dr. Biswas concluded that Wurzel could return to work without restrictions:

> As far as his returning to work, based on the information that I have at this time which includes that his carotid

arteries are normal and he is having some atypical chest pain and he is on medications, I do not have any objection to him going back to work without restrictions.

> **\*\*5** In conclusion, although the patient has atypical angina or chest pain, whatever it is, it seems under control and the patient rarely gets these episodes and according to him, these episodes can be quickly brought under control with the nitroglycerine used sublingually. From that point of view, I think he can return to work without any restrictions.

*Id.* at 3–4. Accordingly, Dr. Marshall authorized Wurzel to return to his paint-department position in December 2008. Marshall Dep. at 14.

In the beginning of 2009, Wurzel again had spasms at work:

- On January 22, 2009, Wurzel was transported via an in-plant ambulance and stretcher to the EHC, complaining of chest pain. Wurzel stated that he was not dizzy, but felt fatigued and went home. EHC Record of 1/22/09 (R. 37–2 at 55).

- On January 30, 2009, Wurzel visited the EHC because he had taken a nitroglycerin pill on the way to work and wanted his blood pressure checked. Wurzel reported that he was dizzy and very fatigued. The EHC called Wurzel's daughter to drive him home. Notes of 1/30/09 (R. 37–2 at 21–22).

- On February 6, 2009, an in-plant ambulance was requested for Wurzel, who went to the EHC with chest pains. Wurzel obtained relief after taking two nitroglycerin pills, but remained pale and fatigued. The nurse noted that Wurzel had stated that this was a "bad one," and that lately his pain seemed to be worse. The nurse also noted a statement by Wurzel that "[t]here are days I have taken 9 nitro." EHC Record of 2/6/09 (R. 37–2 at 56). [5]

Wurzel saw Dr. Issa on February 13, 2009, for an evaluation. Under the "History of Present Illness" section of his letter, Dr. Issa wrote, "I saw the patient in our Cardiovascular Clinic on 2/13/09 for follow-up. As you may recall, he is a 45–year–old male who is followed for Prinzmetal angina. The patient at work had three episodes of chest pain, relieved promptly with nitroglycerin in less than 3 minutes; otherwise, no other cardiac symptoms." Issa letter of 2/17/09 (R.43–1 at 1). Based on this information, Dr. Issa concluded that

Wurzel v. Whirlpool Corp., 482 Fed.Appx. 1 (2012)
26 A.D. Cases 521, 45 NDLR P 40

Wurzel's symptoms were "stable" and that **\*7** Wurzel should not be restricted from returning to work. *Id.* Dr. Issa stated in deposition that he constructed the medical history from what Wurzel told him. Issa Dep. at 86. However, when Dr. Marshall subsequently informed Dr. Issa of Wurzel's recent additional spasms, Dr. Issa maintained his conclusion that Wurzel could work without restriction. Marshall Notes of 2/19/09 (R. 37–2 at 63–64). [6]

Despite Dr. Issa's opinion, Dr. Marshall remained concerned that Wurzel was a safety risk, particularly because of the working environment at the Clyde Division—involving rapid-pace machines, tow motors, and conveyor lines—and the frequency of Wurzel's symptoms. Marshall Aff. ¶ 11; Marshall Notes of 2/19/09. Dr. Marshall was concerned that Dr. Issa and Dr. Biswas "do not clearly understand the risks that are present in this environment." Marshall Notes of 2/19/09. Dr. Marshall was also concerned that Dr. Biswas was not aware of the more frequent occurrence of Wurzel's symptoms. *Id.* Dr. Marshall concluded that he would again contact Dr. Biswas for his input, and in the meantime Wurzel could return to work, but with significant restrictions, including no working around machinery, no working at heights, and no driving company vehicles. *Id.* Because Wurzel's position in the paint department required him to work at heights and around conveyor lines and moving machinery, he could not return to his job and was forced to remain on sick leave. Schulz Aff. ¶ 12.

 **\*\*6** Dr. Marshall wrote Dr. Biswas on February 19, 2009, informing him of the spasms that Wurzel had experienced since Dr. Biswas's November 2008 IME. Marshall Letter of 2/19/09 (R. 43–1 at 9–10). In addressing the incident of February 6, 2009, Dr. Marshall wrote that Wurzel had "taken nine nitroglycerin with no relief of his symptoms." *Id.* at 9. Dr. Marshall also mentioned that Wurzel's job caused him to work next to machinery and out of others' sight. *Id.* at 10. Dr. Marshall asked if this new information would change the recommendations Dr. Biswas had made in his original report. *Id.* Dr. Marshall also informed Dr. Biswas that he had spoken with Dr. Issa the day of the letter, and that Dr. Issa still recommended that Wurzel be returned to work without restriction. *Id.* at 9.

Dr. Biswas wrote back on March 5, 2009. Biswas Letter of 3/5/09 (R. 43–1 at 11). Dr. Biswas noted that he was unable to obtain Dr. Issa's latest records, and thus could not comment on Dr. Issa's conclusion that Wurzel could return to work without restriction. *Id.* As for his own opinion, Dr. Biswas wrote that

Wurzel's safety was "paramount and very concerning," and explained:

> From the limited information available, it appears that Mr. Wurzel's symptoms are quite serious. I believe that he should seek the opinion of another cardiologist to enter into a treating relationship. His returning to work seems to pose some risk for his health. It is my understanding that Mr. Wurzel's regular duties include working next to machinery and working alone out of the line of sight of others. I would strongly recommend that if Mr. Wurzel returns **\*8** to work, he should work under close observation. If this is not possible, then I would recommend that he be kept off work.

> *Id.*

Dr. Biswas then reviewed Dr. Issa's records and on May 8, 2009, wrote a letter to Dr. Marshall. Biswas Letter of 5/8/09 (R. 43–1 at 12–13). Dr. Biswas notes that it appeared Dr. Issa was not aware of the severity of Wurzel's spasms at work because the records did not acknowledge Dr. Marshall's communication regarding the severity of the symptoms. Dr. Biswas notes that Dr. Issa understood that Wurzel had chest pain, but believed that it was mild and promptly relieved with nitroglycerin. Dr. Biswas recommended that Wurzel communicate with Dr. Issa regarding the additional instances Dr. Marshall had described. With regard to his own conclusions, Biswas wrote:

> As I mentioned in my previous letter, until we clear this situation regarding the disparity of his symptoms I would recommend that he should be working only under observation and should avoid working close to any potentially risky area. My concern is that if he continued to use the nitroglycerin in such excessive number, such as nine at a time, which can create significant

Wurzel v. Whirlpool Corp., 482 Fed.Appx. 1 (2012)

26 A.D. Cases 521, 45 NDLR P 40

problems in terms of side effects of this medication.... Again, I am recommending that he communicate with Dr. Issa regarding this episode he had in your plant on February 6, 2009, and describe the symptoms and the number of nitroglycerin he took at that time.

**\*\*7** *Id.* at 13.

On June 11, 2009, Dr. Marshall again wrote Dr. Biswas, asking him to clarify his conclusions that Wurzel could only work under close observation and should avoid working close to any potentially risky area. Marshall Letter of 6/11/09 (R. 43–1 at 14). Dr. Biswas responded that Wurzel should "not work alone near areas with an assembly line or moving machinery" and should avoid working close to moving objects or moving machinery. Biswas Letter of 6/17/2009 (R. 43–1 at 15–16).

On August 6, 2009, Whirlpool conducted a "Restriction Review" evaluating Wurzel's job duties in the paint department in relation to the restrictions recommended by Dr. Biswas and adopted by Dr. Marshall. Restriction Review (R. 41–1 at 19). Whirlpool determined that Wurzel could not perform the job functions because one of the rotations required him to work alone and outside the presence of other employees and all of the positions involve working close to a "moving overhead conveyor." *Id.* On August 13, 2009, Wurzel was informed that Whirlpool had determined that he could not safely perform the essential functions of the paint department position based on his restrictions. Schulz Aff. ¶ 14. Wurzel was told that he could bid on any position that he believed met his restrictions, and if a restriction review determined that he could safely perform the essential functions of the position, it would be given to him. *Id.* Otherwise, Wurzel would have to remain on sick leave, unless he could confirm that he had been spasm-free for six months. *Id.* Wurzel had experienced multiple spasms within the prior six months and, thus, went on sick leave. *Id.* Because Wurzel had exhausted his 26 weeks of paid sick leave, his leave was without pay. *Id.* ¶ 15.

Wurzel eventually returned to work without restrictions on March 1, 2010, claiming to have been spasm-free for six months. EHC Notes of 2/25/10 (R. 47–4).

**II. Procedural History**

Wurzel filed suit in the United States District Court for the Northern District of Ohio against Whirlpool in March 2009. Although **\*9** the amended complaint alleged violations of several state and federal laws, only Wurzel's claim pursuant to the ADA is before this Court on appeal. [7] Whirlpool filed a motion for summary judgment, which the district court granted in April 2010.

In its decision, the district court noted that the events of the case occurred both before and after the effective date of the most recent amendments to the ADA and analyzed Wurzel's claim under both versions. [8] The court characterized the case as involving Wurzel's two treating physicians' opinion that he could return to work without restriction versus the opinion of the plant physician and an independent medical evaluator that Wurzel could not safely return to work without restriction, and concluded that Wurzel's treating physicians were not aware of pertinent information while plant physician Dr. Marshall was well informed of Wurzel's symptoms. *Id.* at 11–12. The court determined that Wurzel failed to make out a *prima facie* case of discrimination because Wurzel did not establish that he was regarded as disabled under either version of the ADA. Specifically as to the pre-amendment ADA, the court concluded that Wurzel failed to show that Whirlpool regarded him as having an impairment that substantially limited him from working in a "broad class of jobs," a requirement for establishing that he was regarded as disabled under the ADA.

*See* Sutton v. United Air Lines, Inc., 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Wysong v. Dow Chem. Co.,* 503 F.3d 441, 452 (6th Cir.2007). The court concluded that, during the relevant time, the only job from which Wurzel was restricted was driving a tow motor.

**\*\*8** Regarding the post-amendment ADA, the court concluded that Wurzel failed to meet the "regarded as" requirement that he be "subjected to an action prohibited under [the ADAAA] because of an actual or perceived physical or mental impairment whether or not the impairment limits a major life activity." 42 U.S.C. § 12102(3)(A). As part of the determination of whether Whirlpool's action against Wurzel was prohibited, the court analyzed whether Wurzel was "qualified." The court concluded that Wurzel posed a direct threat to the health and safety of himself and others in the workplace, and thus was not "qualified." It also concluded that "actions motivated by bona fide concerns with worker safety cannot be deemed or found to be prohibited under the

ADA, as amended or otherwise[.]" Based on those premises, the court held that Wurzel had not shown that Whirlpool's actions violated the ADAAA. Thus, the court held that Wurzel was not regarded as disabled under the ADAAA.[9] Wurzel timely appealed.

### *DISCUSSION*

### I. Standard of Review

This court reviews *de novo* the order of a district court granting summary judgment. *Tucker v. Tennessee,* 539 F.3d 526, 531 (6th Cir.2008). A court "shall grant **\*10** summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When evaluating a summary-judgment motion,

> credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the facts and any inferences that can be drawn from those facts [ ] must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

*Biegas v. Quickway Carriers, Inc.,* 573 F.3d 365, 373 (6th Cir.2009) (quotation marks omitted).

### II. Relevant Disability Law

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In order to recover on a claim of discrimination under the ADA, "a plaintiff must

show that: 1) he is an individual with a disability; 2) he is otherwise qualified to perform the job requirements, with or without reasonable accommodation; and 3) he was discharged solely by reason of his handicap." *Macy v. Hopkins County Sch. Bd. of Educ.,* 484 F.3d 357, 363 (6th Cir.2007) (internal quotation marks omitted).[10]

The timing of the relevant events in this case—from May 2003 to August 2009—means that there are two relevant standards for defining a disability, in particular a "regarded as" disability. In 2008, the ADA was modified by the ADAAA. The amendments were effective as of January 1, 2009, and do not apply retroactively to conduct occurring before that date. *See Milholland v. Sumner County Bd. of Educ.,* 569 F.3d 562, 567 (6th Cir.2009). Accordingly, with regard to events occurring before January 1, 2009, the ADA applies; with regard to events occurring in and after 2009, the amended version of the ADA—*i.e.,* the ADAAA—applies. *Compare* 42 U.S.C. § 12102(2) (2006) *with* 42 U.S.C. § 12102(3)(A)-(B).

**\*\*9** The parties raise numerous arguments related to the district court's interpretation and application of the regarded-as disability requirement, under both the ADA[11] **\*11** and the ADAAA.[12] However, the court need not address these issues in order to resolve this appeal. Even assuming in Wurzel's favor that he was disabled or regarded as disabled, Wurzel cannot prevail under either version of the statute where the record establishes as a matter of law that Whirlpool's determination that Wurzel posed a direct threat was based on a reasonable medical judgment, which relied on the most current medical knowledge and best available objective evidence and reflected an individualized assessment of Wurzel's abilities. Because the district court correctly determined that the record establishes that Wurzel was a direct threat, and we may affirm on any ground supported by the record, *Bazzi v. City of Dearborn,* 658 F.3d 598, 606 (6th Cir.2011), this conclusion resolves the appeal now before us.

### III. "Otherwise Qualified" / "Direct Threat" Analysis

#### A. Applicable Law

In *Estate of Mauro v. Borgess Medical Center,* 137 F.3d 398 (6th Cir.1998), this Circuit set out the applicable case law:

> To prevail under his Americans with Disabilities Act claim, [a plaintiff] must show that he is "otherwise qualified" for

> the job at issue. *See* [*Doe v.*] *Univ. of* [*Md. Med. Sys.*], 50 F.3d [1261,] 1266 [ (4th Cir.1995) ]. A person is "otherwise qualified" if he or she can perform the essential functions of the job in question. *See* *Bradley* [*v. Univ. of Tex. M.D. Anderson Cancer Ctr.*], 3 F.3d [922,] 924 [ (5th Cir.1993) ]. A disabled individual, however, is not "qualified" for a specific employment position if he or she poses a "direct threat" to the health or safety of others which cannot be eliminated by a reasonable accommodation. *See* 42 U.S.C. § 12111(3); *University of Md.,* 50 F.3d at 1265. [13]
>
> ***12** ... Our analysis ... [entails] one question: Did [the plaintiff's] activities [at his job] pose a direct threat or significant risk to the health or safety of others?

> *Mauro,* 137 F.3d at 402. *See also* *Holiday v. City of Chattanooga,* 206 F.3d 637, 648 n. 4 (6th Cir.2000) ("The ADA provides that a disabled individual is not 'qualified' for a specific employment position if he poses a 'direct threat' to the health or safety of others that cannot be eliminated by a reasonable accommodation.").

There are four factors to be considered in a direct-threat analysis: (i) the duration of the risk, (ii) the nature and severity of the potential harm, (iii) the likelihood that the potential harm will occur, and (iv) the imminence of the potential harm. 29 C.F.R. § 1620.2(r); *Mauro,* 137 F.3d at 402. With regard to the risk presented, "[a]n employer ... is not permitted to deny an employment opportunity to an individual with a disability merely because of a slightly increased risk. The risk can only be considered when it poses a significant risk, *i.e.* high probability, of substantial harm; a speculative or remote risk is insufficient." *Id.* at 403. [14]

****10** With regard to the employer's evaluation of an employee's direct-threat risk, "the employer must conduct an individualized inquiry into the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question." *Holiday,* 206 F.3d at 643. In addition, the risk assessment must be based on "medical or other objective evidence." *Bragdon v. Abbott,* 524 U.S. 624, 649, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). *See also* 29 C.F.R. § 1630.2(r) ("This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence."). Courts are to assess the objective reasonableness of the views of the employer and/or employer's medical professionals who made the direct threat-decision. *Bragdon,* 524 U.S. at 650, 118 S.Ct. 2196.

Applying these standards, courts of appeals have affirmed summary judgment in favor of a defendant where the record evidence demonstrated that the plaintiff was a direct threat in his factory workplace. In *Moses v. American Nonwovens,* ***13** *Inc.,* 97 F.3d 446, 447–48 (11th Cir.1996), *cert. denied,* 519 U.S. 1118, 117 S.Ct. 964, 136 L.Ed.2d 849 (1997), the Eleventh Circuit explained that an epileptic worker with a significant risk of seizures on the job who worked close to fast-moving and high-temperature machinery was a direct threat. The court rejected the worker's argument that there was no actual risk of harm as long as he followed instructions and worked "downstream" from the equipment. *Id.* at 448. In *Hutton v. Elf Atochem North America, Inc.,* 273 F.3d 884, 886–87 (9th Cir.2001), the plaintiff, a diabetic who had experienced hypoglycemic episodes where he could not communicate for a period of time and was sometimes lightheaded, operated the equipment that produced, stored, and transferred liquid chlorine. The court acknowledged the plaintiff's arguments that he lost consciousness only once in his lengthy tenure and that the potential for harm was small because of the safety features of the equipment he used. *Id.* at 893–94. However, the court concluded that the plaintiff nevertheless posed a significant risk under the direct-threat framework, noting the plaintiff's history and the fact that "a significant physical or mental lapse by [plaintiff] as a result of a diabetic episode could result in substantial harm to his co-workers and others." *Id.* at 894. Finally, in *Darnell v. Thermafiber, Inc.,* 417 F.3d 657, 661 (7th Cir.2005), the Seventh Circuit concluded that a plaintiff with uncontrolled diabetes and a resulting risk of passing out on the job presented a direct threat where employees were required to climb tall ladders, operate dangerous machinery, and help lift 80–pound pieces of fiberboard in a hot environment. The court reached this conclusion despite plaintiff's arguments that the single doctor who evaluated him was not thorough enough and that he had worked at the plant for ten months without incident. *Id.* at 660, 662.

### B. Decision Below and Parties' Arguments

**\*\*11** The district court concluded that Wurzel did not meet the qualification requirement because he posed a direct threat to his and others' safety. With regard to the first two factors—duration of risk and nature and severity of potential harm—the court noted that Prinzmetal angina is a life-long condition, and that, if Wurzel were to suffer a spasm "while driving a tow motor or working alone in proximity to moving machinery or at a height from which a fall could cause injury, the consequences for his own well-being and others['] can hardly be disputed." With regard to likelihood of occurrence, the court concluded that the unforeseeability of a spasm and the unpredictability of its effects meant that "the odds are great" that Wurzel or someone else would have been injured had he continued to drive a tow motor, or work alone near moving machinery or at heights. *Id.* at 17. With regard to imminence, the court concluded that "[w]hile the risk of injury in this case might not have been in every instance and at every moment immediate, it was sufficiently likely to occur that at any given moment it might have been imminent, as the law understands that term in this context." *Id.* at 18.

On appeal, Wurzel contends that the law requires that a defendant's belief that an employee presents a direct threat must be objectively reasonable and based upon the available medical evidence reflecting an individual assessment of the employee. Wurzel contends that Whirlpool's belief that he presented a direct threat was flawed because:

(i) Dr. Marshall, a family physician, discounted the opinions of Wurzel's treating physicians—cardiology specialists—without speaking with them **\*14** or getting information from them, and

(ii) Dr. Marshall relied on the opinion of Dr. Biswas that Wurzel could not safely return to work, which was problematic because:

(a) Dr. Biswas, an independent medical examiner, was unfamiliar with the Whirlpool plant, did not have Wurzel's medical records before he met with him, and made all of his determinations based upon one interview with Wurzel and Wurzel's "paperwork,"

(b) Dr. Biswas first concluded that Wurzel could work without restrictions, and only changed his mind after Dr. Marshall asked him to reconsider,

(c) Dr. Marshall gave Dr. Biswas the incorrect information that Wurzel had taken nine nitroglycerin pills in one day, information upon which Dr. Biswas relied when changing his recommendation, and

(d) Dr. Biswas testified that had he done an in-person interview with Wurzel, his determination may have been affected.

In addition to echoing Wurzel's arguments, the EEOC argues that the district court erred by ignoring Wurzel's testimony indicating that he always knows when a spasm is about to begin and that, despite having spasms, he has never had an accident. The EEOC also argues that both of Wurzel's treating cardiologists testified that he was highly unlikely to become incapacitated without warning, and that the chance that Wurzel would become suddenly incapacitated raises a genuine issue of material fact, rather than establishing significant risk as a matter of law.

**\*\*12** With regard to Wurzel's arguments concerning Dr. Marshall's decisionmaking process, Whirlpool responds that Dr. Marshall did speak to, and elicit information from, Wurzel's treating physicians—he reviewed the records of Dr. Issa and Dr. Stockton, and consulted with Dr. Issa multiple times. With regard to Dr. Biswas not having Wurzel's medical records before he met with him, Whirlpool notes that Dr. Biswas's testimony that it was not uncommon to perform an IME without reviewing the medical records beforehand, and notes that, in any case, Wurzel does not take issue with the results of that IME. Whirlpool points out that Wurzel's treating physicians were also not familiar with the Whirlpool plant; only Dr. Marshall was. Whirlpool also argues that Wurzel was not forthcoming with Dr. Issa and Dr. Stockton about his symptoms, meaning they had an inaccurate understanding of how Prinzmetal angina affected Wurzel specifically. Concerning the nitroglycerin pills, Whirlpool points to Dr. Biswas's testimony that, even if Wurzel had not taken nine nitroglycerin pills, his opinion about Wurzel's symptoms being a safety concern would not have changed.

Whirlpool further contends that the district court's reasoning was sound. In response to the point that, despite having spasms at work, Wurzel had never had an accident, Whirlpool contends that an employer is not required to wait for a serious injury to occur before concluding that a worker is a direct threat. Whirlpool also argues that Wurzel's physicians did not state that it was highly unlikely that Wurzel would become incapacitated without warning, rather one (Dr. Stockton) did not address it and another (Dr. Issa) simply stated that, in his experience, he had never seen it happen. In any case, Whirlpool stresses, Wurzel did become incapacitated on several occasions.

26 A.D. Cases 521, 45 NDLR P 40

### C. Analysis

Applying the standards set out above, we conclude that Whirlpool was entitled to **\*15** summary judgment because the evidence before the district court establishes, as a matter of law, that Whirlpool's determination that Wurzel posed a direct threat was based on a reasonable medical judgment, which relied on the most current medical knowledge and best available objective evidence and reflected an individualized assessment of Wurzel's abilities. We also conclude that there is no evidence of a reasonably based medical judgment supporting the view that Wurzel did not pose a direct threat.

As an initial matter, Dr. Marshall—the individual who gave Whirlpool its information about the risks Wurzel's condition posed—engaged in a sufficient process. He was familiar with Wurzel's job duties and knew that they included (initially) operating a tow motor, and (later) working in a position where he had to be in close proximity to moving machinery and an automatic conveyor belt, and where one essential rotation entailed working out of the sight of others. Dr. Marshall obtained much individualized information about Wurzel's medical condition. He saw Wurzel himself, reviewed the medical records from the plant's EHC, obtained the medical opinions of Wurzel's treating cardiologists, Dr. Issa and Dr. Stockton, and, in light of the differences of opinion between medical professionals, sought out the opinion of an independent medical examiner. As Dr. Marshall was the plant physician, he had access to updated information as Wurzel's condition changed, meaning his medical knowledge of Wurzel's condition was current. In addition, he followed up with Wurzel's other physicians in order to make them aware of his better understanding of Wurzel's job environment and changes in Wurzel's condition. *Cf. Hutton,* 273 F.3d at 891–94 ("individualized assessment of each factor" had occurred in case where company had the input of several physicians who had examined plaintiff and information about the plant atmosphere and plaintiff's job duties). Further, the result was reasonably reached. Dr. Marshall adopted the ultimate recommendation of independent medical examiner Dr. Biswas that Wurzel should "not work alone near areas with an assembly line or moving machinery" and should avoid working close to moving objects or moving machinery. Biswas Letter of 6/17/2009 (R. 43–1 at 15–16). These restrictions were reasonably supported by Wurzel's extensive history of spasms in the workplace, which entails at least eleven instances, at least five of which required visiting the plant emergency room, and the majority of which required Wurzel to leave work and go home. Wurzel's spasm history

also includes at least one incident where he was found by another employee doubled over on a bench, "ready to pass out," another incident where he required an in-house ambulance and stretcher to bring him to the plant's EHC, and several others where he needed an escort to get to the EHC. In addition, Wurzel's own admission that he was at times dizzy and fatigued in connection with these spasms, and that he could not predict when one would occur or how severe it would be lends support to the reasonability of the restrictions. These restrictions were then evaluated in relation to Wurzel's specific job duties in the paint department. *See* Restriction Review (R. 41–1 at 19). Whirlpool determined that Wurzel could not do the job because one of the rotations required him to work alone and outside the presence of other employees and all of the positions involved working close to a "moving overhead conveyor." *Id. Cf. Hutton,* 273 F.3d at 891–94 (company closely examined plaintiff's medical restrictions and specific job duties before concluding that he could not fill any position).

**\*16   \*\*13** In addition, none of Wurzel's (or the EEOC's) arguments provides reason to conclude that the result was not reasonably reached.

With regard to the argument that Whirlpool wrongly discounted the opinions of Wurzel's treating cardiologists, Whirlpool's decision to favor the recommendation of its own plant physician, Dr. Marshall, and the final recommendation of the independent medical examiner and cardiologist, Dr. Biswas, over the recommendations of Wurzel's treating cardiologists, Dr. Issa and Dr. Stockton, was reasonable. As explained below, Wurzel's treating cardiologists did not have current and complete information when making their recommendations—and there is evidence that one of them would have changed his recommendation, had he had complete information.

Leading up to Dr. Issa's March 2008 conclusion that Wurzel could return to work without restrictions, Wurzel had informed Dr. Issa that he had experienced "rare episodes of chest tightness relieved with nitroglycerin" and "otherwise denied any cardiac symptoms." Thus, Dr. Issa did not know that, actually, Wurzel had recently experienced three spasms, had gone to the EHC because of a spasm, and had left work early due to fatigue and safety concerns.

In October 2008, Dr. Issa again concluded that Wurzel could return to work. Although Dr. Issa's records correctly reflect that Wurzel had experienced "an increase of angina

symptoms" and that these symptoms were on a daily basis, Dr. Issa was not aware that Wurzel had experienced dizziness, fatigue, and lightheadedness in connection with his recent increased spasms.[15] Dr. Issa testified in his deposition that dizziness or lightheadedness is not a common symptom of Prinzmetal angina,[16] and had he known that Wurzel was experiencing those symptoms, he would have considered performing other testing, adjusting Wurzel's medication, or monitoring for an arrhythmia. Issa Dep. at 67–68. Notably, Dr. Issa stated that, had he known Wurzel was experiencing dizziness, lightheadedness, and/or fatigue, it would have changed his prior opinion that Wurzel was able to return to work:

> Q: ... had you known that Mr. Wurzel was experiencing dizziness, lightheadedness, fatigue, in connection with his spasms, would that have changed your opinion of his ability to return to work?
>
> A: Would have, yes.

*Id.* at 69. In addition, Dr. Issa stated that his opinion about Wurzel's condition would have changed had he known that Wurzel was found slumped over a work bench at the plant. *Id.* at 89.

In February 2009, Dr. Issa again recommended that Wurzel be returned to work without restriction. Again, Dr. Issa did *17 not appear to be aware of the severity of Wurzel's symptoms. Although Dr. Issa's medical history stated that "[t]he patient at work had three episodes of chest pain, relieved promptly with nitroglycerin in less than 3 minutes; otherwise, no other cardiac symptoms," in reality, (i) Wurzel had stated that his pain was getting worse lately and that one of his episodes in particular had been "a bad one," (ii) a single nitroglycerin pill did *not* relieve the symptoms promptly in at least two of his three most recent crises, and (iii) Wurzel had had to leave work each time.

**14 Wurzel's other treating cardiologist, Dr. Stockton, also saw Wurzel in February 2009. Although Dr. Stockton did not say anything explicitly about work restrictions, he wrote that "[at t]his point, I would continue to put no specific limitations on Mr. Wurzel from a cardiac standpoint." To the extent this statement can be understood as a release to work without restrictions, Dr. Stockton did not appear to know very much about any of Wurzel's spasm history. The "History of Present Illness" section in Dr. Stockton's notes did not mention Wurzel suffering any spasms at work at all, and there is no indication whether Dr. Stockton was aware of them.

In light of all of the information that Wurzel's treating cardiologists were missing at the various times that they recommended he be allowed to work with no restrictions,[17] Dr. Marshall's discounting of their opinions was eminently reasonable.[18]

With regard to Wurzel's argument that the independent medical examiner, Dr. Biswas, had originally concluded that Wurzel could work without restrictions and only changed his mind after Dr. Marshall asked him to reconsider, Dr. Marshall's action was reasonable. As was the case with his treating physicians, Wurzel did not accurately inform Dr. Biswas of the extent of his condition when Dr. Biswas examined him in November 2008. Wurzel told Dr. Biswas that he rarely experienced chest pain, and when he did, his symptoms "c [ould] be quickly brought under control with the nitroglycerine." Dr. Biswas's original no-restriction recommendation was based upon this flawed information. When Dr. Marshall contacted Dr. Biswas in February 2009, he updated Dr. Biswas as to Wurzel's current job duties, and as to spasm incidents that had occurred since Dr. Biswas had seen Wurzel last, reasonable action for a physician looking for a thorough evaluation from a fellow physician.

It is true that one of the things that Dr. Marshall told Dr. Biswas was the problematic information that Wurzel had "taken nine nitroglycerin with no relief of his symptoms." As mentioned in the fact section above, Wurzel taking nine nitroglycerin pills is a disputed fact which finds some support in the record, and Wurzel taking nine pills at a time with no relief is a fact simply not supported by the record. It is further true that both Dr. Marshall and Dr. Biswas mention this fact as a part of their explanation for restricting Wurzel. However, this point does not affect the analysis in this case. Although Wurzel *18 disputes having taken nine pills, he did testify that he had taken a maximum of four to five nitroglycerin pills per day. And, Dr. Marshall states in his affidavit that, had Wurzel never taken as many as nine pills in a day, but only four or five, his opinion about Wurzel's symptoms being a safety concern would not have changed. Wurzel Aff. ¶ 14. In addition, both Dr. Marshall and Dr. Biswas relied on additional non-problematic grounds for their conclusions. As Dr. Biswas explained in his deposition, he also relied upon the severity of Wurzel's symptoms and the fact that they had gotten worse since his original report, the fact that Prinzmetal angina "itself" can potentially cause one to pass out, and the fact that Wurzel would be working in close proximity to machinery. Biswas Dep. at 59, 64 (R.

40). Likewise, Dr. Marshall also relied upon the increasing frequency of Wurzel's symptoms over time, the presence of dangerous machinery in Wurzel's work environment, and Wurzel's essential work duties involving close contact with the machinery and working out of others' sight. Marshall Aff. ¶ 15.[19]

**\*15** Having concluded that Whirlpool engaged in a sufficient process, and that the conclusions it reached were objectively reasonable based upon Wurzel's medical condition, the remaining question is whether these conclusions about Wurzel's condition meet the standard for posing a direct threat. Applying the four-part standard of *Mauro* and 29 C.F.R. § 1620.2(r), we hold that the district court did not err in concluding that Whirlpool's decision reflected that Wurzel posed a direct threat. With regard to the first factor, duration of the risk, the district court rightly noted the fact that Wurzel's condition was life-long. While it is true that Wurzel was apparently spasm-free for at least six months subsequent to Whirlpool's decision, at the time of the decision, Wurzel and his physicians had not yet achieved that kind of control over his condition, and there was no indication that they would. With regard to the **\*19** second factor, nature and severity of the potential harm, the district court's simple analysis—that "were plaintiff to suffer a spasm while driving a tow motor or working alone in proximity to moving machinery or at a height from which a fall could cause injury, the consequences for his own well-being and others can hardly be disputed"—is apt. With regard to the third and fourth factors—the likelihood that the potential harm will occur and the imminence of the potential harm—Wurzel and the EEOC focus their arguments on the fact that Wurzel had never had an accident and Wurzel's own testimony that he would be able to sense when a spasm was coming and take steps to safely stop what he was doing.

These arguments do not defeat summary judgment on this point. Wurzel's deposition testimony does not establish that Dr. Marshall's conclusion was unreasonable. Wurzel's deposition is internally contradictory and conflicts with other record evidence. Although Wurzel did state that he knew when an attack was imminent, Wurzel Dep. at 129–30, he also testified that there was no way to know when a spasm was about to happen. *Id.* at 40. Although Wurzel testified that he thought he could stop what he was doing in advance of a spasm and that he had never had an accident, *id.* at 129–31, Wurzel had also been found in the workplace doubled over a bench, close to passing out. Thus, Wurzel's testimony does not serve as an indicator that Dr. Marshall's medical judgment

about him was not reasonably based on an individualized inquiry into his condition.

On the work-history point, it is true that some courts have noted the fact that an employee has an injury-free record, or a safe driving history, in concluding that the employee has established a genuine issue of material fact on the direct-threat question. *See* EEOC Amicus Br. at 27–28. However, courts evaluating individuals whose conditions might cause them to be incapacitated tend to focus on the risk related to the workplace. *Compare Moses v. Am. Nonwovens, Inc.,* 97 F.3d 446, 447–48 (11th Cir.1996), *cert. denied,* 519 U.S. 1118, 117 S.Ct. 964, 136 L.Ed.2d 849 (1997) (an epileptic working near dangerous fast-moving and high-temperature machinery was a direct threat) *and Dark v. Curry,* 451 F.3d 1078, 1086–87 (9th Cir.2006) (driver with epilepsy who had once passed out in the work vehicle, but had not gotten into an accident, was not qualified without an accommodation) *with Nunes v. Wal–Mart Stores, Inc.,* 164 F.3d 1243, 1247–49 (9th Cir.1999) (employee, a cashier who suffered from fainting episodes, successfully raised an issue of material fact as to the question of direct threat) *and Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 219–21 (2d Cir.2001) (convenience store clerk with epilepsy did not pose a direct threat to herself or others). As someone who worked close to dangerous automatic machinery and, at times, out of the sight of other employees who might be able to assist in an emergency, Wurzel's job environment certainly falls in the potentially dangerous category. When one also considers the facts that Wurzel had once previously been found on the worksite doubled over and close to passing out, and that numerous times he had required the assistance of a fellow employee to get him to the EHC in a medical emergency, the factors concerning likelihood and imminence of harm are unmistakably met.

**\*16** For the above reasons, we conclude that no reasonable juror could find that Whirlpool's determination that Wurzel posed a direct threat to his own safety and that of **\*20** others in the plant was not based on a reasonable medical judgment, which relied on the most current medical knowledge and best available objective evidence and reflected an individualized assessment of Wurzel's abilities. Nor could a reasonable juror find that there was evidence of a reasonably based medical judgment supporting the view that Wurzel did not pose a direct threat.[20]

Wurzel v. Whirlpool Corp., 482 Fed.Appx. 1 (2012)
26 A.D. Cases 521, 45 NDLR P 40

*CONCLUSION*

The district court did not err in granting summary judgment, as the record establishes that Wurzel posed a direct threat. Because this Court may affirm on any ground supported by the record, on this basis alone, we **AFFIRM**.

**All Citations**

482 Fed.Appx. 1, 2012 WL 1449683, 26 A.D. Cases 521, 45 NDLR P 40

**Footnotes**

| | |
|---|---|
| * | The Honorable Mark A. Goldsmith, United States District Judge for the Eastern District of Michigan, sitting by designation. |
| 1 | Dr. Marshall described Wurzel's working environment as follows:<br><br>... Mr. Wurzel was a tow motor driver, and if his thought process or concentration were impaired for just one second there was a significant risk that he could seriously injure himself or others at the [Clyde] Division. This is because the tow motors operate in the same aisle on which pedestrians walk, with only yellow painted lines separating the pedestrian lanes from the tow motor lanes. Furthermore, some of the machines operating in the Division are near the aisles used by the tow motor operators, so there was a chance Mr. Wurzel could hit the machines as well, causing significant injury to himself.<br><br>Marshall Aff. ¶ 4. |
| 2 | As a result of the increased spasms Dr. Issa increased Wurzel's dosage of Procardia and added magnesium oxide. Issa notes of 6/11/08 (R. 37–2 at 33). Dr. Issa's records reflect that he understood that Wurzel had "an increase of angina symptoms," and that these symptoms were on a daily basis. Issa notes of 6/17/08 (R. 37–2 at 31). However, Wurzel did not inform Dr. Issa that he had experienced dizziness, fatigue, and lightheadedness in connection with spasms. Issa Dep. at 47, 67–68. |
| 3 | As Dr. Marshall put it, "[a]lthough Mr. Wurzel presented a note from Dr. Roush that he could return to work and drive a tow motor, the note again stated that Mr. Wurzel was not at any more risk for sudden incapacitation than any other patient being treated for angina. Again, this did not alleviate my concerns because it did not confirm Mr. Wurzel, as a person suffering from angina[,] was not at risk for sudden incapacitation." Marshall Aff. ¶ 7. |
| 4 | In addition a "Pre–Transport/Emergency Record" dated October 16, 2008, indicates that Wurzel visited the EHC after a spasm and was pale and uncomfortable. According to the document, emergency medical services were called and Wurzel was transported from the EHC to a hospital emergency room. EHC Record of 10/16/08 (R. 37–2 at 46). In his deposition, however, Wurzel stated that the report was incorrect and that his shift had not yet started by the time the report stated that he was in the EHC. |
| 5 | The nine-nitroglycerin-pills statement is the source of significant disagreement between the parties. The statement that the nurse wrote in the record is: "There are days I have taken 9 nitro." Dr. Marshall's affidavit states that he was informed that Wurzel had told the nurse "that he had taken nine Nitros with no relief," a significantly worse allegation (since it sounds as if Wurzel had both taken nine pills at one time and that doing so had not been effective), which seems to be mistakenly derived from the original statement. Marshall Aff. ¶ 10. Dr. Marshall also states in a later clinic note that Wurzel had taken nine nitroglycerin pills with no relief on February 6, 2009. There is no support in the record for this statement. In any case, Wurzel disputes even the original statement by the nurse. He contends that he has taken a maximum of four to five nitroglycerin pills per day, and certainly not nine at a time. Wurzel Dep. at 226, 229, 236 (R. 37). |
| 6 | Around this time, Wurzel also saw Dr. Stockton the cardiologist who had performed his catheterization some years prior. Although Dr. Stockton did not say anything explicitly about work restrictions, he wrote that "[at t]his point, I would continue to put no specific limitations on Mr. Wurzel from a cardiac standpoint." Stockton |

Wurzel v. Whirlpool Corp., 482 Fed.Appx. 1 (2012)

26 A.D. Cases 521, 45 NDLR P 40

letter of 2/25/09 (R. 43–1 at 3). Dr. Stockton's "History of Present Illness" section did not mention Wurzel suffering any spasms at work and there is no indication that Dr. Stockton was aware of them.

7    The district court concluded that Wurzel had abandoned all but his ADA claim; Wurzel did not challenge that holding on appeal.

8    In 2008, the ADA was modified by the Americans with Disabilities Act Amendment Act (ADAAA), Pub.L. No. 110–325, 122 Stat. 3553.

9    In addition, the court held that, even assuming Wurzel had established a *prima facie* case, Whirlpool was entitled to summary judgment because Wurzel had presented no evidence that Whirlpool's legitimate, nondiscriminatory reason for its actions was a pretext for discrimination. *Id.* at 19. Because we affirm on other grounds, we need not further address this holding.

10   For the first time at oral argument, Wurzel argued that he presented direct evidence of discrimination and that the district court need not have engaged in the *McDonnell Douglas* burden-shifting analysis. *See also* EEOC *Amicus* Br. at 18–19 (making the same argument). The Court need not make a determination on this point, however. Under either a circumstantial-evidence analysis (requiring application of the *McDonnell Douglas* burden-shifting framework) or a direct-evidence analysis (not requiring the burden-shifting framework), a plaintiff must show that he is otherwise qualified for the position. *See* 🚩 *Macy*, 484 F.3d at 363 (describing requirements where no burden-shifting analysis employed); 🚩 *id.* at 365 (describing requirements under burden-shifting analysis). Because this case turns on the issue of Wurzel's qualifications (specifically, whether Wurzel is a "direct threat"), the question whether Wurzel has raised a direct-evidence argument or a circumstantial-evidence argument is not outcome determinative.

11   Wurzel argues that, in addition to the tow-motor restriction, Dr. Marshall expressed concern about Wurzel's ability to work at the plant, and that together, these are evidence that Whirlpool regarded Wurzel as "disabled in a variety of jobs, not just as a Materials Handler."
     Whirlpool responds that Dr. Marshall's "general expression of concern" does not serve as evidence that the company regarded Wurzel as disabled in a variety of jobs, citing the facts that the only restriction placed on Wurzel during this time was the driving restriction, and that Whirlpool placed Wurzel in another position (in the paint department).

12   Wurzel and his *amici* (the EEOC and the National Employment Lawyers Association (NELA)) contend that the district court improperly incorporated a qualification/direct-threat analysis into the straightforward question of "regarded as" disability. They further argue that the district court's analysis of whether Wurzel was a direct threat was an evaluation of Whirlpool's defense to liability, an issue that is not a part of the preliminary question of whether Wurzel was disabled and an issue that is to be considered only after the resolution of the disability issue. EEOC *Amicus* Br. at 18; NELA *Amicus* Br. at 15. The *amici* contend that the phrase "action prohibited under this chapter," as employed by the statute, simply means *any adverse action* taken by the defendant, and not (as the district court concluded) an adverse action that also violates the ADAAA. *See* NELA *Amicus* Br. at 10–13; EEOC Rule 28(j) letter of 4/25/11.
     Whirlpool defends the district court's interpretation of the ADAAA, arguing that the adverse-action interpretation is counter to the plain meaning of the statute. *See* Appellee's Br. at 29 ("After all, an 'adverse action,' in and of itself, is not prohibited under the ADAAA."); *id.* at 31 ("if the employer acts because of a legitimate business reason, or because the employee poses a 'direct threat,' the conduct is not discriminatory or 'prohibited under the ADAAA' ").

13   As a plaintiff bringing a "regarded as" claim, Wurzel would not be entitled to the benefit of a reasonable accommodation. *See* 42 U.S.C. § 12201(h) (2009). Thus, the question of his qualification must be decided without regard to any potential accommodation. *See* 🚩 *Baker*, 414 Fed.Appx. at 774–76 (in evaluating whether "regarded as" plaintiff was otherwise qualified, plaintiff would not have been entitled to any reasonable accommodations). To the extent Wurzel's allegations should also be construed as an actual-disability claim (as Wurzel argued in his reply brief), we note that Wurzel has never sought any accommodation, making reasonable accommodation a non-issue in this case.

Wurzel v. Whirlpool Corp., 482 Fed.Appx. 1 (2012)

26 A.D. Cases 521, 45 NDLR P 40

14   There is some question as to which party maintains the burden of proof. The Sixth Circuit has not yet ruled on this issue, and the courts of appeals decisions addressing it are not uniform. *Compare* EEOC v. Wal–Mart Stores, Inc., 477 F.3d 561, 571–72 (8th Cir.2007) (employer must prove direct threat) *with* LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 835 (11th Cir.1998) (plaintiff must prove the absence of a direct threat). *See also* Borgialli v. Thunder Basin Coal Co., 235 F.3d 1284, 1291–94 (10th Cir.2000) (describing cases on both sides); Rizzo v. Children's World Learning Ctrs., 213 F.3d 209, 223 (5th Cir.2000) ( "[T]he ADA is not a paragon of legislative drafting. Particularly impenetrable is the statutory allocation of burden of proof regarding an employee's qualifications and the threat that disabled employees might pose to health and safety."); EEOC v. Amego, Inc., 110 F.3d 135, 144 (1st Cir.1997) (Plaintiff's "qualification" requirement means that he has the burden to show that he can perform the essential functions of the job and not be a direct threat to others; but where "the issue of direct threat is not tied to the issue of essential job functions but is purely a matter of defense, on which the defendant would bear the burden."). However, we need not resolve the issue of whether the burden is Wurzel's as part of his obligation to show that he is a "qualified" individual with a disability (by showing that he is not a direct threat to safety in the workplace), or whether the burden is Whirlpool's as part of an asserted affirmative defense (that the plaintiff was a direct threat to safety). Regardless of which party possesses the burden of proof on this point, as explained below, the district court's conclusion that Wurzel presented a direct threat is correct as a matter of law.

15   Around this time, Wurzel also saw Dr. Roush, a substitute for Dr. Issa, who issued Wurzel the same back-to-work note (verbatim) that Dr. Issa had issued several months before. The record does not establish what Dr. Roush knew about Wurzel's condition in October 2008, but there is no reason to believe that Wurzel was any more forthcoming with Dr. Roush in October 2008 than he was with his regular doctor that same month.

16   This point illustrates the mistake of another Wurzel argument—Dr. Issa did *not* testify that it was unlikely that *Wurzel* would be incapacitated (dizzy, lightheaded, or fatigued) without warning. Rather, Dr. Issa testified that it was unlikely for an individual with Prinzmetal angina to experience lightheadedness, dizziness, or fatigue. Issa Dep. at 11, 100. The fact that Wurzel *did* experience those (atypical) symptoms was something that Dr. Marshall knew and Dr. Issa did not, demonstrating Dr. Marshall's better contemporaneous understanding of Wurzel's condition.

17   In addition, Dr. Issa was unfamiliar with the environment at the plant, unaware what machines Wurzel used when he operated a tow motor, and unaware what his job duties were when he had his paint department job. Issa Dep. at 57–59. Dr. Issa stated at deposition that this information did not matter to him because he did not feel that Wurzel needed any restrictions. *Id.* at 59–60, 96–97.

18   Notably, even Wurzel's physicians who, at some point, concluded that he could return to work do not offer testimony that, after being made aware of all of the evidence, they felt he could have returned to work.

19   Whirlpool effectively refuted Wurzel's other arguments that Dr. Biswas (i) was unfamiliar with the Whirlpool plant, (ii) did not have Wurzel's medical records before he met with him, and (iii) made his determinations after conducting only one interview with Wurzel and reviewing his paperwork. Whirlpool's various responses —all amply supported by the record—demonstrate that (i) all the physicians except for Dr. Marshall were unfamiliar with the Whirlpool plant, (ii) it is common practice to perform an IME without reviewing the medical records beforehand, and (iii) criticizing Dr. Biswas's IME procedures is of little importance in light of the fact that Wurzel does not take issue with the results of the IME.

As for the final argument—that Dr. Biswas testified that, had he done an in-person interview with Wurzel, his determination may have been "affected"—this claim is unpersuasive. In the relevant exchange, Dr. Biswas confirmed that he had interviewed Wurzel in person only once and did not re-interview him. In response to counsel's question whether, if he had in fact interviewed Wurzel a second time, "could [it] have affected your recommendation," Dr. Biswas responded "It may." Biswas Dep. at 62. This response by Dr. Biswas was the only practical response to a general question about whether doing something different *could have* yielded something different. But this allowance means nothing without the fact (or even allegation) that Wurzel would

have presented contradictory or new information in a second interview. This innocuous testimony by Dr. Biswas stands in sharp contrast to the testimony of Dr. Issa that had he known that Wurzel was experiencing dizziness, lightheadedness, and fatigue, his opinion *would have* been different. *See* Issa Dep. at 67–68. Dr. Issa's admission that his opinion would change was significant because the record evidence establishes that, in fact, Wurzel *was* experiencing dizziness, lightheadedness, and fatigue, exposing the fact that Dr. Issa's conclusion was based upon incomplete or mistaken information. Dr. Biswas's testimony shows no such thing.

**20**
To the extent Wurzel's citation to two cases that are not binding precedent for this court— *Justice v. Crown Cork & Seal Co.,* 527 F.3d 1080 (10th Cir.2008) and *EEOC v. Burlington Northern & Santa Fe Railway Co.,* 621 F.Supp.2d 587 (W.D.Tenn.2009)—is meant to bolster his direct-threat argument, these cases are readily distinguishable. The *Burlington* court determined that the defendant was not entitled to summary judgment where the company determined he could not return to work without examining the plaintiff or even consulting with any physicians who had. *See* 621 F.Supp.2d at 602. In contrast, here Dr. Marshall had frequent and regular contact with Wurzel and Dr. Biswas examined Wurzel. In *Justice,* the Tenth Circuit concluded that the question of direct threat could not be resolved at the summary judgment stage where there existed serious questions about the objectivity of the single medical professional, a physical therapist, who concluded that the plaintiff could not return to work. 527 F.3d at 1091–92. In particular, the physical therapist's only information about the nature of the plaintiff's job duties and workplace came from a tour that may not have been an accurate depiction. *Id.* at 1084, 1090. In contrast, here, both Dr. Marshall and Dr. Biswas reached the same conclusion regarding Wurzel's abilites; nor is there any evidence that either physician received tainted information about Wurzel's workplace or duties.

---

**End of Document**